# EXHIBIT "01"

## Affidavit of ██████████

Now comes the affiant and under oath does hereby aver and say:

1. My name is ██████████, and I am a professor of education, having worked for much of my entire career at the University of Massachusetts located in Amherst, MA.

2. I first met ██████████ in May 2015, and we have been acquaintances ever since that time.

3. After first meeting ██████████, I came to learn that she was involved in a complaint brought by her against the Department of Microbiology at the University of Massachusetts, alleging employment discrimination.

4. I offered ██████████ a position as a research scholar at the University's College of Education based upon her profile and an expected grant.

5. In order to provide ██████████ with a reliable location for receiving correspondence, I permitted her to utilize my University address.

6. My recollection is that ██████████ began to use this address in the summer of 2016; the address used was W156 Furcolo Hall, College of Education, UMass-Amherst, MA 01003.

7. ██████████ continues to use this address to the present day, and consistently receives correspondence without problem. I am aware that her correspondence there is substantial.

8. On January 22, 2019, I received an opened letter in my office with a return address of the Equal Employment Opportunity Commission, located in Boston, MA. This letter was addressed to ██████████.

9. In addition to noting that the letter was opened, I also observed that the Pitney Bowes generated stamp on this letter was dated October 2, 2018 even though it did not arrive at my office until January 22, 2019, 110 days after it had been mailed.

10. I left the letter on my desk, knowing full well that ██████████ would come to my office that day, as she did every day, in order to pick up her mail.

11. The day after I first saw this letter, I received a phone call from ██████████ in which she requested a meeting to discuss the letter she had received from EEOC. We met a few hours later, and for the first time ██████████ revealed the contents of this letter to me, expressing profound confusion as to how the date stamped on the letter was October 2, 2018, 110 days before she received it, and its envelope was opened.

12. ███████, at this meeting, expressed significant anxiety arising from the apparent legal requirement that any notice of suit had to be made by her to the courts within 90 days of receipt of this EEOC letter, and I agreed she appeared not to have received the requisite correspondence until more than 110 days had passed.

13. ███████ also pointed out that her address in this correspondence was grossly inaccurate, that the Notice of Suit letters were directed to her, but at the wrong address. She was flabbergasted that it had, in fact, been mailed to her opponent. I came to understand that the address in the EEOC correspondence, "639 Morrill IV North," is the address for the Microbiology Department, the focus of her complaint!

14. The discrepancy between the date of the EEOC letter and the date of its arrival perplexed me because this correspondence was not only addressed to the opposing party, but the envelope itself was already opened when I first received it (suggesting possibly that someone else may have read the contents), and there was a delay of 110 days before it reached my desk, which effectively appears to deny ███████ her right to sue.

Sworn under the pains and penalties of perjury,
this ___30___ day of January, 2019.



# EXHIBIT "02"

EEOC Form 161 (11/16)

### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | From: | Boston Area Office |
|---|---|---|
| ▉▉▉▉▉▉▉▉▉▉<br>635 North Pleasant Street<br>422F Morrill IV North<br>Amherst, MA 01003-9298 | | John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |

| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|
| **EEOC Charge No.** | **EEOC Representative**<br>**Amon L. Kinsey, Jr.,**<br>**Supervisory Investigator** | **Telephone No.**<br><br>**(617) 565-3189** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Feng An, Kenneth*

**OCT 0 2 2018**

| Enclosures(s) | **Feng K. An,**<br>**Area Office Director** | *(Date Mailed)* |
|---|---|---|

cc:

**MASS-C UNIVERSITY OF MASSACHUSETTS -**
**Amherst**
**333 South Street, Suite 400**
**Amherst, MA 01003**

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | ██████████████████ | From: | Boston Area Office |
|---|---|---|---|
| | 639 North Pleasant Street | | John F. Kennedy Fed Bldg |
| | 422F Morrill IV North | | Government Ctr, Room 475 |
| | Amherst, MA 01003-9298 | | Boston, MA 02203 |

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| EEOC Charge No. | EEOC Representative | | Telephone No. |
| ████████████ | Amon L. Kinsey, Jr., Supervisory Investigator | | (617) 565-3189 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☒ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Feng An, Kenneth*
_____

**Feng K. An,
Area Office Director**

OCT 0 2 2018
_____
(Date Mailed)

Enclosures(s)

cc:

**MASS-C UNIVERSITY OF MASSACHUSETTS-**
**Amherst**
**Legal Department**
**333 South Street - Suite 400**
**Shrewsbury, MA 01545**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than** 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – *not* 12/1/10 – in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please **make your review request** within 6 months **of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

> * **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
> * In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
> * **Only one major life activity need be substantially limited.**
> * With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
> * An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**
> * An impairment **may be substantially limiting even though it lasts or is expected to last fewer than six months.**

**"Regarded as" coverage:**
> * An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
> * **"Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.**
> * The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
> * A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# FACTS ABOUT FILING AN EMPLOYMENT DISCRIMINATION SUIT IN FEDERAL COURT IN THE STATE OF MASSACHUSETTS

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. A lawsuit can be filed at the following U.S. District Court locations in Massachusetts:

- The United States District Courts for the District of Massachusetts are located at:

    o The John Joseph Moakley U.S. Courthouse, 1 Courthouse Way, Suite 2300, Boston, MA 02210 or by contacting the Clerk of Court Office at (617) 748-9152

    o Donahue Federal Building & Courthouse, 595 Main Street, Room 502, Worcester, MA 01608 or by contacting the Clerk of Court Office at (508) 929-9000

    o Federal Building & Courthouse, 1550 Main Street, Springfield, MA 01103 or by contacting the Clerk of Court Office at (413) 785-0214

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within 90 days of the date you receive the enclosed final action. Once this 90 day period is over, unless you have filed suit, you will have lost your right to sue.

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit. You may file a complaint in federal court without a lawyer which is called a *pro se* complaint. Every district court has either a clerk or staff attorney who can assist you in filing *pro se*. To find out how to file a *pro se* complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may vary from district to district.

You may, however, wish to retain a lawyer in order to adequately protect your legal rights. Whether you retain a private attorney, or file *pro se*, you must file your suit in the appropriate court within 90 days of receiving this mailing.

## WHAT IF I WANT A LAWYER BUT CAN'T AFFORD ONE?

If you can't afford a lawyer the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer. You should consult with the office of the district court that assists *pro se* complainants for specific instructions on how to seek counsel.

Generally, the U.S. District Court charges a $350.00 filing fee to commence a lawsuit. However the court may waive the filing fee if you cannot afford to pay it. You should ask the office of the District Court that assists *pro se* complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may be of assistance to you in finding a lawyer to assist you in ascertaining and asserting your legal rights:

American Bar Association

The Massachusetts State Bar Association (617) 338-0500

National Employment Lawyers Association Referral Service (212) 819-9450

(312) 988-5522

Your County, City or Municipal Lawyers or Bar Association may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge to be destroyed after 2 years from the date of a no cause determination or six months after other types of final actions. If you file a suit, and wish us to retain your file for more than the normal retention period, you or your attorney should forward a copy of your court complaint to this office within 10 days after you file suit. IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD ALSO NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: ▉▉▉▉▉▉ | From: **Boston Area Office** |
|---|---|
| **639 North Pleasant Street**<br>**422 Morrill IV North**<br>**Amherst, MA 01003-9298** | **John F. Kennedy Fed Bldg**<br>**Government Ctr, Room 475**<br>**Boston, MA 02203** |

| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| ▉▉▉▉▉▉ | **Amon L. Kinsey, Jr.,**<br>**Supervisory Investigator** | **(617) 565-3189** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☒  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Feng An, Kenneth*

**OCT 0 2 2018**

| Enclosures(s) | **Feng K. An,**<br>**Area Office Director** | *(Date Mailed)* |
|---|---|---|

cc:

**MASS-C UMASS**
**Attn:  Kelly Pleasant, Benefits Supervisor**
**325 Administration Building**
**181 President's Drive**
**Amherst, MA 01003**

# EXHIBIT "03"

**Affidavit of** ▮▮▮▮▮▮▮▮ **(filed at the MCAD on July 31, 2017)**

I, ▮▮▮▮▮▮▮▮ , do hereby swear and state under oath that:

1. I am a female.

2. I am a dark-skinned French National. French is my native language. English is my fourth language.

3. I graduated with a Ph.D. in the Biomedical/Life Sciences from the University of Paris.

4. On April 21, 2011, while I was a postdoctoral research associate ("postdoc") at Yale University, I contacted a professor of UMass-Amherst Microbiology Department, Prof. Derek Lovley. The purpose was to propose an original research project dealing with microbial electrosynthesis studies (Ex. "1").

5. On July 15, 2011, I formally applied to Prof. Lovley's research group to obtain a postdoc position (Ex. "2"). In my application, I provided my research statements (Ex. "3") and a detailed version of the project ("Research Proposal #1"), which I had shared on April 21, 2011 (Ex. "4"). Two days later, Prof. Lovley answered that he would not be able to offer me a position (Ex. "2").

6. On July 19, 2011, I submitted a similar application to Prof. Kelly Nevin (Ex. "5"). She is also a professor of UMass-Amherst Microbiology Department from which she graduated under the supervision of Prof. Lovley. However, at that time I did not know that she was still a member of the Lovley group and that she was Prof. Lovley's girlfriend. That same day, she told me to contact Prof. Lovley who does all the hiring for the group (Ex. "5").

7. On March 4, 2013, I learned that Prof. Lovley and Prof. Nevin published a review in the scientific journal Current Opinion in Biotechnology. The content of this review is summarized via a figure (Ex. "6"), which was published on the websites of both the journal and the Lovley group. The figure published in both places is almost identical to the figure accompanying the Research Proposal #1 (Ex. "4") that I shared with both Prof. Lovley and Prof. Nevin in July 2011. To date this figure is still visible on the home page of the Lovley group website (Ex. "7").

8. On April 26, 2013, I met with Prof. Lovley during a conference at Yale University. At this meeting, I reapplied to his group by sharing ideas for a new project ("Research Proposal #2") in relation to the pili research (Ex. "8"). He said his group had not performed these kinds of experiments yet and expressed a willingness to find out whether he could fund this project (Ex. "8").

9. On January 29, 2014, I signed a contract for a year with Prof. Lovley, whereby I would be paid $38,500 to participate in the pili research under his mentorship in his lab in the Microbiology Department of UMass-Amherst and the start date would be Sunday, February 2, 2014 (Ex. "9"). At that time, I also became a member of the postdocs' union (Ex. "9" and Ex. "10").

1

10.   On January 29, 2014, I met the manager of the Lovley lab, Joy Ward. She put emphasis on informing me that she is also a technician and holds a Master's degree.

11.   On February 3, 2014, I began working as a postdoc in the Lovley group. Prof. Lovley assigned me two projects ("Project #1" and "Project #2") that were not related to the two research proposals, which I had shared with him (Research Proposal #1 in 2011 and Research Proposal #2 in 2013). These projects involved areas of expertise new to me. Moreover, for these projects, he gave me no descriptions, no deadlines, no recommendations, no references and no help. And, he did not explain how my ideas and/or results would be credited. Although he was my "mentor" for these projects, he did not offer me the possibility to write in a joint effort between the two of us an Individual Development Plan ("IDP"). I later found out this was required, pursuant to the postdocs' union contract (See Article 15 "IDP and Progress assessments" in Ex. "10"). The requirement was not only to describe the projects he was assigning me but also to follow and assess my progress; as well, to document my short- and long-term career goals and our mutual expectations in terms of: a) publications/grant-applications writings to which I would contribute and for which I would be credited, b) conferences where I would participate, and c) trainings that I would attend.

12.   On February 3, 2014, Ms. Ward told me that Prof. Lovley had decided that I would share the office where another postdoc, Dr. Nikhil Malvankar, had been allocated space in the Microbiology Department. This was his second office since his primary office was in the Physics Department. He used this office essentially for storage of personal items and he would come by the Microbiology Department about once per week because his role there was mainly collaborative. On my first day I met him and he demanded that I keep the door of the office closed at all times. He made this demand as if it were a rule in the group. I found out later on May 30, 2014 that there was no such rule in the group work policies (Ex. "11"). Moreover, Ms. Ward whose office was full of materials and equipment would always leave her office door open, even when her office was unoccupied.

13.   On February 21, 2014, I spoke about one of my two projects, Project #2, for a few minutes with Prof. Lovley who I had not seen in the lab since February 6, 2014. I again asked him questions pursuant to an email I had sent him earlier that same day about Project #2 (Ex. "12"). I then proposed an idea to address this project.

14.   On February 25, 2014, I asked Ms. Ward for two new frozen stock samples because the ones that she had given me earlier were contaminated. She raised her voice and with hostility said that I could still use the contaminated samples. I answered calmly that I would make a request for these new samples to my mentor and I walked toward the office where I had been allocated space with the intention of sending an email to Prof. Lovley. Ms. Ward followed me, and, infuriated, shouted at me that I did "not have to ask anything to Derek!" Finally, she said that she would ask Trevor Woodard, the technician in Prof. Nevin's lab, for new samples.

15.   I was never authorized to access the Lovley group frozen stocks collection whereas the other postdocs and the graduate students had this permission.

16.     On February 25, 2014, I emailed Dr. Jo Philips, a non-immigrant postdoc from Belgium, about the frozen stocks issue and Ms. Ward's conduct (Ex. "13"). Dr. Philips could not understand the reason for her belligerent behavior. She said: "You have more experience than Joy Ward even if you have not been trained in this field." Dr. Philips informed me that prior to my arrival Ms. Ward was doing only administrative work and she advised me to prepare myself a personal back up of frozen stocks once I got the new samples.

17.     Given the set-up of the Lovley lab, I had to make 15-20 trips per day back and forth from the lab to the office space assigned to me. On Friday, February 28, 2014, while in this office space, I left the door slightly open to quickly collect information from my electronic lab notebook for my experiment. Unexpectedly, I was verbally assaulted by Dr. Malvankar who got enraged because the door of the office we shared was ajar while I was alone inside. That same day I asked Prof. Lovley whether I could change offices. He replied that Ms. Ward would find me a new office space.

18.     On March 3, 2014, Ms. Ward informed me that finally Prof. Lovley had reneged on his authorization to relocate me to another office until he could figure out my projects. It was my understanding when I was hired that I would be working on the projects related to the research proposals I had shared in 2011 and 2013. However, after a month in the position, I was the only postdoc who did not have defined projects.

19.     While in the office I shared with Dr. Malvankar, there was a vent blowing cold air directly onto my workstation. I needed to have the opinion of a union representative before asking for accommodation concerning this issue.

20.     On March 6, 2014, I inquired about taking sick leave. I went to the Microbiology Department business office and I was directed to Human Resources where I was told to talk to Susan Chinman, who I later discovered was an Assistant Dean of the Graduate School. Even though I had not made an appointment, she offered to listen to me straight away. Back then, Ms. Chinman made me believe she was my union representative, so I divulged confidences to her. She told me to speak with Ms. Ward, which I did on the same day (Ex. "14").

21.     On Sunday, March 9, 2014, I spoke with an Adjunct Professor in the lab, Dr. Dawn Holmes. I confided in her that I was feeling pressure to accomplish in record time the projects that I had been tasked with. She told me not to worry because I had just arrived. Indeed, on March 9, 2014, I had been at the lab for only thirty-four (34) days and the lab manager was already questioning my knowledge and capabilities. Dr. Holmes saw that my hands were severely chapped (they exhibited itching, bleeding cracks) and advised me to see a physician as fast as possible because she believed I had frostbite. She said: "Your hands are more important than any of this." By "this" she referred to my research work. Then, she asked me: "Is Nikhil helping you?" I answered "No," and recounted the recent incident about the door of the office we shared. She answered that before me Dr. Philips was supposed to work with Dr. Malvankar and when she shared office space with him, he was also mean to her. She added: "Nikhil should have an office for himself. He is simply mean." After that she asked: "Is Derek still kind to you?" Because Derek can be very..." She did not finish her sentence.

3

22.   I met with Prof. Lovley on March 10, 2014. I had spoken with him only briefly and solely twice since my arrival (February 3, 2014 and February 21, 2014). He announced that finally he would not have me work on Project #2. This was the project for which I had already suggested an idea on February 21, 2014. He told me he would reassign it "to a technician" (without giving a name). He told me to continue to work only on Project #1 while he considered new projects for me. He gave me the impression of being disappointed in me, which was extremely unusual since I had been working in the lab for only thirty-five (35) days. He did not answer when I asked him, for a second time, whether I could change offices given my fear of Dr. Malvankar.

23.   On March 17, 2014, Prof. Lovley paired me with Dr. Toshiyuki Ueki, a former postdoc in his group that he had just promoted to an Assistant Professor position. He asked Dr. Ueki to allocate space for me in his personal office. Dr. Ueki refused, saying that his office was too small and designed for only one person. Finally, Prof. Lovley assigned me an office that was unoccupied and could accommodate several researchers simultaneously. Consequently, I was finally placed in a situation similar to that of Dr. Jo Philips and Dr. Li-Ying Wang (the only two other female postdocs from Belgium and China respectively in the Lovley lab).

24.   On March 17, 2014, Prof. Lovley justified having paired me with Dr. Ueki, saying: "[He] needs a collaborator." However, Dr. Ueki *immediately* began treating me as if I had been assigned to work *under* him whereas according to my job description I was supposed to work independently (Ex. "9"). He would belittle me and attempt to prevent me from expressing a scientific opinion by frowning, making faces, or speaking over me. Additionally, he tried to limit my access first to research hours and then to office space. He criticized me, even when my experiments were working, and he kept repeating I was "too slow." When I asked him about this treatment, he answered: "Derek wants that." I believe I was being oppressed in an effort to make me quit. When Prof. Lovley paired me with Dr. Ueki I had been at the lab for only forty-two (42) days.

25.   On March 18, 2014, Prof. Lovley came to look for me in the office, where I was at the computer typing my lab notes. He shouted at me: "What are you doing in the office?! You should be in the lab working with Dr. Ueki!!" I got terribly frightened but, with composure, answered that Dr. Ueki had not contacted me yet to explain to me what we would be working on. And, Dr. Ueki had not told me I was supposed to be in the lab with him.

26.   At that same time, Ms. Ward began telling me: "If you're unhappy, you can leave and Derek will give you a recommendation letter. You're not trapped in here." She conveyed this to me on several occasions for three consecutive weeks. Given the degree of hostility to date, I felt I was never welcomed into the Lovley group and was being harassed out, after only forty-three (43) days.

27.   On March 19, 2014, just my forty-fifth (45) day on the job, I learned serendipitously that Prof. Lovley had given Project #2 to Ms. Ward, who had less credentials and qualifications than I. Ms. Ward was trying to address this project using the idea I had given only to Prof. Lovley on February 21, 2014. Ms. Ward is from the United States and is a White female.

4

While Prof. Lovley was trying to remove me from his employ, he was using my ideas and my creativity for his own benefit.

28. A few days later, I spoke with Dr. Holmes about a problem I had with a strain culture. She told me that I should not trust Mr. Woodard's frozen stock samples because "they are contaminated." This confirmed what I had already noticed on February 25, 2014. A graduate student in the lab, Sean Murphy, was also present when she made this statement.

29. By March 28, 2014, I inquired of Ms. Chinman whether I could be fired (Ex. 15). I believe I was being set up for failure because: a) I was not given any defined duties; b) my duties were changed without discussion; c) people were given access to my ideas; d) individuals in the lab were rude and discourteous toward me; e) I was told repeatedly I could leave if I were unhappy; f) Prof. Lovley rarely made time for me and treated me unfavorably compared to his lab assistants and technicians; g) Prof. Lovley failed to timely offer a proper office; and h) I was not given projects to work on, even ones that I had initially proposed. All of this had occurred in a span of fifty-three (53) days, which was not sufficient time for me to be adjudged incompetent. I also asked information regarding sick leave. When I told Ms. Chinman that I had already booked a flight for my sick leave, she said: "I can't help you anymore." At which point, I learned, to my dismay, that she was not my union representative.

30. On March 28, 2014, I contacted the advisor for International Scholars (i.e. Faculty and Researchers) at the International Programs Office ("IPO"), Nancy Condon, to request help finding my union representative. Ms. Condon redirected me to Ms. Chinman (Ex. "16").

31. On April 3, 2014, I finally managed to speak for the first time with my union representative, Ryan Quinn, who reported in his notes that I had expressed a potential workplace grievance (Ex. "17"). He also gave me my first copy of the postdocs' union contract (Ex. "10").

32. On Sunday, April 6, 2014, I spoke with Dr. Holmes about the problems I was having with Dr. Ueki. She told me it was a "culture problem." She added: "His wife has a Ph.D. but she was obliged to abandon her career; she does everything for him. Give him a carrot." I took this to mean that Dr. Ueki was from a culture where women should be serving men and that I should accept to be treated this way. Then, Dr. Holmes told me: "If you feel Derek doesn't like you that might change if you bring him data. Derek is data-driven." As a result, I felt great pressure to complete my experiments and I felt I needed to bring data to Prof. Lovley in order to be able to take my sick leave and continue at the lab. At that time, I had been at the job for sixty-two (62) days.

33. While in Dr. Holmes' office, I noticed that her graduate student, Jessica Smith, had like me an air-vent above her desk but a modification had been performed to redirect the cold air. Ms. Smith is a U.S citizen and a White female. A similar accommodation was not made for me.

34. On Tuesday, April 8, 2014, I spoke with Dr. Ueki about an experiment whose results were negative. I proposed changing part of the experiment. He got upset and I walked away to avoid an argument. He followed me while calling after me in the corridor. I retreated into the office I had been assigned and closed the door to avoid him but he opened the door with his

5

key. He immediately began to shout: "Do you mean you do not want to follow my plan? Do you mean you do not want to follow my way? Because this is not what you said to Derek on Friday!!"

35.  In the latter regard, I found out on June 28, 2016 that the Lovley lab published, in the journal Frontiers in Microbiology, an article (Ex. "18") heralding that they brought to fruition the project on which I was working with Dr. Ueki during March-April 2014. The researcher to whom this project was reassigned on April 28, 2014, Dr. Yang Tan, is credited as being the primary author on the June 28, 2016 article. To address this project, Dr. Tan used the exact method that I was attempting to utilize before Prof. Lovley paired me on March 17, 2014 with Dr. Ueki to implement the method suggested by Dr. Ueki on March 18, 2014. Therefore, this article supports the preliminary negative results, which I shared with Dr. Ueki on April 8, 2014 and which demonstrated that the method Dr. Ueki had ordered me to use on March 18, 2014 was inappropriate.

36.  The next day, on Wednesday, April 9, 2014, Ms. Ward told me that I had two options. I could voluntarily resign or get transferred to another project under Prof. Lovley's supervision. At that time, I had been at the lab for only sixty-five (65) days and I was being asked to resign. Ms. Ward started to say that Dr. Ueki was my supervisor, which was not true. Half an hour later I was called to Prof. Lovley's office and he recommended that I do not choose another project with him. After a little over two months, it was clear he was trying to get me to leave the program. I answered that I had no problem with working on another project with him as my supervisor. Unhappy with this response, he announced that he was placing me *immediately* on administrative leave. And he asked me to give my answer the following Monday (i.e., I was given four days to make a decision). This was done against my consent and I never received a formal, written notification that I had been placed on instant, forced administrative leave. He never gave me the reasons for this forced administrative leave and its duration. Moreover, there is no provision for administrative leave in the postdocs' union contract (Ex. "10"). Then, Ms. Ward confiscated my research samples and work products so that I could not continue my experiments in the lab. This was another direct violation of the postdocs' union contract (See Article 17 "Research Conduct" in Ex. "10").

37.  On Friday, April 11, 2014, Mr. Quinn told me that the Assistant Dean of the Graduate School, Ms. Chinman, who is the person who earlier had made me believe that she was my union representative, had conveyed to him that my pay would not be suspended during the forced administrative leave but there was no second option anymore. I was told I could only resign voluntarily immediately, otherwise I would be fired.

38.  On April 15, 2014, I met with the director of the Student Legal Services Office ("SLSO"), Atty. Charles DiMare, who offered his counsel by courtesy since, as a postdoc, I was not eligible to receive assistance from his office. He suggested that I consult with an attorney. Then, he contacted Atty. Marissa Elkins on my behalf to schedule a consultation and negotiated a reduced fee agreement for me (Ex. "19"). Finally, he advised me to ask for "severance." At that time, I did not even know this English word. He also offered to train the

union representative Mr. Quinn for better representation services but Mr. Quinn, who had been trying to convince me to resign since April 11, 2014, refused his help.

39. On April 17, 2014, Mr. Quinn told me that Ms. Chinman had relayed to him that "their intention is to fire you effective on Sunday [April 20, 2014] if you don't accept their last offer [...]" (Ex. "19"). This was made in violation of my contract. About three weeks later when I asked Mr. Quinn to file on my behalf my first grievance with the union, Mr. Quinn confided in me that on April 17, 2014, Ms. Chinman had asked him to try to convince me to accept their last offer by telling me that "this way [I] could take [my] sick leave."

40. On Saturday, April 19, 2014, I consulted with Atty. Elkins who told me to negotiate severance and she said that this was something that my union representative could do instead of me hiring her to do it.

41. On April 22, 2014, I spoke with Prof. Lovley about returning to the lab. He told me "there is no coming back, this has gone too far, the union is involved." Then, he added while smiling: "Me, I do not have a union." This was a direct violation of M.G.L. c. 150E as it demonstrates clear anti-union animus. At that time, I asked for severance and I clearly explained that this would be to allow my transfer in another lab where I would try to implement the Research Proposal #2 that I had shared with Prof. Lovley on April 26, 2013. According to the regulations of my program as an exchange 'Research Scholar,' I needed to have personal funding to support myself for about six months in order to be authorized to continue my research program in another lab (Ex. "20").

42. On April 24, 2014, I met with the chair of the Microbiology Department, Prof. John Lopes, to ask for help to change labs. He advised me to apply to two Faculty in his Department who could potentially have both an interest in my profile and an opening. Prof. Klaus Nusslein was one of these two Faculty. Then, my union representative, Mr. Quinn, tried to convince me to set up a meeting on April 25, 2014 at 3 pm to sign an agreement separating my relationship with Prof. Lovley's lab without even giving me a copy of the agreement beforehand or advising me of the terms of the agreement (Ex. "21"). At my suggestion, Mr. Quinn asked Ms. Chinman for a written copy of this agreement (Ex. "21").

43. On April 25, 2014, I found an email forwarded to me at 6:55 pm on April 24, 2014 (Ex. "22"). I did not find this email earlier because I left the UMass-Amherst campus after Mr. Quinn told me on April 24, 2014 at 5:05 pm that Ms. Chinman would finish the agreement during the morning of April 25, 2014 (Ex. "21"). Upon receipt of the settlement agreement, I was asked to sign that same day (Ex. "21"). I requested time to think about the terms and I was given only the weekend to consider the agreement.

44. The following Monday i.e. on April 28, 2014, I went to the Equal Opportunity and Diversity ("EO&D") Office (Ex. "23") and the Ombuds Office (Ex. "24") where I asked for help both to change labs and to preserve my Research Proposal #2 that Prof. Lovley wanted to take as his own. In the afternoon, I asked Mr. Quinn to relay to Ms. Chinman that I needed additional time regarding the severance agreement (Ex. "25").

45.   On April 29, 2014, in the morning, the Ombuds, Catharine Porter, emailed me that she had spoken with Prof. Lopes and that he had noted the same Faculty names that he had already given to me five days earlier (Ex. "26"). After that I went to see Prof. Lopes again and I asked him where I could find Prof. Nusslein's office. I then went directly to speak with Prof. Nusslein in an attempt to obtain another research position. When asked why I was looking for another research position, I informed Prof. Nusslein of the problems I was experiencing with Dr. Ueki. Prof. Nusslein asked me if it was "because Dr. Ueki is not used to working with women?" Then, I explained that I believed Prof. Lovley had hired me only to seize the Research Proposal #2 that I had shared with him on April 26, 2013. And, I told him that Prof. Lovley had already plagiarized a figure that I had conceived to illustrate the Research Proposal #1 that I had shared with him on July 15, 2011 (Ex. "4" and Ex. "6'). After that, Prof. Nusslein stated that Prof. Lovley was renowned for doing that and added: "Maybe you did not know?"

46.   A few hours after I met with Prof. Nusslein, Mr. Quinn informed me in the afternoon of April 29, 2014 at 2:38 pm that Ms. Chinman had told him that Prof. Lovley had withdrawn the settlement agreement, which had initially been a one-day offer that we had gotten a few extensions on, that my pay would be retroactively suspended for one month and that I would begin in another lab rather than returning to Prof. Lovley's lab (Ex. "27"). These actions were taken in retaliation for making a complaint to the EO&D Office (Ex. "23") and the Ombuds Office (Ex. "24") as well as for having consulted with the director of the SLSO (Ex. "19") and with a private lawyer (Ex. "19"). I felt I was now threatened to be suspended without pay if I did not resign voluntarily. I had already been threatened with being fired if I did not resign voluntarily (Ex. "19"). I believe these threats were being made against me in retaliation for reporting the conduct internally. About two hours later at 4:34 pm I received an email from a grievance officer of the EO&D Office, Kelly Burgess (Ex. "28").

47.   On April 30, 2014, I received from Prof. Lovley a letter informing me that my pay had been suspended retroactively for 30 days starting on Sunday, April 27, 2014 (Ex. "29"). I am not aware of anyone ever receiving a retroactive suspension. The reasons presented in the letter are all misrepresentations defaming my character and maligning my reputation.

48.   On May 13, 2014, I requested assistance to Ms. Porter for an informal resolution so that I could save my job opportunity with Prof. Nusslein who, before the suspension of my pay, had shown interest in hiring me. Since I had contacted Prof. Nusslein before I received notification of the suspension of my pay, I believe I should have been allowed to change labs. On May 13, 2014, Ms. Porter answered for Prof. Nusslein stating: "You must go through the grievance procedure in the postdoc contract. This would mean that you may not attempt an informal resolution." (Ex. "30"). As my pay was suspended, she added that Ms. Chinman wanted her to check with me whether I would be "willing to sign the Settlement and Release agreement if the disciplinary letter [was] rescinded." (Ex. "30"). It is my understanding that such actions are retaliatory and violate M.G.L. c. 151B section 4. Moreover, it was my impression that Ms. Chinman, the EO&D Office and the Ombuds Office were working together to deny me my rights.

49. On May 27, 2014, I met with Ms. Porter and others at a mediation meeting that I had asked Ms. Porter to organize. I asked for union representation at the meeting as I am a foreigner and needed assistance with language issues. Ms. Porter denied my request for union representation in violation of M.G.L. c. 151E section 4. At this meeting, I requested that the April 30, 2014 letter be withdrawn as I had not received any progressive discipline and/or warnings and since I could prove with multiple exhibits that this letter was misleading factually. I was forced to defend myself in a foreign tongue and without the benefit of the union representation. At that time, I observed that I had been replaced by a new postdoc from China who had just graduated, Dr. Yang Tan, and who had been hired on Sunday April 27, 2014, the same day that my pay was retroactively suspended for 30 days. Dr. Tan is a man and is not dark-skinned and had less experience than I. During this meeting, Prof. Lovley vehemently tried to force me to resign voluntarily (he desperately kept offering his settlement and the withdrawal of his suspension letter if I resigned). Since I firmly resisted all his attempts to coerce me into resigning, he finally, very angry, said that I would have to help the lab manager, Ms. Ward, with whom he was pairing me. This was a violation of the employment contract I had signed. He then asked me to email to Ms. Ward who told me she was his representative at the meeting (Ex. "31").

50. At this same mediation meeting, Prof. Lovley also committed to authorizing me to write an IDP and that I would be an author on the publication(s) relative to the project for which I was going to help the lab manager. After the mediation, I asked Ms. Porter for a summary in writing of the commitments made by Prof. Lovley. Ms. Porter refused to provide me with such a document or provide documentation of the promises made at the meeting. By denying me union representation, the agreement was never formalized which I later discovered was my employer's intent all along. It was a concerted attempt to deny me representation, to make promises that would never be fulfilled, and to deny me witnesses who would have been able to verify that promises had been made.

51. Since May 27, 2014, Ms. Ward started to behave as if she were my supervisor (Ex. "31", Ex. "32", Ex. "33", and Ex. "34") even if I was supposed to have only been paired with her. Ms. Ward was not qualified to be my mentor as she has only a Master's degree.

52. On May 28, 2014, I met with Atty. DiMare (Ex. "35") to tell him that the Ombuds had refused to help me have the April 30, 2014 letter withdrawn from my records and that she was friends with Prof. Lovley. He told me that Ms. Porter had been working at the Ombuds Office for about a decade and grown to know many of the faculty members. He also told me that it was extremely unlikely that the Ombuds would be helpful. It was Atty. DiMare's opinion that Ms. Porter was no longer neutral. When I expressed that I wanted to file both a grievance with the Union and a complaint at the MCAD, he told me that if I did so they would "use tactics to build a case to fire me." He strongly tried to discourage me from filing a complaint at the MCAD; indeed, he even stated: "There is no justice."

53. On June 5, 2014, I obtained a copy of my personnel records (at that time it had 54 pages) proving that I had received no previous discipline and/or warnings prior the 30-day retroactive pay suspension letter of Prof. Lovley. This copy of my employment records also

9

revealed that a few days after my arrival the source funding my position was changed from a source supposed to last for twelve months to a source supposed to last for three months. My last day on payroll according to this change of funding was Sunday, April 27, 2014, the exact day when both my pay was retroactively suspended for 30 days and Dr. Tan was hired to replace me (Ex. "36"). Furthermore, these records showed that Prof. Lopes, who I had met on April 24, 2014 and April 29, 2014 to ask for help, authorized on April 30, 2014 the retroactive suspension of my pay for 30 days starting on Sunday, April 27, 2014 and he documented it as "an unpaid leave of absence" (Ex. "37"). Finally, a letter dated October 29, 2013 and written by Prof. Lovley (Ex. "38") unveiled that originally Prof. Lovley had applied to the EO&D Office for a waiver of search that was approved on November 4, 2013 to hire me for *two* years on a grant supported by the U.S. Department of Energy. In his letter Prof. Lovley wrote " ███████ has extensive experience with study of molecular genetics, structural proteins and biofilms. These skills in addition to her interest in microbe electrode interactions are an ideal combination for a very productive postdoctoral appointment."

54. On June 6, 2014, I filed my first grievance with the union (Ex. "39") and I signed the Lovley lab work policies (Ex. "11") as well as a participation agreement (Ex. "40").

55. On June 12, 2014, I filed a complaint with this Commission against the University of Massachusetts.

56. On June 13, 2014, during a lab-wide planning meeting organized by Prof. Lovley (Ex. "41"), I presented new research ideas, via a set of Powerpoint slides that I prepared according to my personal style. This presentation was on a project that I had been tasked with on May 27, 2014 to help the lab manager. Prof. Lovley approved my new research proposal ("Research Proposal #3") and, after my presentation, he told me that I could stop working with Ms. Ward and requested that I send him my slides, which I did a few moments later. In comparison, Ms. Ward suggested no new ideas during the meeting whereas she had written on June 10, 2014: "He asked us to get ideas from literature and he is looking for something that is new to the lab. We are not to just try someone's protocol from our lab, just improve the current lab protocol, or just use someone's protocol from another lab." (Ex. "42"). Also, during this meeting, I found out that Dr. Malvankar presented both a converted/derived version and an identical version of my Research Proposal #2, which I had never shared with him.

57. On June 16, 2014, in a summary of the projects that had been approved on June 13, 2014 (Ex. "43"), Prof. Lovley wrote: " ████ is evaluating several methods for pili purification from the *pilT*-deficient strain of KN400." Shortly thereafter, the first-step hearing of my first grievance with the union occurred (Ex. "44").

58. On June 17, 2014, Ms. Ward told me that the samples that I had prepared, prior to the instant, forced administrative leave followed by a 30-day retroactive pay suspension, were "being disposed of" (Ex. "45"). I believe they were being disposed of in retaliation for my first-step hearing grievance. Like the confiscation of my samples/lab products, this was in violation of the Postdocs' union contract (See Article 17 "Research Conduct" in Ex. "10").

59. On June 18, 2014, because several members of the group were infringing upon the rules in the lab work policies (Ex. "11"), Ms. Ward sent for the first time since my arrival a safety reminder to all the lab members (Ex. "46"). The actual violators of the rules were not reprimanded.

60. The next lab meeting was scheduled for June 20, 2014. At this meeting, I explained the steps that I would need to undertake in order to implement the Research Proposal #3. I had prepared slides but I was not allowed to present them, which surprised me. After the meeting, since there was no rule about "pre-made solutions" in the lab work policies (Ex. "11"), I asked Ms. Ward for several solutions that I needed in order to implement my research proposal. She responded by email and said that the procedure to follow is to check in the inventory. If I did not find any solutions there, I could look at other researchers' lab benches but would need their permission to use their solutions. She also told me that I would need to prepare most, but not *all*, solutions myself (Ex. "47"). This was yet another roadblock placed upon me to prevent me from accomplishing my research. Later that day, I shared with Dr. Malvankar via email two publications of interest authored by Prof. Lisa Craig from the Simon Fraser University in Canada to help him with the structural studies article that, at the meeting, he reported he was writing (Ex. "48").

61. On June 27, 2014, Ms. Ward sent a second lab safety reminder because the perpetrators of the infractions she had noted on June 18, 2014 continued to infringe on the lab work policies (Ex. "49" and Ex. "11"). Again, no one was disciplined for the infractions. I am aware of a previous infraction that occurred on March 17, 2014 when a graduate student, Jessica Smith, was caught working in the lab without a lab coat, without her safety glasses and wearing two earphones connected to her smartphone by Gaurav Dhawan [an associate biological safety officer of the Department of Environmental Health and Safety ("EH&S")]. Ms. Smith and/or her supervisor were not reprimanded. According to the EH&S policy, the Lovley lab should have been fined.

62. On June 27, 2014, Prof. Sally Powers, Associate Dean for Faculty and Research, rendered her decision on my first-step hearing grievance (Ex. "50"). She is a close associate of Prof. Lovley. She found against me, reasoning: "Dr. Lovley explained that although he met with ██████████ formally and informally on a regular basis, it is not customary to keep notes on frequent and regular communications with post-doctoral associates, and that this would be a very unusual and burdensome practice." Consequently, on June 30, 2014, the union appealed for a second-step hearing (Ex. "51").

63. Our next lab meeting was scheduled for July 3, 2014, and I had to prepare some solutions prior to this meeting. In order to do that, I needed to copy some information from the label of pre-made solutions. I looked everywhere in the lab for such solutions, and found some in the RNA manipulation room. This is a room that is rarely accessed due to issues with contamination, and the solutions I found there were covered with dust. Therefore, I thought that it would not be a problem if I took these solutions for some time and kept them on my lab bench until I could get around to copy the information I needed to reproduce them. I was unable to copy the information immediately as I had several more pressing tasks to complete.

11

64.  On July 2, 2014, I received an email from Ms. Ward stating that she had seen these solutions on my lab bench, that I was not allowed to use them, and that I needed to put them back immediately (Ex. "52"). I replied that I had not in fact used them but had merely borrowed them to copy the information I needed. I also asked why some people in the lab had their own personal bottles of pre-made solutions. She did not respond (Ex. "52"). This event signaled to me that the lab manager was over-scrutinizing my bench. At that time, no one in the lab was searching for these solutions or needed them for their experiments.

65.  During the July 3, 2014 lab meeting, I submitted an IDP for my Research Proposal #3 and I presented a chart summarizing the IDP known as a Gantt chart. I also stated that I would prepare all solutions necessary for my research. Moreover, I wanted to present the slides from two weeks prior that I had updated, but again I was not allowed to do so. I then emailed the IDP and the Gantt chart to Prof. Lovley (Ex. "53") and he did not give me any feedback. In another email that I sent to Prof. Lovley the same day (Ex. "54"), I reiterated that I would prepare all necessary solutions myself.

66.  On Friday, July 4, 2014, I came to work and saw that Prof. Lovley had emailed me at 9:53 am a letter of reprimand based on the email discussion of the solutions that I had a few days earlier with Ms. Ward (Ex. "55"). Other similarly-situated employees in the past had violated lab protocols but had received no discipline. Likewise, Whites, light-skinned individuals, males and Unites States citizens had routinely violated lab procedures with impunity. Unlike them, I had committed no infraction. This letter of reprimand was, in fact, in violation of the postdocs' union contract (See Article 18 "Workspace and Materials" in Ex. "10"). On this same day, Dr. Tan approached me and asked me to authorize him to "use" my Research Proposal #2 that I had presented at the June 13, 2014 meeting because Prof. Lovley had asked him for an idea to increase the pili conductivity and he was having trouble finding an answer.

67.  On July 7, 2014, Ms. Ward emailed to all the lab members a third reminder; this time it was about safety trainings (Ex. "56"). On that same day, the second-step hearing of my first grievance with the union was initiated (Ex. "57"). The hearing officer granted my request to present the pieces of evidence supporting my allegation that the letter of April 30, 2014 was inaccurate and untrue. To give me enough time to accomplish this task, the second-step hearing started on July 7, 2014 was scheduled for continuance on August 4, 2014. Then, at 5:40 pm, Prof. Lovley asked me for: "a detailed list of the buffers that [I was] trying to make; the rationale for using these buffers; and any relevant publications with the section highlighted where they described using the buffer." (Ex. "58"). That same day at 10:01 pm, Prof. Lovley emailed me his feedback about the IDP and the GANTT that I had sent him on July 3, 2014 stating: "your work plan for July is acceptable.  if (sic) you have success with that portion of your plan, then we can talk about next steps." (Ex. "59").

68.  On July 8, 2014, I emailed Prof. Lovley the information about the buffers and the relevant publications that he had requested (Ex. "60"). One of the two germane publications whose references I provided to Prof. Lovley on July 8, 2014 is a publication from Prof. Craig that I had already shared with Dr. Malvankar on June 20, 2014 (Ex. "48").

69.  On July 11, 2014, I contacted Prof. Craig to ask her questions about the pili purification protocol utilized in her lab (Ex. "61").

70.  On July 15, 2014, I spoke with a former technician of the Lovley lab who had changed departments, Manju Sharma (indeed, she was now working in the Biology Department). She told me: "You have to be mean to work in this lab." This reminded me of Dr. Holmes' personal words about Dr. Malvankar and Prof. Lovley. Around the same day, Ms. Ward moved her office to the one that was next to the office where I had been allocated workspace. Given the history with Ms. Ward, I believe this action was taken to keep an eye on me.

71.  The next lab meeting was on July 18, 2014. At this meeting, I presented slides about my research corresponding to a former and an updated versions of the Gantt chart I had emailed to Prof. Lovley on July 3, 2014.

72.  Four days later, on July 22, 2014, I received at 8:11 am a second letter of reprimand (Ex. "62") stating that I had not presented any slides on July 18, 2014. I previously tried to present Powerpoint slides at these meetings but had been denied the possibility to do so. At the July 18, 2014 meeting I had found a way to present the major part of the content of the Powerpoint slides that I wanted to present at the past two meetings via two GANTT charts copied-pasted in Powerpoint slides, but I was now being disciplined under the pretense that I had not presented slides. Other similarly-situated employees had not been disciplined for this reason before. In this letter of reprimand, Prof. Lovley for the first time told me that there was a specific format he required for slides. I was the sole lab employee to receive such a directive regarding format and substance of slides. Dr. Tan was criticized by Prof. Lovley during the July 18, 2014 lab meeting for his slides but was not disciplined. In addition, the July 22, 2014 letter of Prof. Lovley stated that I had to include research results in my slides, even though Prof. Lovley knew that I could not have any since he only had approved this project on June 13, 2014. Lastly, this letter stated that my progress continued to be "very poor."

73.  On July 23, 2014, I was told by a co-worker, Dr. Li-Ying Wang, that Prof. Lovley was looking for me. I headed toward his office and found him in the conference room talking to Dr. Ueki. He seemed extremely angry at me because he asked me in a raised tone of voice to send him the slides he had asked for. I told him that I had presented slides on July 18, 2014, and asked him if these were the slides he was referring to. He then said that these slides were not what he had asked for. I then requested union representation. He first said that I did not need to involve the union, but I insisted and he allowed me to go look for a representative. I was unable to do so before the end of the day (Ex. "63").

74.  On July 24, 2014, I sent Prof. Lovley a revised version of the slides I had presented on July 18, 2014 (Ex. "64"). Then, at 8:12 pm Prof. Lovley rejected my revised slides (Ex. "65"). At 9:41 pm he sent me an email about the IDP and the Gantt chart that I had sent him on July 3, 2014 where he changed his opinion of what he had said on July 7, 2014 (Ex. "59"). Indeed, he stated: "my feedback on this plan at present is as follows [...]" (Ex. "66"). In his modified feedback Prof. Lovley also denied my request to perform the converted version of my Research Proposal #2 presented by Dr. Malvankar as one of his projects of interest during the

June 13, 2014 lab-wide planning meeting. I had expressed interest in the same project in my IDP. Indeed, I wrote in the paragraph 5.f. on page 11: "█████████ would like to be chosen for the project dealing with the replacement of (Alanine preferentially) AAs at strategic positions in pilA-N gene with aromatic AAs in order to try to increase the conductivity of the pili of *Geobacter sulfurreducens* (variants PCA and KN400)," (Ex. "67").

75.   I later found out on July 13, 2016 that Dr. Tan et al. published, in the journal Small, results obtained via the conversion of my Research Proposal #2 (Ex. "68"). Based on these results, Dr. Tan, Dr. Malvankar, Ramesh Adhikari, Ms. Ward, Prof. Nevin and Prof. Lovley were all credited as inventors on a patent application filed by the Lovley lab on the conversion of my Research Proposal #2.

76.   On July 25, 2014, I responded that I disagreed with Prof. Lovley's mischaracterization of the facts and I also asked to meet with him in the presence of a union representative because I was having difficulty understanding why he considered my slides non-compliant (Ex. "69"). He answered the following day: "these directions are very simple and should not require a meeting with a 'representative' to understand." (Ex. "69").

77.   On July 28, 2014, I emailed Prof. Lovley again saying that I believed I had found new conditions to implement a reliable pili purification method (Ex. "70"). He responded that he did not understand what I meant (Ex. "70"). I answered that I would present "something new" at the lab meeting scheduled for August 1, 2014. He then asked me to send him new slides. I asked to meet with him again to understand what he expected in the slides (Ex. "70").

78.   On July 30, 2014, I received at 6:04 am a letter informing me that I was being suspended effective immediately (Ex. "71"). I was ordered to turn in the lab and office keys, my lab notebook, and the lab-owned computer at the Microbiology Department business office. The stated reason was failure to comply with Prof. Lovley's "simple request to produce the (sic) a simple set of slides." (Ex. "71"). It was outrageous that I was being suspended when I asked the simple question of what he expected from the slides. The letter further informed me that an investigatory meeting with Prof. Lopes had been scheduled for August 4, 2014 at 10 am (i.e. a few hours before the continuance of the second-step hearing of my first grievance with the union). This fact signaled me that Prof. Lovley had already discussed my case with Prof. Lopes and prejudiced him against me. Moreover, shortly after I returned the keys to the Microbiology Department business office at 11 am, I came back to this office to check my mail and a clerk there, Ruth Allis, shouted at me that I was not allowed to be even in the building and she ordered that I leave right away. Prof. Lovley sent me another email at 1:05 pm ordering that I return my lab notebook before 4 pm (Ex. "72"). While alleging I was incompetent on the one hand, on the other Prof. Lovley was asking for my research notes to further the projects I had initially proposed.

79.   On August 1, 2014, my email address was removed from the list of the Lovley lab members so I would not know what was happening in the lab. Consequently, I had no knowledge on how my Research Proposal #3 had been affected. Later, I found out that in the two articles published by the Lovley lab on which Dr. Tan is the first author [one was published on June

14

28, 2016 in the journal Frontiers in Microbiology, (Ex. "18"); the other on July 13, 2016 in the journal Small, (Ex. "68")], the method to purify the pili includes steps based on suggestions that I made when I was creating a new pili purification protocol in the Lovley lab in June-July 2014: notably a) to use a Waring blender to separate the pili from the cells as documented in Ex. "45" and b) to use ammonium sulfate to precipitate the pili as documented in one of the files that I emailed to Prof. Lovley on July 8, 2014 (Ex. "60"). Despite my ideas and contributions to the research (cf. my Research Proposal #3, my IDP, etc.), I was given no credit regarding the new pili purification protocol project.

80.  On March 4, 2015, Prof. Lovley even made a press release heralding: "The UMass Amherst team is now working on a 'pili factory' to make purified *Geobacter* pili freely available to other researchers [...]" (Ex. "73"). This occurred after crucial contributions I brought to the creation of this new pili purification protocol in June-July 2014.

81.  During the investigatory meeting held on August 4, 2014, I showed Prof. Lopes that I had complied with Prof. Lovley's requirements regarding slides. Nevertheless, on August 13, 2014, Prof. Lopes issued his decision concluding that my suspension was valid (Ex. "74"). In the afternoon of August 4, 2014, the University continued the second-step hearing of my first grievance with the union.

82.  On August 8, 2014, I filed a complaint requesting a hearing at the anti-bullying at the workplace initiative office that had just recently been created by UMass-Amherst Chancellor Dr. Kumble Subbaswamy (Ex. "75").

83.  After I received on August 13, 2014 Prof. Lopes' determination (Ex. "74"), I asked him several times to correct his investigation letter but he refused to do so (Ex. "76").

84.  On August 20, 2014, the hearing officer at the step-two hearing of my first grievance, Ms. Susan Pearson, who is an Assistant Chancellor, affirmed the decision made by Prof. Powers at the first-step hearing (Ex. "77"). She mischaracterized the evidence by stating: "Prof. Lovley asserts, and ██████████ does not dispute, that he repeatedly informed her of his dissatisfaction with her work and with the nature of her interactions with others in the laboratory, included those he appointed to supervise her work, and that continuing in this way was unacceptable." At all times I disputed Prof. Lovley's version of the facts.

85.  On August 21, 2014, the director of the anti-bullying at the workplace initiative office, Ms. Kathy Rhines, summarily denied my complaint (Ex. "78") and, consequently, I was not given a hearing.

86.  On September 4, 2014, I resubmitted my slides after discussing them with two union representatives (Ex. "79"). One of them, Court Cline, told me to follow exactly the directions sent in an email by Prof. Lopes on September 1, 2014 (Ex. "80") and suggested that I "cut and paste" the directions into my slides. I followed his advice. Then, I filed a second grievance with the union (Ex. "81").

87. On September 11, 2014, Prof. Lopes emailed me a memorandum stating that I would be fired unless I resubmitted slides compliant with Prof. Lovley's requirements by September 25, 2014 (Ex. "82").

88. On September 12, 2014, I was informed that the first-step hearing of my second grievance with the Union had been scheduled on September 17, 2014 (Ex. "83").

89. On September 16, 2014, I was informed that the first-step hearing of my second grievance with the union had been cancelled because Prof. Lovley was sick (Ex. "83").

90. I resubmitted slides on September 17, 2014. This was the fourth time that I submitted slides (Ex. "84"). They contained the same information as my initial slides presented but with a different look. I asked for feedback since there was still time remaining before the stated deadline but was not given any (Ex. "84").

91. On September 18, 2014, at a Joint Council of the union UAW Local 2322, I asked the union to advance my first grievance to arbitration. I found out later that during this same Joint Council, after my case was discussed, a motion was passed with solely one abstention regarding a $5k holiday party fund whereas the union refused to fund an arbitration of my first grievance.

92. On September 19, 2014, Mr. Quinn informed me that the union had decided to use the threat of arbitration to negotiate a settlement. I repeated to him that the only settlement I would be amenable with would be a settlement enabling my relocation and/or assignment to other duties like teaching as allowed by the union contract (See Article 22 "Teaching Opportunities" in Ex. "10"). He answered that he doubted that the University would ever agree with this type of settlement. Consequently, I told him that I was refusing union representation and was going to ask again for help to the Chancellor who I had already contacted on September 15, 2014. Against my consent Mr. Quinn called Ms. Chinman and then emailed me at 4:55 pm the major lines of a settlement—one of these lines reads as: "███ would withdraw with prejudice any claims against the University, including both the Union's grievances and any internal or external complaints." I adamantly rejected the proposal since I had never asked him to perform such negotiations (Ex. "85").

93. On September 22, 2014, I was informed that the first-step hearing of my second grievance with the union had been rescheduled on September 29, 2014 (Ex. "86"). Then, Becky Dean who is an assistant to the Chancellor emailed me: "Please be advised that Chancellor Subbaswamy is not prepared to intervene in your case." (Ex. "87"). Mr. Quinn emailed me again insisting that I reconsider the offer he had sent me on September 19, 2014 (Ex. "88"). To intimidate me, he stated that he expected that I would be fired if I did not accept this offer and he said that he had gotten Ms. Chinman to agree to hold off on the September 25, 2014 deadline for slides that Prof. Lopes had given me (Ex. "82"). Again, as seen by the evidence, these slides had not been submitted just once but four times and I had asked on numerous occasions how to correct the slides. Mr. Quinn also stated that I was risking being fired the next week over the slides if I did not accept this offer.

94. On September 23, 2014, I emailed Prof. Lopes to ask for feedback on the slides that I had sent him on September 17, 2014 (Ex. "89"). He answered on the same day "I received your slides and I will get back to you as soon as possible." (Ex. "90").

95. On Saturday, September 27, 2014, Prof. Lovley emailed me at 11:33 am a letter announcing the non-renewal of my appointment contract and no reason was stated in this letter to justify this decision (Ex. "91"). At that time the Union was still attempting to intimidate me saying that I would be fired if I did not accept to resign voluntarily with three months of severance payments and withdraw all my complaints in exchange for the cleansing of the misrepresentations Prof. Lovley had placed in my personnel/employment records.

96. On Saturday, September 27, 2014, I stopped receiving information regarding the events (seminars, conferences, workshops, trainings) organized at UMass-Amherst, at the College of Natural Sciences of UMass-Amherst and in the Microbiology Department of UMass-Amherst, very likely because my email address with domain microbio.umass.edu was removed from the Microbiology Department employees' list for collective information diffusion.

97. On September 29, 2014, with no notice and for no reason, the first-step hearing for the second grievance I had filed with the union since September 4, 2014 did not take place.

98. On September 30, 2014, I received a letter from an attorney hired by the union, Atty. James Shaw, announcing without justification the refusal of the union to arbitrate my first grievance as well as to pursue the proceedings of my second grievance (Ex. "92"). Then, I emailed again Prof. Lopes asking for his feedback on the slides I had sent him on September 17, 2014 (Ex. "93").

99. On October 1, 2014, the President of the union UAW local 2322, Jocelyn Silverlight emailed me a letter in which she tried to justify Atty. Shaw's letter (Ex. "94"). Ms. Silverlight made several false statements in this letter.

100. On October 2, 2014, Prof. Lopes answered me: "De (sic) to negotiations with you and your union rep regarding settlement discussions, we are holding off on final review of your slides until these negotiations are finished." (Ex. "95"). I answered: "I do not know about which 'negotiations with [me]' you are referring to since I have never asked you or the Union to make such." (Ex. "96").

101. On October 3, 2014, Prof. Lopes answered: "I understand.  Susan Chinman needs to get involved and she will be in touch with Ryan Quinn.  I will wait until I hear back from Susan." (Ex. "97"). I then replied: "I am really sorry but I do not understand what you mean by 'Susan Chinman needs to get involved'. Is Mrs. Chinman now the person who is going to review my slides?" (Ex. "98"). Then, Prof. Lopes retorted: "I mean exactly what I stated below, Susan will be in touch with Ryan Quinn and then I will get back to you." (Ex. "99"). Then, after I told him that I could not understand why he was refusing to tell me what he meant (Ex. "100"), he answered: "I did receive your latest message. I will be in touch as soon as I have more to say." (Ex. "101").

17

102. On October 9, 2014, Prof. Lopes finally responded stating that my slides had been accepted and that I would be permitted to return to work on October 27, 2014, if I submitted a new research plan by October 17, 2014 (Ex. "102").

103. The day after, i.e., on October 10, 2014, I engaged in voluntary mediation regarding my complaint pending with this Commission. During this process, I asked to be relocated to a different lab.

104. On October 17, 2014, I emailed Prof. Lopes that I was awaiting a decision on my request to be relocated to a different lab (Ex. "103").

105. On October 19, 2014, I emailed Prof. Craig to try to set up a visiting stay in her lab. On that occasion I learned that she was collaborating with Dr. Malvankar (Ex. "104"). And I later learned on March 3, 2015 that Dr. Malvankar published the scientific article of structural studies that he was writing while I was working in the Lovley lab in June-July 2014. This article was published in the journal mBio and Prof. Craig was given credits in the Acknowledgements section (Ex. "105").

106. On October 20, 2014, Prof. Lopes replied that I was being ordered to submit a research plan no later than October 24, 2014 (Ex. "106").

107. On October 21, 2014, I found out via a scientific article published on that same day in the journal mBio by the Lovley group that Dr. Ueki had been working on a project similar to the Research Proposal #1 I had shared in July 2011 with both Prof. Lovley and Prof. Nevin. Dr. Ueki, Prof. Nevin and Prof. Lovley are the main authors on this article (Ex. "107").

108. The attempt for a mediation failed on October 22, 2014.

109. On October 23, 2014, I sent Prof. Lopes my research plan (Ex. "108"). He did not respond.

110. On October 27, 2014, I reported to work. Prof. Lopes told me that I could not return to Prof. Lovley's lab because I had said that I was uncomfortable there. He also said that I would be provided with a separate lab space. I explained to him that I needed to access the equipment that I had previously used in Prof. Lovley's lab, as well as all the solutions I had already prepared. Because my contract was expiring on February 1, 2015 and Prof. Lovley had informed me on September 27, 2014 that it would not be renewed (Ex. "91"), I had very little time to attempt to make meaningful progress and save my career. Prof. Lopes kept trying to end the conversation and started to raise his voice. He told me to seek union representation. Later that day, I emailed Prof. Lopes explaining why I needed to return to Prof. Lovley's lab (Ex. "109").

111. In the same email (Ex. "109"), I also asked to be paired with an undergraduate student assistant because the type and amount of work I would need to complete in the short time I had left would cause me pain. In fact, after a few months in the Lovley lab, I had noticed that the commonly-admitted practice in the Lovley lab to reduce the risks of accidents and/or occupational diseases that some of the culture methods in anaerobic conditions have high chances to entail, was to pair postdoctoral researchers and graduate students with

18

undergraduate students who would bring them assistance. Dr. Holmes had at least two undergraduate students performing the most strenuous media preparations for her. Likewise, Dr. Philips had at least two undergraduate students helping her with her media preparation needs. And, Jessica Smith and the lab manager herself had at least, each, three undergraduate students to help them with the same types of tasks. Lastly, I asked to be reimbursed the travel expenses for a visiting stay in another lab and the bus fare to attend a specific training series organized in another university.

112. On October 28, 2014, Prof. Lopes replied denying my request to return to the Lovley lab as well as my request for reimbursement of the travel/transportation expenses that would have been incurred by my above-mentioned visit to another lab and participation to the training series (Exhibit "109"). These restrictions constituted a violation of the postdocs' union contract (See Article 19 "Training" in Ex. "10"). The unfairness of Prof. Lopes' restrictions was corroborated by the email that Prof. Lopes' assistant, Maryann Wells, had forwarded to the Microbiology Department employees on June 4, 2014 (Ex. "110"). As to my remaining requests, Prof. Lopes stated that he needed additional time to review them.

113. By November 5, 2014, which is the date of the second complaint that I filed at the MCAD against the University of Massachusetts, Prof. Lopes had still not responded to my remaining requests and had not yet allowed me to come back to work. As of October 28, 2014, I had been on forced unpaid leave once; I had been suspended three times, which amounted to a total of one hundred and forty (140) days of suspension; and I had received two letters of reprimand. This had all occurred in just two hundred and sixty-seven (267) days since my start date on February 3, 2014. I am not aware of any other University employee who was so heavily disciplined in such a short period of time. The treatment I received from the time I started up until October 28, 2014 was outrageous. I was barred from projects that I had initiated. I was refused office accommodations. I was treated disrespectfully. I strongly feel the disrespect toward me was due to my being a dark-skinned woman from a foreign nation.

114. I filed a complaint with this Commission against the University of Massachusetts a second time on November 5, 2014. Two weeks after the second filing, Prof. Lopes answered on November 19, 2014 (Ex. "111") to the October 23, 2014 email that contained the plan he had demanded from me (Ex. "108"). In his November 19, 2014 Return to Work Letter, he committed to allow me to return on November 24, 2014. Also, he refused my request for undergraduate student assistance, which blatantly proved disparate treatment vis a vis the White female employees in the lab (Dr. Holmes, Dr. Philips, Ms. Smith, and Ms. Ward are all White females who had more than one undergraduate student helping them with their media preparation tasks).

115. On November 24, 2014, when I reported to work, Prof. Lopes pretended that he did not have the lab work policies of the space he had assigned to me, and he told me to come back the day after. In fact, he never gave me any lab work policies.

116. Finally, on November 25, 2014, Prof. Lopes allowed me to return to work but relocated me to a worn-out combined lab and office space where I was alone and had no access to the major

part of the materials and equipment that I needed to perform meaningful research. This was another violation of Article 18 "Workspace and Materials" of the postdocs' union contract (See in Ex. "10"). Moreover, working in this remote space was violating Article 22 "Health and Safety" of the postdocs' union contract (See in Ex. "10"). I was completely alone in a space containing hazardous materials and equipment; if an accident had occurred no one would have been available to assist. In this latter regard, according to the Lovley lab work policies "No one is allowed to work alone [...]" (Ex. "11"). This workspace also presented serious health and safety issues. Besides the general worn-out conditions that were frightening, was also a very loud, repetitive, mysterious noise from the rooftop and the heating system was not functioning.

117. Following the filing on November 5, 2014 of my second MCAD complaint where Prof. Lopes was named, Prof. Lopes started to be very rude to me. Though I was not allowed to interact with the Lovley lab members, who totally ostracized me, I learned of my replacement via a conference I attended, a new postdoc, Dr. David Walker, who is a White male.

118. On December 1, 2014, following my request for training on equipment that was new to me (Ex. "112"), Prof. Lopes replied that my emails were unproductive and accused me of insubordination and harassment (Ex. "113").

119. On December 3, 2014, Atty. Raymond Dinsmore with whom I first consulted on November 20, 2014, sent a records release request to the General Counsel Office of UMass (Ex. "114").

120. Prof. Lopes held meetings with me on December 8, 2014 and December 15, 2014 (Ex. "115" and Ex. "116"). During these meetings, his assistant Maryann Wells took notes and he made mischaracterizations, which made me very uncomfortable. Indeed, these meetings were completely unethical. I would spend my time begging for keys, materials, and authorizations (to access equipment and to attend trainings) while he denied them or claimed they had already been supplied. Finally, since there was no meaningful research that I could accomplish without access to the right materials and equipment, there was no work progress to assess, and Prof. Lopes would seek information from me regarding my thoughts on my proposed research projects that others were performing. In fact, he used these meetings to gather scientific information for Prof. Lovley.

121. On December 10, 2014, Prof. Lopes refused to allow me to attend a training held on December 12, 2014 (Ex. "117"). He continued his rude behavior towards me while ignoring professional ethics. I believe he denied me access to the training in retaliation for my second MCAD complaint.

122. On December 12, 2014, Atty. Dinsmore sent a second letter to the General Counsel Office of UMass this time to request that I be immediately granted authorization to use the materials and equipment whose access had been denied to me by Prof. Lopes (Ex. "118"). This letter was sent to Prof. Lopes too.

123. On December 17, 2014, a significant fluid leak occurred in the remote research space where I had been forcibly relocated. I nearly slipped as I was walking owing to the volume of water

on the floor that I had not seen upon entering the workspace adjacent to the lab space. Fortunately, I regained my balance fast enough to avoid falling on the wet floor. I immediately called the Microbiology Department business office for help. Sue Laford answered and came over. She witnessed the damages: the roofing material, soaked due to the leaking liquid of unknown origin, had begun to break and fall onto the floor. Ms. Laford called Maintenance and an agent came to reassure us that he had managed to stop the leak that was coming from the floor above and with his help I cleaned the damages and wiped the water off the floor.

124. On December 18, 2014, Atty. Lisa Lippiello, who I first consulted on July 24, 2014, sent a letter to the General Counsel Office of UMass to request a mediation (Ex. "119") with a copy to Prof. Lopes.

125. Prof. Lopes scheduled a meeting with me on December 22, 2014. I requested to exercise my Weingarten rights in order to have a union representative present (Ex. "120"). He did not answer. I appeared for the meeting but he was busy giving out chocolate at the Microbiology Department business office, so I did not approach him and the meeting did not occur (Ex. "121"). Seemingly unfazed, he rescheduled the meeting for January 5, 2015 (Ex. "121").

126. Later that day, I filed a complaint of misconduct in research for plagiarism and abuse of confidentiality (Ex. "122"), with the help of the Director of the Office of Research Compliance, Jennifer Donais, who told me that what happened to me was an "ugly story."

127. On January 5, 2015, I appeared for the meeting. Owing to the unavailability of a representative, I asked Prof. Lopes if we could reschedule it. He said the meeting was not disciplinary in nature; however, his assistant was present. The meeting did not take place because I said I was uncomfortable. At that time, I had reached a point where I was scared of Prof. Lopes given the new complaint that I had filed on December 22, 2014 (Ex. "122") in which he was named. I was searching for someone to accompany me to the meetings that Prof. Lopes was asking me to have with him and his assistant (Ex. "123") because things that I said were mischaracterized, changed, and later used against me. Furthermore, on that same day, a second letter, a letter of demands, was sent by Atty. Lippiello to the General Counsel Office of UMass (Ex. "124") and Cc'd to Prof. Lopes.

128. On January 6, 2015, I had a preliminary review meeting regarding the complaint of misconduct in research that I had filed on December 22, 2014. Prof. Elisabeth Chilton, on Faculty in the UMass-Amherst Anthropology Department, conducted this meeting. Since she had no knowledge in my fields of expertise, she was accompanied by Atty. Richard Stevens who is an employee of the UMass General Counsel specializing in Intellectual Property issues. I was accompanied by a member of the Amherst community, Mrs. Vira Cage, who agreed to be a witness, after Mr. Quinn, who she personally contacted to ask him to represent me at this meeting, showed no interest in making himself available (Ex. "125").

129. On January 9, 2015, the Vice Chancellor for Research and Engagement, Dr. Malone denied me a hearing in front of a committee of experts under the University's misconduct in research policy (Ex. "126") asserting that there was insufficient substance to the allegation (Ex.

"127"). Moments after receiving the decision, pursuant to UMass research misconduct policy and procedures (Ex. "126"), I notified Dr. Malone via email of my intent to appeal his decision to the Provost once I knew the proper procedures.

130. A meeting with Prof. Lopes was scheduled for January 12, 2015. At the time I could not find anyone willing to accompany me to this meeting (Ex. "128"), and because I was extremely fearful of Prof. Lopes, on Sunday, January 11, 2015, at 4:16 pm I sent an urgent request to meet on Monday, January 12, 2015 with the Provost, Dr. Kathleen Newman (Ex. "129"), regarding my appeal of Dr. Malone's determination relative to my complaint of misconduct in research. I felt I needed help for enforcement of protective measures (See IV. Retaliation in Exhibit "126"). Believing that the Provost's Office would schedule a meeting and wishing to have a block of time available, I asked Prof. Lopes at 9:10 pm to reschedule the meeting of January 12, 2015 (Ex. "130") explaining that I had a meeting planned with the Provost, though a meeting had not yet been scheduled. I was expecting to hear back from the Provost's Office imminently on the morning of Monday, January 12, 2015.

131. On Monday, January 12, 2015, since I had still not received any answer from the Provost's Office, I went to this office around 11:00 am where I met with the Provost's assistant, Diane Vayda. I requested an urgent meeting with the Provost to obtain the policy for filing an appeal. In the UMass research misconduct policy and procedures (Ex. "126"), there is no rule describing how such appeal is supposed to proceed. Ms. Vayda did not schedule a meeting for me but instead said that she was going to ask the Provost for the policy, and that she would email it to me (Ex. "131"). To my surprise, I received no official document, only the notes emailed by Ms. Vayda (Ex. "131"). Then, Prof. Lopes answered my request for rescheduling that we would meet on January 20, 2015 and he asked me to bring proof that I met with the Provost on January 12, 2015 (Ex. "132").

132. On January 13, 2015, I filed an appeal to the Provost (Ex. "133").

133. On January 20, 2015, I met with Prof. Lopes at 9:00 am; his assistant Ms. Wells was also present. He asked for proof that I had a meeting with the Provost on January 12, 2015. I requested to have a union representative with me. He replied that he had told me I could bring one if I wanted, and he suspended me without pay until my scheduled end date on February 1, 2015. At that time, he handed me out a letter that was already prepared showing he had the intention of suspending me prior to the meeting and most likely arranged with the Provost Office that no meeting with the Provost would ever take place. I refused to take the letter in his paper format and I told him to email it to me. Then, I went to look for a union representative. Both Mr. Quinn and Mr. Cline were in their office on UMass-Amherst campus, but neither of them agreed to come meet Prof. Lopes with me. Mr. Quinn said that he would instead make a call to Ms. Chinman.

134. In the afternoon, at 4:42 pm, Prof. Lopes sent me a letter of suspension where the suspension without pay until my scheduled end date that he had announced me at about 9:00 am in the morning had been turned into a suspension with pay until the scheduled end date of my appointment on February 1, 2015 (Ex. "134"). This was the result of the phone call made by

22

Mr. Quinn (Ex. "135") during which, very likely, Mr. Quinn informed Ms. Chinman that if they suspended my pay, pursuant to the union contract, I could request an expedited grievance whose filing the union would have been unable to deny and that would have obliged the University to extend my contract (See Article 10 "Discipline/Dismissal" in Ex. "10"). However, owing to the fact that my pay was finally not suspended, Mr. Quinn refused to file a grievance on my behalf.

135. On December 11, 2014, Atty. Dinsmore recommended that I contact Atty. Sandra Torres, the Associate Counsel of UMass regarding immigration issues (Ex. "136"). Indeed, at that time I was looking for information about the way to fill a gap between two paid positions and maintain a J-1 visa valid during this gap (the Exchange Visitor Program is continuous: in case of interruption, the J-1 visa is invalidated and a wait period of two consecutive years is indispensable before submitting a new application for another J-1 visa).

136. On December 11, 2014, I called Atty. Torres. She was very hostile and did not answer my questions regarding a gap between two paid positions under a J-1 visa. She redirected me to the director of the IPO, Kenneth Reade (Ex. "137").

137. On December 22, 2014, I met with Mr. Reade (Ex. "138"). Equally hostile, he began the meeting with "We know about the performance issues; we talked with the General Counsel office [...]" and he refused to answer my questions relative to a gap between two paid positions. This was again in retaliation for my MCAD complaints and it was clear the University did not want to accommodate me in any way, shape, or form because I had the courage to assert my rights.

138. On January 21, 2015, in an attempt to obtain information about the possibility to change J-1 visa categories (i.e. to change my visa from a J-1 category 'Research Scholars' to a J-1 category 'Students') I requested a meeting with the SEVIS Coordinator, Naoko Ishida. On January 21, 2015, she scheduled a meeting with me for January 23, 2015. But on January 22, 2015, Ms. Ishida cancelled the appointment already set up for January 23, 2015 and redirected me to the director of the IPO, Mr. Reade (Ex. "139"). This was yet another retaliation for my MCAD complaints. I then asked for an appointment with Mr. Reade. He replied he had no availability before January 26, 2015 and he tried to address my questions via emails owing to my circumstances (Ex. "140").

139. On January 22, 2015, I filed a third complaint at the MCAD. Then, I asked to meet with the Advisor for International Faculty and Researchers, Ms. Condon. One of the IPO's clerks responded that I could not meet with her because the director of the IPO, Mr. Reade, had asked to the IPO clerks to redirect me to him for any questions I might have. This was yet another act of retribution for my complaints with the MCAD.

140. On January 23, 2015, I returned to the IPO and inquired again to meet with Ms. Condon. Fortunately, Mr. Reade was not in, so the IPO clerk with whom I spoke let me meet with her. Ms. Condon explained to me that I could fill a gap between two paid positions by working on my own funding; this way I would not lose my J-1 visa while waiting for a grant under which I would be compensated. She had already told me something similar but less clear in

a former email (Ex. "20"). She also told me that if I obtained from any lab director at UMass—except from the Microbiology Department—an offer to work on my own personal funding she would extend my program. As well, she said that she would be able to extend my program even during the 30-day grace period after the end date of my program scheduled on February 1, 2015.

141. On February 10, 2015, I accepted a non-compensatory position offered by Prof. Alexander Ribbe in the Department of Polymer Science and Engineering of UMass-Amherst (Prof. Ribbe is also the director of the Electronic Microscopy facility of UMass-Amherst) until he could get a grant to compensate me. At that time, my appointment in the Lovley lab had ended on February 1, 2015 and so I was on the 9th day of my 30-day grace period. In order to work with Prof. Ribbe, I needed only to have my program extended i.e. no transfer was required since, like Prof. Lovley, Prof. Ribbe was affiliated with UMass. So that she could extend my program as promised on January 23, 2015, I then informed Ms. Condon of my new sponsor who was willing to hire me under my own resources for six months, until he got funding via the grant application(s) we were to write together. Surprisingly, she answered me to redirect Prof. Ribbe to Mr. Reade (Ex. "141"). I believe that this was another act of retaliation against me for filing MCAD complaints.

142. On February 13, 2015, Prof. Ribbe informed me that Mr. Reade answered him: "It is too late; upon federal regulations I cannot extend her visa." This was yet another act of reprisal against me for filing my MCAD complaints. This information is contradictory to what Ms. Condon told me on January 23, 2015 and is not supported by the Title 22 (Foreign Relations) Chapter I (Department of State) Subchapter G (Public Diplomacy and Exchanges) Part 62 (Exchange Visitor Program) of the Code of Federal Regulations available at: https://www.nafsa.org/_/file/_/amresource/22cfr62.htm).

143. On February 26, 2015, Ms. Condon was contacted by Dr. Victor McCrary, the Vice President regarding Research and Economic Development of the Historic Black College and University ("HBCU") Morgan State University in Maryland, to have my immigration records transferred to the Office of International Student and Faculty Services of Morgan State University (Ex. "142").

144. On February 27, 2015, Mr. Reade did the transfer (Ex. "143"). The fact that Mr. Reade could transfer my immigration records to the Maryland HBCU, proves that Mr. Reade could have extended my program at UMass-Amherst so that I could work with Prof. Ribbe. UMass-Amherst at that time was denying me opportunities at its own institution because I had three MCAD complaints. By comparison, Nuydlia Araeva who was, in or about 2014, an Asian, not dark-skinned, non-immigrant research scholar at UMass-Amherst College of Education, was offered a non-compensatory position until UMass-Amherst College of Education could find her a position with compensation.

145. On January 20, 2015, after having been notified orally by Prof. Lopes at about 9:00 am of the suspension of my pay until the end date of my contract, I went to check my mail at the

Microbiology Department business office and I saw that the tag indicating the location of my mail box had been removed. This was again in retaliation for having filed MCAD complaints.

146.   On January 22, 2015, I filed at the MCAD a third complaint against the University of Massachusetts regarding the last adverse employment action by Prof. Lopes that I had been a victim of on January 20, 2015 as mentioned above.

147.   On January 23, 2015, Prof. Lopes should have received the serving letter relative to my January 22, 2015 complaint. I assume this letter arrived at his office before noon (I received mine via email at 4:27 pm; Ex. "144").

148.   On January 23, 2015, at 1:58 pm, Prof. Lopes, sent me an email asking me for a forwarding address. I answered I could pick up my mail and had no forwarding address; then, he replied (Ex. "145"): "I am afraid this is not possible because starting Saturday (sic) (Feb 1, 2015) UMass will stop accepting your mail and will send it to your last known address." He did not tell me what he meant by my last known address (in the UMass Human Resources system my last known address was my professional address in the Department of Microbiology). He even added: "You will need to secure an off-campus P.O. Box by next Friday and provide this information to me in writing."

149.   On February 2, 2015, I went to the Microbiology Department business office to request the mail that had arrived for me during my last week of employment (I needed very important documents that were supposed to have already been mailed to me—my W-2 form, my HNE 1099-HC form, the information about the mandatory retirement plan OBRA, etc.) The clerks at the Microbiology Department office told me that Prof. Lopes had directed them to give him my mail. This action was yet another retaliatory action taken against me. I asked them whether they could ask for my mail from Prof. Lopes and they answered I had to ask for it myself. The assistant of Prof. Lopes, Ms. Wells, even said that Prof. Lopes was in his office, that I could knock on his door and ask him for my mail.

150.   On February 6, 2015, I went to the UMass-Amherst EO&D Office accompanied by Ms. Kathleen Anderson (the President of the Amherst branch of the NAACP) to ask advice about how to obtain my mail sequestrated by Prof. Lopes. I met with Atty. Ryan Morse who told me that this was my mail and I simply had to go to the Microbiology Department business office and demand it. In addition, he advised, in case Prof. Lopes would refuse to give me my mail or if he happened to be out, that I demand it via email.

151.   On February 6, 2015, after my visit at the EO&D Office, I went to the Microbiology Department business office to demand my mail. I was still accompanied by Ms. Anderson. The clerk in charge of the mail, Ms. Allis, said Prof. Lopes was not present and that she could not find my mail in his office. After that, I emailed him at 12:36 pm to demand my mail (Ex. "146").

152.   On February 6, 2015, I entered a forwarding address in UMass-Amherst Human Resources system (Ex. "147") at 4:33 pm. Beforehand, I tried to make a change at the Post Office but I

was informed there that U.S. Postal Forwarding Services do not apply to addresses at UMass-Amherst and I was redirected to the UMass-Amherst Human Resources Office.

153. On February 6, 2015, Atty. Nathan LaVallee from the UMass-Amherst General Counsel Office, in response to the email I had sent earlier to Prof. Lopes, emailed me at 4:55 pm alleging that I had sent an unauthorized communication (Ex. "148").

154. On February 26, 2015, I returned to the Microbiology Department business office in company of a student, Ritika Kumar. I asked the two clerks present, Ms. Allis and Lorell Perreault, where my mail had been sent (no mail had been received yet at the new address that I had entered in the UMass-Amherst Human Resources system on February 6, 2015). They refused to answer. At this time, I had been requesting my mail for over three weeks. On the counter of Ms. Allis, I saw the issue for the month of February 2015 of the journal Nature Reviews in Biotechnology to which I was the only subscriber in the Microbiology Department. The mailing tag on it had been removed. I strongly suspect that this was my periodical that the Microbiology Department business office had kept. This was yet another retaliatory action by the respondents.

155. On February 26, 2015, I asked Atty. LaVallee in person to tell me where my mail had been sent and to tell the Microbiology Department business office to return my periodicals to me.

156. On February 27, 2015, Atty. LaVallee hand-delivered to me an envelope containing the mail received at my previous office of employment for the week of February 23, 2015 (it consisted of one first class letter), a copy of my W-2, a copy of my last paycheck showing that the hard copy paycheck had been mailed to my new forwarding address in the UMass-Amherst Human Resources database on February 27, 2015, and a copy of my HNE 1099HC form. This was now twenty-five (25) days after I had initially requested my mail. I again asked him for my periodicals and I asked to what address the mail that I was given copies of had been delivered during my last week of employment and the time period prior to February 23, 2015.

157. On March 2, 2015, Atty. LaVallee told me at last where my mail had been sent (Ex. "149"). He rewrote the last email of Prof. Lopes to make it look as if Prof. Lopes had told me what he meant by "your last known address in the system" in the email conversation of January 23, 2015 (Ex. "145"). I believe that Prof. Lopes sequestrated my mail then sent it to an address that no longer existed in the UMass-Amherst Human Resources database in retaliation for my three MCAD complaints.

158. On March 3, 2015, I filed at the Massachusetts Department of Labor Relations (DLR) a charge of prohibited practice (violation of the duty of fair representation; DOCKET NUMBER: ▇▇▇▇▇▇▇) against the union PRO-UAW (Ex. "150").

159. On March 23, 2015, regarding the charge ▇▇▇▇▇▇▇, an in-person category II investigative conference was scheduled on April 15, 2015 at 10 am at the DLR office in the State Office Building of Springfield, MA (Ex. "151").

160. On March 24, 2015, I filed at the Massachusetts DLR a charged of prohibited practice (retaliation for having engaged in protected activities; DOCKET NUMBER: ▇▇▇▇▇▇▇)

with regard to the refusal of Mr. Reade to extend my program at UMass-Amherst so that I could work for Prof. Ribbe (Ex. "152").

161. On April 9, 2015, regarding the charge ████████, an in-person category II investigative conference was scheduled on May 7, 2015 at 10 am at the DLR office in the State Office Building of Springfield, MA (Ex. "153").

162. On April 15, 2015, an investigative meeting was held in the presence of the DLR hearing officer Atty. Brian Harrington to hear my grievance against the union (Ex. "151").

163. On May 6, 2015, at 3:46 pm Atty. Ethan Mutschler from UMass General Counsel Office sent a motion to attempt to dismiss the charge ████████ (Ex. "154") but the DLR hearing officer, Atty. Brian Harrington, maintained the investigation meeting of May 7, 2015.

164. After the May 7, 2015 DLR investigative conference, I found in my email a message sent on the same day at 10:48 am, from Dr. McCrary, to rescind his offer and cancel my transfer to Morgan State University (Ex. "155"): "We can no longer be in a position to offer you an opportunity at Morgan State University per Dr Niba's email. We ask you (sic) contact the proper authorities and (sic) arrangements for your immigration status consistent with the current laws."

165. On May 19, 2015, an investigation conference was held in the presence of the MCAD compliance officer, Maryann Brunton, regarding the second complaint that I had filed at the MCAD on November 5, 2014 (#████████) (Ex. "156").

166. On May 27, 2015, I met with the head of UMass-Amherst Biology Department, Prof. Rolf Karlstrom (Ex. "157"). During our conversation I explained some of the problems I encountered in the Lovley lab and I expressed my interest in performing postdoctoral researches in his Department. Prof. Karlstrom did not question my characterization of the Lovley lab. He even stated that Prof. Lovley was known for putting several postdocs on the same project to force them to compete when I told him that I had been tasked with helping Ms. Ward. He referred me to one of the Faculty in his Department who might be interested in my profile, Prof. Jeffrey Blanchard (Ex. "157"). He also mentioned that several Faculty from the Microbiology Department had already transferred to his Department. Ms. Anderson was present at this meeting as well as two of her friends (one of these two persons, Ms. Susan Theberge, is a personal friend of Prof. Karlstrom). After the meeting, Ms. Anderson said to me that Prof. Karlstrom told her that he was not surprised by what I was recounting and that Prof. Lovley was "screwing [me] up."

167. On June 1, 2015, based on the confidential grant application that I had started to draft and share with him on this same day (Ex. "158"), Prof. Blanchard offered me a self-funded position of about six months at least until he could compensate me via a grant.

168. On June 5, 2015, Prof. Blanchard sent me an email where he wrote "I just sent a letter of support to Nancy Cardon (sic) and Ken Reade. Best wishes in this process." (Ex. "159"). Thereafter, Prof. Blanchard emailed me on June 18, 2015 (Ex. "160") stating: "I talked with Nancy Condon and Nate LaVallee yesterday. They are working on it and will contact me

when we can move forward with the application. It sounds like it maybe (sic) a week or two." In reality, UMass-Amherst was denying me the opportunity to work with Prof. Blanchard. This was expected as ████████████████████ had already announced me about forty minutes earlier on the same day (Ex. "161"): "I just spoke to Mr. Reade, and he said he could not discuss your case. He referred me to a Mr. LaVallee, a university lawyer in Whitmore. I called Mr. LaVallee and told his secretary why I was calling. The secretary asked me to send Mr. LaVallee an email. She commented that that (sic) he was going to get back to me after he finished other business. Long story short, I am sure Mr. LaVallee is not likely to be helpful. I will send him an email and cc you." In fact, ████████████ did send an email to Atty. LaVallee a few minutes after he emailed me (Ex. "162") but he never received an answer. Following the email that I received from ████████████, on this same day, without even requesting my permission, the Department of State ("DOS"), which I had contacted on June 2, 2015 to explain that I was being retaliated against by the sponsor of my program, filed a complaint on my behalf (Ex. "163").

169. On June 19, 2015, a hearing was held at the Department of Unemployment Assistance (DUA) regarding a pre-date issue (Ex. "164"). Ms. Pleasant who is the UMass-Amherst Human Resources Benefits supervisor but also the person who wrote the respondents' position statements to my previous MCAD complaints, was the representative of UMass-Amherst at this hearing. She performed a direct retaliatory act during the hearing. Indeed, whereas she had been invited by the DUA Review Examiner, Kathleen Della Penna, solely to attend the hearing (and not to be a participant), she started to ask me questions and to insist that Ms. Della Penna enter in the Exhibits of the case a letter written by Atty. LaVallee. In his letter, Atty. LaVallee was demanding that DUA not allow me to receive benefits until I could provide an updated work authorization. At that time, he knew already that Prof. Blanchard had offered me a non-compensatory position for six months until I could get funded via a grant (Ex. "160"). Therefore, Atty. LaVallee's letter was retribution for my past engagement in protected activities and signaled me that the offer of Prof. Blanchard, similarly to Prof. Ribbe's offer, would not be processed by UMass-Amherst IPO. Moreover, by doing so the employer also knew that it would prevent me from receiving unemployment assistance. I allege that this was another direct retaliation as I had not been discharged but laid off. Unfortunately, Ms. Della Penna did not look into the retaliation (she did not document the retaliatory act that took place during this hearing but the hearing was recorded). However, she reversed the previous non-monetary determination regarding the pre-date issue that was being heard (Ex. "165").

170. On August 5, 2015, DOS rendered a determination. Without any explanation they alleged that they had found no evidence of retaliation (Ex. "167"). A few weeks after the August 5, 2015 determination, I learned that Atty. LaVallee had been forced to resign. Later, on April 29, 2016, Atty. Laura Quilter, who is the Copyright and Information Policy librarian at the UMass-Amherst Du Bois library, told me that several employees had already complained about Atty. LaVallee (herself included) because "he was giving bad advice."

171. On September 29, 2015, Prof. Blanchard wrote: "[…] my understanding is that you do not have the necessary approval to work at UMass," without offering an explanation of what he meant by "necessary approval" (Ex. "166"). I was denied yet another position at the University in retaliation for my three MCAD complaints.

172. Since October 22, 2015, I have been reporting two counts of Domestic Assaults and Battery perpetrated against me on September 30, 2015 and October 1, 2015, by a UMass-Amherst student, Michael Mongeau, while being a roommate of this student on the campus of UMass-Amherst. However, after filing a crime report at the UMass-Amherst Police Department ("UMPD") on November 5, 2015, my case was not investigated despite the fact that, before me, several students of UMass-Amherst had already complained about Mr. Mongeau. This is in retaliation for having filed complaints with the MCAD. The UMPD was fully aware of my accusations against UMass-Amherst because I shared this information on October 22, 2015 during my interview with Sergeant David Black as well as in my November 5, 2015 crime report.

173. On January 14, 2016, two employees of the UMass-Amherst Du Bois library, Ms. Teresa Warner and Ms. Roberta Armenti filed a false report against me at the UMPD (Ex. "168"). A few moments later, a building monitor of the Student Union, Miguel Alex Rivera, called the UMPD on me, once again, simply because I was in tears after the traumatic event that I had just endured from the false allegations of both Ms. Warner and Ms. Armenti (Ex. "169"). In fact, Ms. Warner's and Ms. Armenti's false allegations were a retaliatory response to the request that I had formulated three days earlier to an undergraduate student, Sandra Nguyen, who had been disrespectful toward me on several occasions at the Teaching Commons located on the 26th floor of the Du Bois library. Indeed, on January 11, 2016, after Ms. Nguyen started to harass me again, I requested to meet with a supervisor of the Du Bois library who has at least a Ph.D. degree under the incentive that such a person would understand why I needed to write and print (i.e., work) so much at the library. Before I got a chance to speak with any supervisor, Ms. Warner and Ms. Armenti took advantage of the fact that on January 14, 2016 I was running late at the Du Bois library to call the Police on me and accuse me of having been living at the library and of having no right to use the Faculty writing room, etc.

174. On March 23, 2016, Aaron Snow, a building monitor employed at the Du Bois library who believed that the UCard for Faculty and Staff that I had was a fraudulent card, filed a racially-biased report against me in the internal records of Ms. Warner (Ex. "170"). The report starts by "At 4:15am during a rove I arrived on the 25th floor and knocked twice and announced twice 'building monitor' on the door of the women's room (as I always do during my roves) as I slowly opened the door I viewed a person dressed in black jump into a stall and slam the door shut." Mr. Snow described in these ridiculous terms "jump into a stall and slam the door shut" the fright he caused me when I saw an unknown male unexpectedly enter the female bathroom of the 25th floor of the Du Bois library at about 4:15 am on March 23, 2016. Moreover, he wrongly described me as "a person dressed in black" whereas I was wearing no clothes that were of a black color or a dark color. This is how Mr. Snow justifies the hard time that he made me endure then to verify whether or not the UCard I showed him was valid.

Indeed, showing him my UCard was not enough for him, he needed to verify its validity. I doubt that Mr. Snow would have subjected to such a level of scrutiny or would have mistrusted a White person placed in a similar situation. Because he could not find me in the main database of the people affiliated to the UMass-Amherst campus, he wrongly concluded that I was committing a fraud and he started to ask me to leave the library at about 4:15 am. He kept refusing my plea that he verify via the circulation desk that my UCard was valid. When, finally, he realized his mistake, he got scared, he did not even apologize and he stated that he needed his job because he had two little kids.

175. On March 24, 2016, during a meeting organized at my request, Ms. Warner stated in front of ████████████████, Ms. Leslie Button—who is the Assistant Director of the UMass-Amherst Du Bois library—and myself, that she never said to the UMPD that I was living at the library or that I was not allowed to use the Faculty writing room in reference to the false report she and Ms. Armenti filed against me on January 14, 2016. When I asked her to go to the UMPD fix her statements in the report that she and Ms. Armenti had filed against me, she did not respond (Ex. "171"). When I asked her to redact my name from the disparaging report filed in the internal records of the Du Bois library by Mr. Snow, she refused twice (Ex. "171").

176. Since April 1, 2016, I have asked several times to the recently-appointed UMPD Chief, Tyrone Parham, to investigate the false allegations of Ms. Warner and Ms. Armenti, but as for the two counts of Domestic Assault and Battery cited previously, he has kept refusing (Ex. "172"). Once again this is in retaliation for having filed complaints with the MCAD.

177. On April 26, 2016 ████████████'s application to allow the extension of my courtesy account at UMass-Amherst filed three days earlier on April 23, 2016 was rejected without justification and he was referred to Mr. Reade, the director of the IPO (Ex. "173").

178. On June 23, 2016, ████████████ contacted DOS to inquire for help to have my immigration paperwork processed in relation to the funded position for which he currently would like to hire me. He was referred to the UMass-Amherst IPO (Ex. "174").

179. On August 18, 2016, ████████████ informed his Department Chair, Prof. Laura Valdiviezo, that he would like to appoint me with the Center for Racial Justice and Urban Affairs (Ex. "175").

180. On August 29, 2016, ████████████ requested help from Prof. Valdiviezo to facilitate the processing of my work authorization (Ex. "176").

181. On September 12, 2016, ████████████ emailed Ms. Condon to schedule a meeting to discuss procedures for obtaining a work authorization for me (Ex. "177"). Ms. Condon answered that she forwarded the request to Mr. Reade (Ex. "177"). This was again in retaliation for my three MCAD complaints.

182. On September 16, 2016, Mr. Reade answered (Ex. "178"): "The situation was carefully discussed within the Provost's Office and Human Resources and I have been informed that the university will not authorize any further consideration of employment of ████████." This was yet more retaliation for my three MCAD complaints. When asked "[…] on what

grounds wAS (sic) the decision made to not authorize any further consideration of employment of ▮▮▮▮▮▮▮?" Mr. Reade deferred to the Vice Provost for Academic Personnel, John Bryan (Ex. "178"). So far at the date of filing of this affidavit, Mr. Bryan has still not shared with ▮▮▮▮▮▮▮▮▮ any of the justifications for denying me the proffered position.

183. On November 28, 2016, Prof. Lovley published an updated version (Ex. "179") for the review he published on March 4, 2013 and that included a plagiarized version of a figure, which I had shared with him and Prof. Nevin in July 2011 (Ex. "4"). In this revised review (Ex. "179"), he corrected (cf. Figure 2 on page 2 in Ex. "179") the mistakes he made in the figure summarizing his March 4, 2013 review (Ex. "6"), when he plagiarized my figure (Ex. "4"). And his co-author for this review is, as for the review he published on March 4, 2013, a White female from the U.S., recently recruited by UMass-Amherst, Prof. Caitlyn Butler.

184. On January 17, 2017, Prof. Lovley published in the journal mBio another article (Ex. "180") for which my contributions to the new pili purification protocol used in his lab were integral. On this article (Ex. "180"), Dr. Tan has a shared first-author position. As in the previously-cited two articles on which Dr. Tan has a first author position (Ex. "18" and Ex. "68"), the Materials and Methods section (cf. on page 7 in Ex. "180") makes reference to "a Waring Blender" and "ammonium sulfate," which were part of the ideas I suggested when I was creating a new pili purification protocol in the Lovley lab in June-July 2014 (cf. my Research Proposal #3 as well as Ex. "45" and Ex. "60").

185. On April 5, 2017, to my numerous requests to the EO&D Office for a decision on whether I can file a formal complaint regarding the two UMPD employees, Sergeant Jonathan Hall and Officer Jessica Norton, who wronged me in a false report (pre-emptively filed against me by Mr. Mongeau), Atty. Morse answered: "I have been informed that you are engaged in active litigation against the University, and are currently represented by counsel. At this time, the EO&D Office will not be responding to your queries, and must insist that any communication be directed to the University's counsel by your counsel of record." (Ex. "181"). This is in retaliation for filing complaints with this Commission. On March 3, 2016 (i.e. seven months before the end of the statute of limitations), I contacted Atty. Morse to file a complaint with his office (Ex. "182"). After considerable efforts, I was finally authorized by the Executive Director of the EO&D Office, Atty. Debora Ferreira who I met on April 27, 2016, to have an intake meeting. According to Atty. Ferreira, the purpose of this intake meeting was to determine whether my allegations of wrongdoing by employees of UMass-Amherst had ground to allow me to file a formal complaint. During the intake meeting held on May 25, 2016, I shared multiple documents substantiating my allegations. The April 5, 2017 response of Atty. Morse (Ex. "181") revealed that I have been denied the right to file a formal complaint. And, to date, the EO&D Office has made no comment on the evidence I have provided since May 25, 2016.

Signed under the pains and penalties of perjury this 18th day of April 2019,

Before me, The undersigned notary public,
Douglas R. Dagarin, appeared Sylvie
Sivapah, known to me, and under pains
and penalties of perjury swore that
the foregoing affidavit is true
to her own knowledge.

4/18/19

Notary Public
Commonwealth of Massachusetts
My Commission Expires July 17, 2020

32



**- Notice of Order**

1 meddelande

-COMMONWEALTH OF MASSACHUSETTS

Dated: August 15, 2019

NOTICE OF DOCKET ENTRY

IMPORTANT INFORMATION ABOUT ELECTRONICALLY FILING

Thank you.