# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

### Civil Action No. 3:19-cv-30056-MGM *SEALED*

████████████ , an individual,
**Plaintiff,**

v.

**UMass-Amherst, a Massachusetts public institution of more than 300 employees,
Dr. Derek Lovley, an individual,
Dr. Toshiyuki Ueki, an individual,
Dr. John Lopes, an individual,
Defendants.**

### Dated August 12, 2019

## MEMORANDUM IN SUPPORT OF
## AUGUST 12, 2019 SECOND MOTION FOR IMPOUNDMENT

The present document is organized as described in the Table of Contents on page 2. References are made to applicable exhibits, of which a detailed list is furnished on pages 3-4, and which are all appended to the present memorandum. Plaintiff is under the impression that no copyrights law was violated by providing press materials in some of these exhibits.



81

## Table of Contents

**List of Exhibits** ...................................................................................................................**3**

**Affidavit** ............................................................................................................................**5**

**Procedural History** ...........................................................................................................**6**

**Argument** ...........................................................................................................................**7**

    *Preliminary* .....................................................................................................................*7*

    *Standard for ruling on an impoundment motion* ...........................................................*7*

    *URIP Balancing test to determine whether good cause exists* .....................................*10*

        *The nature of the parties and the controversy* ...........................................................*10*

        *The type of information and the privacy interests involved* ......................................*13*

        *The extent of community interest* ..............................................................................*29*

        *The reason for the request* .........................................................................................*31*

        *Constitutional rights, investigative secrecy, and safety* ...........................................*34*

        *Immediate and irreparable harm is very probable* ...................................................*35*

    *Narrow tailoring* ...........................................................................................................*36*

**Conclusion** .......................................................................................................................**38**

**Service** .............................................................................................................................**39**

## List of Exhibits

Exhibit "01", Copy of the article "Wired Bacteria Form Nature's Power Grid: 'We Have an Electric Planet'" written by the author of the "Matter" column for The New York Times, Carl Zimmer, and published on July 1, 2019 ............................................................................. 10

Exhibit "02", Copy of the article "Professor says Harvard was warned of abuse" written by The Boston Globe staff, Beth Healy and Deidre Fernandes, and published on May 25, 2019 ........ 10

Exhibit "03", Copy of the Nature Editorial "Protect postdocs. A survey of young scientists in the United States highlights the exploitation of visa holders" pre-published online on November 21, 2018 and published on November 22, 2018 ..................................................................... 11

Exhibit "04", Copy of the Nature Correspondence "Royal Society president stands up for Chinese scientists in the United States" written by Dr. Venkatraman Ramakrishnan, pre-published online on July 16, 2019 and published on July 18, 2019 ................................................ 12

Exhibit "05", Copy of The Baffler article "Surely, You're a Creep, Mr. Feynman" written by Leila McNeill and published online on January 8, 2019 ............................................................ 13

Exhibit "06", Copy of The Guardian article "Academia is built on exploitation. We must break this vicious circle" anonymously signed and published online on May 18, 2019 .................... 14

Exhibit "07", Copy of the email sent by the then MCAD investigator, Atty. Olga Serafimova, to Plaintiff on October 16, 2014 ........................................................................................... 15

Exhibit "08", Copy of the email sent by the then MCAD investigator, Atty. Olga Serafimova, to Plaintiff on November 13, 2014 ......................................................................................... 16

Exhibit "09", Copy of the page "Whistleblower Protections: History and Current State of the Law" published on March 2, 2016 and available in the section News Past Events of the Royal Law Firm's website .............................................................................................................. 16

Exhibit "10", Copy of the second pre-complaint filed by Plaintiff at the DLR on March 24, 2015 ......................................................................................................................................... 16

Exhibit "11", Copy of the email sent by the Hamphire Law Library to Plaintiff on May 1, 2015 ......................................................................................................................................... 16

Exhibit "12", Copy of the two Wilberforce Pamphlet documents, PowerPoint presentation and English online reading, downloaded by Plaintiff on May 1, 2015 from the official J-1 Visa website, dated respectively April 29, 2014 and December 22, 2014 ...................................... 17

Exhibit "13", Copy of email conversation with the lead program analyst at the Office of Private Sector Exchange Administration of DOS Bureau of Educational and Cultural Affairs, Mark Howard, between June 2, 2015 and December 15, 2015 ....................................................... 18

Exhibit "14", Copy of the first complaint filed by Plaintiff at the Civil Rights Department of the AGO Western Massachusetts Division in Springfield, MA on February 24, 2015 ................. 19

Exhibit "15", Copy of the email and the attached letter sent by the AGO paralegal Sharon Coles to Plaintiff on February 25, 2015 ..................................................................................... 20

Exhibit "16", Copy of first cover both sides, page 1, and page 22 of the UMass-Amherst School of Public Health and Health Sciences 2015 Annual Report ................................................ 20

Exhibit "17", Copy of ██████████ LinkedIn page as it appeared on the date of July 17, 2019 ....................................................................................................................... 20

Exhibit "18", Copy of the page Public Health Center Locations of the Alaska Department of Health and Social Sciences Department of Public Health's website as it appeared on the date of July 17, 2019 ........................................................................................................................ 20

Exhibit "19", Copy of the second complaint filed by Plaintiff at the Civil Rights Department of the AGO Western Massachusetts Division in Springfield, MA on November 12, 2015 ..........20

Exhibit "20", Copy of the email sent by AGO Civil Rights Department Senior Investigator, Richard Steward, to Plaintiff on February 11, 2016 ..............................................20

Exhibit "21", Copy of the third complaint filed by Plaintiff at the Civil Rights Department of the AGO Western Massachusetts Division in Springfield, MA on May 12, 2016 ........................22

Exhibit "22", Copy of the letter of the then Springfield Representative, Benjamin Swan, to AGO Senior Investigator, Richard Steward, dated May 19, 2016 ....................................22

Exhibit "23", Copy of email sent by Plaintiff to AGO Senior Investigator Steward on June 15, 2016 ..............................................22

Exhibit "24", Copy of the email and the attached letter sent by Ms. Coles to Plaintiff on June 24, 2016 ..............................................22

Exhibit "25", Copy of the email sent by State Police Detective Gary Hebert to Plaintiff on November 2, 2015 ..............................................23

Exhibit "26", Copy of the article "Inside the secret courts" written by The Boston Globe's Spotlight Team and published on September 30, 2018 ....................................24

Exhibit "27", Copy of the email conversation between Plaintiff and ADA Jennifer Suhl from May 19, 2016 until April 21, 2017 ..............................................24

Exhibit "28", Copy of the email sent by Atty. Scott Clark to Plaintiff on July 29, 2019 .............26

Exhibit "29", Copy of The New York Times article "Star Economist at Harvard Faces Sexual Harassment Complaints" written by Jim Tankersley and Ben Casselman and published on December 14, 2018 ..............................................27

Exhibit "30", Copy of Plaintiff's April 3, 2014 medical records at the UMass-Amherst Health Department obtained on August 21, 2018 ..............................................28

Exhibit "31", Copy of Plaintiff's July 1, 2016 medical records at Cooley Dickinson Hospital in Northampton, MA obtained on July 8, 2016 ..............................................28

Exhibit "32", Copy of the January 8, 2018 letter mailed by the AGO Victim Compensation and Assistance Division Investigator, Atty. Kristal Rohloff, to Plaintiff ....................................28

Exhibit "33", Copy of first and second surgical opinions regarding Plaintiff's April 22, 2017 right knee injury dated respectively January 25, 2018 and March 14, 2018 ........................28

Exhibit "34", Copy of the email sent by ▓▓▓▓▓▓ to Plaintiff on August 11, 2014 ....30

Exhibit "35", Copy of the CNN Politics article "Trump decries immigrants from 'shithole countries' coming to US" written by Eli Watkins and Abby Phillip and published online on January 12, 2018 ..............................................30

Exhibit "36", Copy of the page Public Patent Information Retrieval of the U.S. Patent and Trademark Office's website as it appeared on August 7, 2019 ....................................31

Exhibit "37", Copy of the page ▓▓▓▓▓▓ of the PacerMonitor website as it appeared on August 7, 2019 ..............................................32

Exhibit "38", Copy of the Nature World View article " Universities show their true colours in court" written by Dr. Steven Piantadosi and published online on July 1, 2019 ........................32

Exhibit "39", Copy of the Science article "What's in a name?" written by Melissa McCartney and published on August 9, 2019 ..............................................34

## Affidavit

Plaintiff is represented pro se and avers, under the pains and penalties of perjury, that the statements herein are true.

Respectfully sworn under oath,
/s/ ████████████,

## Procedural History

1. On April 22, 2019, Plaintiff filed a complaint for damages with a demand for a jury trial (Dkt. No. 2). This complaint was accompanied with a petition for impoundment of the records of this case and an in-camera hearing to argue this motion (Dkt. No. 4).

2. On June 19, 2019, Plaintiff received an order entered on June 17, 2019, denying without prejudice the motion for impoundment with an in-camera hearing to present argument (Dkt. No. 9). This order also informed Plaintiff that she had until July 12, 2019 to resubmit a motion for impoundment supported with a memorandum of law.

3. On July 3, 2019, Plaintiff filed a motion for extension of the July 12, 2019 deadline to September 12, 2019 (Dkt. No. 14).

4. On July 18, 2019, Plaintiff received an order entered on July 15, 2019 denying the motion for extension until September 12, 2019 but allowing it until August 12, 2019 (Dkt. No. 15).

5. On August 12, 2019, Plaintiff filed a second motion for impoundment supported with the instant memorandum. Plaintiff also submitted a motion for leave to file this memorandum under the pre-ordered seal with an ex-parte review to avoid disclosing protected information as well as her strategy to the Defendants and the public.

## Argument

### Preliminary

6.   Plaintiff would like to move for a confidential litigation for as long as this Honorable Court will deem it required. Plaintiff is aware of the alternative of filing a motion for leave to litigate using a pseudonym. However, the level of confidentiality requested by Plaintiff consists in keeping away from the public's eye the records of the case 3:19-cv-30056-MGM, which the practice of proceeding anonymously will not fulfill.

7.   As a valid legal reason that can outweigh the public's interest in open judicial proceedings, Plaintiff asserts a reasonable fear of severe harm from litigating this case without restricting the public's right of access to court filings.

### Standard for ruling on an impoundment motion

8.   Plaintiff's research indicates that the First Circuit has not yet explicitly set out for courts an *ad hoc* test governing requests to conduct litigation under seal. The legal standard of establishing the existence of exceptional circumstances precluding court records disclosure has been articulated by the First Circuit in *F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404, (1st Cir.1987) when the government is a party. "Public access to judicial records and documents allows the citizenry to 'monitor the functioning of our courts, thereby ensuring quality, honesty and respect for our legal system.' ... The appropriateness of making court files accessible is accentuated in cases where the government is a party ... the public's right to inspect such records is not absolute. It can be blunted if 'court files might ... become a vehicle for improper purposes,' ... or where access could interfere with the administration of justice.... We agree with the Sixth Circuit that '[o]nly the most compelling reasons can justify non-disclosure of judicial records.' ... When faced with a claim that cause sufficiently cogent to block access has arisen, it falls to the courts to weigh the presumptively paramount right of the public to know against the competitive private interests at stake.... This balance must be struck of course, 'in light of the relevant facts and circumstances of the particular case.' ... The objectors—those seeking to keep the datum hidden from view—must carry the devoir of persuasion." *See F.T.C. v. Standard Financial Management Corp.*, *supra* at 410-411.

9. The First Circuit complemented this standard in *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7 (1st Cir.1998). "Though, the public's right of access to such materials is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access.... It follows that when a party requests a seal order, ... a court must carefully balance the competing interest that are at stake in the particular case.... The mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access.... Suffice to say that the interest in preserving a durable barrier against disclosure of privileged attorney-client information is shared both by particular litigants and by the public, and it is an interest of considerable magnitude. Indeed, this is precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records." *See Siedle*, 147 F.3d 7 at 10-11.

10. Nonetheless, the abovementioned standard does not exhaustively identify the pertinent factors to analyze when calculating the existence of "sufficiently compelling reasons to warrant cloaking the documents in secrecy" or "special circumstances adequate to overcome the presumption of public accessibility." *See F.T.C.*, 830 F.2d at 412-413. Thence, Plaintiff will also refer (*see* below) to the Uniform Rules of Impoundment Procedure ("URIP") in the Commonwealth of Massachusetts, also known as the Massachusetts Trial Court Rule VIII.

11. "The decision to impound is 'always the exception to the rule [of publicity],' [*see Republican Co. v. Appeals Court*, 442 Mass. 218, 223 (2004)], and must be born of the particular facts and circumstances of a given case." *See New England Internet Café, LLC v. Clerk of the Superior Court for Criminal Business in Suffolk County*, 462 Mass. 76, 85 (2012). The presumption of publicity of judicial records is not absolute and may be restricted on a showing of cause relying on the performance of the balancing test set forth in URIP 7(b). "To determine whether good cause is shown [to restrict public availability to court records], a judge must balance the rights of the parties based on the particular facts of each case, [*see Boston Herald, Inc. v. Sharpe*, 432 Mass. 593, 604 (2000)] and take into account all relevant factors, including but not limited to, the nature of the parties and the controversy, the type of information and the privacy interests involved, the extent of

community interest, and the reason for the request.... A party's constitutional rights, investigative secrecy, and the safety of a person or the public are also concerns.... A legitimate expectation of privacy ordinarily is sufficient to constitute good cause.... [But a]llegations of potential embarrassment, or the fear of unjustified adverse publicity, are not sufficient to constitute good cause." *See* Committee Notes on URIP 8(a). The party urging impoundment or continued impoundment of records always bears the burden of demonstrating the existence of good cause. *See* Committee Notes on URIP 10.

12. "If there is good cause to impound court documents, a judge is required to tailor the scope of the impoundment order so that it does not exceed the need for impoundment." *See Boston Herald, Inc.*, 432 Mass. at 605. In this regard, the Committee Notes relative to URIP 8(c) indicate that "[i]f the court determines that good cause is shown, the court must tailor the scope of the impoundment order and limit it to the requirements of the case's particular facts and circumstances.... (burden falls on party seeking impoundment to demonstrate that the impoundment order is narrowly tailored).... Impoundment should be no more extensive than necessary. Although it is often easier to impound more than is necessary, the court should be careful to impound only the portions of the record that require impoundment. An entire case record should not be impounded to protect the confidentiality of some documents. An entire filing should not be impounded to protect the confidentiality of an exhibit. When possible, redacted versions of impounded documents should be filed. The court should be skeptical of arguments that following proper procedures is too cumbersome."

13. In accordance with the Massachusetts Impoundment Procedure, "Medical, Health and Hospital Records" as well as "Trade secrets and other matters in connection with discovery" are listed as "material that a statute, court rule, or standing order designates must be withheld as 'impounded,' 'withheld from public inspection,' 'not available for public inspection,' 'confidential,' 'segregated,' or 'sealed.'"

14. The Uniform Practice I "Clerk's Handling of Impounded Material," included in the Massachusetts Impoundment Procedure, recommends at section (A)(5) that "[w]hen an entire case record is impounded, its docket number and a case caption shall remain public. The case caption shall be revised to omit the parties' names."

*Argument*

**URIP Balancing test to determine whether good cause exists**

*The nature of the parties and the controversy*

15. The parties involve, for the Defendants, employees of a state public university in Massachusetts who are members of the upper class and/or high-profile public figures. One of the four defendants, Dr. Derek Lovley, has been regularly for more than a decade among the ten highest-paid state employees in Massachusetts. Plaintiff has repeatedly been told directly and indirectly that Dr. Lovley is a "very powerful" individual who is above the law. Recently, Dr. Lovley was cited in an article of The New York Times "Wired Bacteria Form Nature's Power Grid: 'We Have an Electric Planet'" written by Carl Zimmer and published on July 1, 2019 (Exhibit "01").

16. On the opposite side stands Plaintiff: an individual representing herself whilst exhibiting a multi-layered vulnerability stemming from being a non-immigrant foreigner whose native language is not English; without family or friends; indigent; undocumented; dark-skinned; and female. Whence, a stark power imbalance between Plaintiff and the Defendants in terms of access to resources and influencers, which puts Plaintiff at a substantial and fundamentally unfair disadvantage.

17. The article "Professor says Harvard was warned of abuse" written by Beth Healy and Deidre Fernandes, published in the edition of May 25, 2019 of The Boston Globe (Exhibit "02"), describes the type of power disparity faced by Plaintiff. "... some Faculty and graduate students ... have raised alarms and staged protests about the problems faced by graduate students **at the hands of the powerful professors who are supposed to be their mentors**.... For graduate students, reporting misconduct by a professor can be particularly fraught. Professors and department chairs guide their research and apply for grants that can help fund their pay. They also provide important recommendations for future positions, and help students establish contacts that can propel their careers. At Harvard, **that power imbalance can be magnified even further: Professors are often superstars in their fields** ... graduate students said. '**The power relationships in academia are difficult. Your supervisor has all control over your career**,' ...." (Emphasis added). Even if Plaintiff was a professional researcher (and not a graduate student any longer) when she worked in the Lovley lab (and where Dr. Lovley was

supposed to be her "mentor"), these observations directly apply to Plaintiff's circumstances. Furthermore, and The Boston Globe's article abovementioned, unfortunately, does not refer to this paramount factor, for graduate students and postdocs who are not immigrants or U.S. citizens, the situation is worse; particularly when they are not self-supporting. They are at the mercy of the Faculty who have *voluntarily* admitted them in the programs in which they showed interest. Literally and figuratively, non-immigrant foreign mentees are on ejection seats controlled by two sponsoring entities: hosting institutions, directly, and mentors, indirectly.

18. Plaintiff believes it is relevant to emphasize that U.S. educational and research institutions rely for the success of their programs on a substantial number of non-immigrant foreign students and postdoctoral researchers. These non-immigrants are usually systematically recruited when they are self-supporting (via e.g., their own governments, and/or foreign private foundations/organizations/corporations, and/or their personal savings). However, a significant fraction of these non-immigrants, not externally funded, also successfully competes with the supply of students and postdocs who are U.S. citizens or immigrant foreigners. Yet, this latter category of non-immigrants is overlooked: its treatment is rarely investigated or documented in the U.S. press. Following the emergence of the #MeTooSTEM movement, Nature, the first worldwide leading scientific journal, published on November 22, 2018 in its editorials "Protect postdocs. A survey of young scientists in the United States highlights the exploitation of visa holders." This article, pre-published online on November 21, 2018 under the title "Stop exploitation of foreign postdocs in the U.S." (Exhibit "03"), explains why the power disparity is aggravated when the postdoc is a non-immigrant who is not self-supporting. "**Some PIs are exploiting the fact that overseas scientists rely on them for continued visas**.... senior scientists are using this reliance to force postdocs to work longer hours and endure unacceptable conditions. The following was said to the study's authors by a postdoc at a US leading university: ... 'Our PI creates this pressure-cooker environment in our lab ... you see the foreign postdocs sleeping on the floor of the labs, working 100-plus hours a week ... PIs know what they are doing ... they take advantage of these guys.' Here is the view of a university administrator: I see something bad almost every week and it seems to be getting worse ... postdocs come into my office and ask me if this or that seems wrong to me ... **the visa issue is a big one**

because foreign postdocs are afraid to report their PIs ... **these are small scientific communities and PIs will blackball their postdocs if you cross them.**' ... **Most estimates agree that about half of the postdocs working the in Unites States are overseas visitors who rely on short-term visas.** Institutions typically sponsor the renewals and extensions. This is largely done by individual departments and lab heads, with universities' central administrations having little formal role in the recruitment and experiences of postdocs. **This puts senior scientists in a position of power. None should use this as leverage against less senior colleagues—many of whom are far from home and vulnerable.**" (Emphasis added).

19. Plaintiff's analysis of the nature of the parties and the controversy would be incomplete if she did not point out that the most part of these non-immigrant foreign postdocs, funded externally or not, invited in routine to perform research at the U.S. most prestigious institutions, will end up positioned on tenure-track paths, and concomitantly sponsored to immigrate to the U.S., by these same institutions. On this aspect, the Royal Society President, Dr. Venkatraman Ramakrishnan, in a correspondence to Nature "Royal Society president stands up for Chinese scientists in the United States" pre-published online on July 16, 2019 and published on July 18, 2019 (Exhibit "04"), reminded the following facts. **"Open societies have benefited immeasurably from an influx of international scientists. The rapid exchange of ideas and expertise depends upon such movement, as do innovation and economic growth.... About one-quarter of US National Academy of Sciences members and one-quarter of US Nobel prizewinners were born abroad — and many more are children of immigrants.** Three of the past five presidents of the Royal Society in London came from overseas, myself included: I'm an Indian-born US and British national." (Emphasis added). Dr. Toshiyuki Ueki, another defendant in Plaintiff's complaint, is a Japanese-born U.S. national, who almost twenty years ago was recruited by Dr. Lovley to carry out postdoctoral research in his lab while participating in the U.S. Exchange Visitor Program ("U.S. EVP") also known as the U.S. non-immigrant J-1 Visa, in the same manner that Plaintiff was in February 2014. In March 2014, Dr. Ueki was promoted Research Assistant Professor by Dr. Lovley himself in his own lab with UMass-Amherst sponsoring him for U.S. immigration. Dr. Lovley, like the last individual Defendant, Dr. John Lopes, is a descendent of immigrants.

20. The above-cited May 25, 2019 Boston Globe article (Exhibit "02") reports that "Blyth, in his letter, said that the bravery for a doctoral student to complaint about a top professor rivals what Hollywood actors had to summon in the face of Harvey Weinstein's alleged sexual harassment." This comparison sets straight the sharp unequal power dynamics in the instant dispute. However, in her Baffler online article "Surely, You're a Creep, Mr. Feynman" published on January 8, 2019 (Exhibit "05"), Leila McNeill remarkably pinpoints a particular component—"the popular conception of the genius mythos in the science"—at play in the "power differentials" at issue: "Genius is a familiar term in science too. It's been applied generously to male scientists throughout history to the present.... For a long time, their contributions to science—the evidence of their putative genius—excused their crimes."

21. In sum, in a type of controversy where contours are shaped by accusations of sexual harassment or white-collar labor exploitation human trafficking, from students or postdocs, against publicly prominent professors, Defendants have quasi-unlimited influences—pre-tipping the scale favorably on their side—that generally become unfettered when Plaintiffs are non-immigrants who are not self-supporting.

*The type of information and the privacy interests involved*

22. Since June 2014, Plaintiff has been attempting to obtain a fair hearing to expose the misconduct of Dr. Lovley who had offered to mentor her in the U.S. EVP governed by the U.S. Department of State ("DOS"). All aspects in this academic misconduct (fraudulent inducement of employment, plagiarism, refusal to credit Plaintiff's contributions, smearing Plaintiff's reputation *after* she began reporting unethical behaviors, blackballing, etc.) converge to the conclusion that Plaintiff was victim of white-collar labor exploitation human trafficking.

23. Even though to date Plaintiff's research for relevant similar legal cases has remained unfruitful, recent efforts of scientific communities to bring this type of exploitation to light offer guidance. *See* in the aforesaid November 22, 2018 Nature editorial: "None should use this as leverage against less senior colleagues—many of whom are far from home and vulnerable." In the same vein, another press article "Academia is built on exploitation. We must break this vicious circle" published online by the Guardian on May 18, 2019 and

noticeably anonymously signed, presents a variant in academic labor exploitation human trafficking, integral in Plaintiff's case (Exhibit "06"): **"Our universities claim to exist to provide our most brilliant minds the freedom to nurture their greatest ideas and inspire the next generation.... Sadly, students are also vulnerable to the theft of data, ideas and materials; not only by their colleagues, but sometimes by their own supervisor....** I once witnessed an incident that still saddens me. We had an undergraduate from overseas studying with us. **To support his work, he had brought some samples with him.** One of the PhD students was appointed to supervise him. **However, once the students got hold of his samples, the young visitor was virtually abandoned. The PhD students and professor were able to extract some useful data from the samples, yet the undergraduate remained excluded from all their success. I soon heard that the student had returned home with nothing to show for his stay with us. Before he left, he reported the theft of his samples and his subsequent exclusion from any research.** The incident was reported, but no action was taken against those responsible.... the wider community would be shocked to know this behaviour was so prevalent at the very highest level of education. The community expects so much more from people calling themselves 'doctor' or 'professor'. **The current model of postgraduate research is severely flawed and should be urgently addressed. If we don't, the vicious circle will continue."** (Emphasis added). Once again, even though Plaintiff was at all relevant times a postdoc, the situation described in this article captures the essence of what was done to Plaintiff. After having been invited to perform in the Lovley lab research projects she had devised herself, the promises made to Plaintiff (e.g., she would be supported on a U.S. Department of Energy grant for a year, establishing an independent researcher career path, credited for her contributions, etc.) were never honored. Plaintiff had earned this invitation based on the content of her brain; she did not make a donation and did not offer sexual favors in exchange for it, nor did she have an influential individual intervene to sway Dr. Lovley into selecting her. Plaintiff did not come empty-handed and contributed in the extremely short and challenging time (about four months under nearly constant hostile workplace harassment) she was actually allowed to work in this lab. Yet, Plaintiff ended up as a victim of violent crimes with her early academic career completely ruined.

*Argument*

24. Specifically, once Plaintiff began figuring out that she had in fact walked into a trap, all her efforts to save her researcher career resulted in causing her only more harm to the point that she was unlawfully removed from the U.S. EVP and became undocumented. While attempting to retrieve a valid program status, Plaintiff had to fight another type of exploitation, "commercial sex" under the guise of marriage to a U.S. citizen, into which predators, who had become aware of Plaintiff's additional layer of vulnerability, tried to coerce her.

25. Plaintiff, in the course of the abusive scheme of Dr. Lovley, also found out that this professor's research misconduct expanded to the realm of federal grant application frauds. For instance, federal funds awarded to Dr. Lovley, to perform specific experimental plans, were re-allocated—following changes in research directions that Plaintiff suspects were not disclosed to federal grantors—to support research efforts that consisted in implementing direct conversions of Plaintiff's research projects and/or early findings. As a result, Plaintiff became unwittingly a whistleblower.

26. Plaintiff's petitions for assistance while she was still in valid U.S. EVP status (or while she could still be reinstated to valid program status), yielded additional reprisals by the trafficking entity with, ironically, harmful inaction (non-enforcement of the rules, violation of due process rights, untimely protracted proceedings, etc.) by the agencies contacted. The patterns underlying this refusal to act reveal a sprawling concerted effort at obstructing the due administration of justice that have caused Plaintiff to become again, unwittingly a whistleblower, this time with respect to corruption at state and federal agencies.

    i. On October 7, 2014, a then Massachusetts Commission Against Discrimination ("MCAD") investigator, Atty. Olga Serafimova, after finding evidence of retaliation against Plaintiff, tried to convince Plaintiff to resign (Exhibit "07"): "... we are getting close to reaching an impasse and unfortunately you need to decide which is the lesser evil – take this offer, however unfair, or proceed and have to leave at the end of January anyway. I know this is a difficult decision to make, but unfortunately it is the situation in which you are [sic] in.". Once Plaintiff reasserted her refusal, instead of issuing a determination as she had promised, Atty. Serafimova informed Plaintiff on November 13, 2014 that "[u]nfortunately, this

case [was] in the process of being reassigned to a different investigator."
(Exhibit "08"). Very shortly after this announcement, Atty. Serafimova left the
MCAD for private practice at the Royal Law Firm in Northampton, MA. This firm
represents public schools, local organizations and corporations. While working at
Royal, P.C., Atty. Serafimova was invited by UMass-Amherst on March 1, 2016 to
"participate in a panel discussion on whistleblower protection legislation. The
discussion introduced UMass Amherst MBA students and members of the
community to the historic development of such legislation, the various contexts in
which whistleblowing is legally protected, the legal elements of a retaliation claim,
and what business owners and employers can do to minimize the risks of such
litigation." (Exhibit "09"). Incidentally, Atty. Serafimova has a strong Bulgarian
accent, which has made Plaintiff wonder whether, like Plaintiff, she was in the past
a participant in the U.S. EVP/non-immigrant J-1 Visa, or immigrated to the U.S. to
perform her post-secondary school studies.

ii.  On May 1, 2015, while preparing an in-person investigation conference scheduled
on May 7, 2015 as a result of filing a second[1] pre-complaint at the Department of
Labor Relations ("DLR") on March 24, 2015 (Exhibit "10")[2], Plaintiff found
(Exhibit "11") that the U.S. EVP is regulated by Part 62 of Title 22 (Foreign
Relations) of the U. S. Code of Federal Regulations. Based on both 22 CFR
62.10(c)(8) "Orientation. A sponsor must offer and record participation in an
appropriate orientation for all exchange visitors. Sponsors are encouraged to
provide orientation for the exchange visitor's accompanying spouse and
dependents, especially for those exchange visitors who are expected to be in the
United States for more than one year. Orientation must include, but is not limited

---

[1] A first pre-complaint was filed by Plaintiff at the DLR three weeks earlier, on March 3, 2015, because the Union of
the UMass-Amherst postdoctoral researchers violated its duty of fair representation.

[2] The gravamen of this second DLR pre-complaint relates to the unlawful denial by UMass-Amherst International
Programs Office ("IPO") to extend Plaintiff's EVP after she was offered on February 10, 2015 an opportunity to
continue her efforts (that had been stymied by Dr. Lovley to prevent her from achieving the goals of her program)
under the mentorship of Dr. Alexander Ribbe, a lecturer of the Polymer Science and Engineering Department of
UMass-Amherst College of Natural Sciences. The requested program extension required a simple *internal transfer*
that would have changed only Plaintiff's onsite location and had the interest of *rescuing Plaintiff from the ending—
without career accomplishments—of her program*, a failure into which Dr. Lovley had actively been trying to force
Plaintiff since April 2014.

*Argument*

to, information concerning: ... Wilberforce Pamphlet on the Rights and Protections for Temporary Workers," and 22 CFR 62.10(d) "Monitoring of exchange visitors. Exchange visitors' participation in their exchange program must be monitored by employees of the sponsor. Monitoring activities must not include any retaliation or discrimination against exchange visitors who make adverse comments related to the program. No sponsor or employee of a sponsor may threaten program termination, remove from the program, ban from the program, adversely annotate an exchange visitor's SEVIS record, or otherwise retaliate against an exchange visitor solely because he/she has filed a complaint; instituted or caused to be instituted any proceeding; testified or is about to testify; consulted with an advocacy organization, community organization, legal assistance program or attorney about a grievance or other work-related legal matter; or exercised or asserted on behalf of himself/herself any right or protection," a reasonable mind can infer that DOS is aware that the U.S. EVP is being abused for "Human Trafficking." The "Wilberforce Pamphlet" referenced in 22 CFR 62.10(c)(8), comprised in May 2015 of two documents—a PowerPoint presentation "Wilberforce Final Version 20140429" and a "Wilberforce Pamphlet English Online Reading Version 12-22-2014"—downloadable from the official U.S. non-immigrant J-1 Visa website (https://j1visa.state.gov/sponsors/current/regulations-compliance/), which are provided (Exhibit "12"). The PowerPoint presentation "Wilberforce Final Version 20140429," remarkably reads at slides 11, 19, 23, and 29: "Your Rights, Continued: 7. Report violations of these rights 8. Receive protection under state and federal law 9. Seek justice in U.S. courts;" "Human Trafficking It is a crime to exploit a person through force, fraud or coercion for labor, services, or commercial sex;" "Employers Should Not: Lie about your working conditions or duties, housing, or wage Deny your rights and ability to get help;" "We value the diverse skills and experience that nonimmigrant workers bring to our country. We want your time in the United States to be rewarding. **WE ALSO WANT YOU TO BE SAFE**." The second document "Wilberforce Pamphlet English Online Reading Version 12-22-2014" on page 11 answers to the question "Will I be deported if I report the abuse?" as follows: "There are programs to protect people who report abuse. You should

not be afraid to seek help even if you have immigration concerns." Based on this information, Plaintiff contacted DOS on June 2, 2015. Against all odds, DOS in a determination[3] that it rendered about two months later, on August 5, 2015, *insinuated* that the sponsoring institution UMass-Amherst had accused Plaintiff of having committed infractions to its rules to justify why it had removed Plaintiff from the U.S. EVP (*See* Exhibit "13" at page 4): "As set forth in 22 CFR 62.10(d), Exchange Visitor Program sponsors may not remove from the program or otherwise retaliate against an exchange visitor solely because he/she has filed a complaint or taken one or more of the other actions described therein. OPA found no credible evidence to suggest that the University of Massachusetts Amherst violated this regulation. Pursuant to 22 CFR 62.40(3), if an exchange visitor violates the sponsor's rules governing the program, a sponsor may terminate an exchange visitor's SEVIS record if, in the sponsor's opinion, termination is warranted. Instead of terminating your SEVIS record, the University of Massachusetts Amherst allowed you to complete the one (1) year Postdoc contract and provided you five (5) months' notice of intent not to renew their employment agreement with you. In addition, the University of Massachusetts Amherst took steps to facilitate your transfer to Morgan State University." Moreover, DOS, in complete contravention of due process law, did not permit Plaintiff to know what violations the sponsor had alleged. To Plaintiff's repeated requests, submitted on November 6, 2015; December 4, 2015; and December 14, 2015 (*See* Exhibit "13" respectively at pages 3, 2, and 1), for "a copy of the position statements of the respondents as well as of the exhibits they supplied ... to substantiate their statements," Plaintiff finally received on December 15, 2015, as a response: "Thank you for your patience. As it pertains to the review of your complaint, OPA maintains the authority to determine the legitimacy of documents submitted by both parties. Sharing the documentation between the complainant and sponsor to determine if documents are

---

[3] Plaintiff contacted DOS on June 2, 2015 and sent on June 4, 2015 a summary of her situation as requested by Mark Howard, the lead program analyst at the Office of Private Sector Exchange Administration of DOS Bureau of Educational and Cultural Affairs, earlier on that same day. The day after, June 5, 2015, Mr. Howard construed Plaintiff's summary as a complaint and filed on her behalf *without asking her authorization* a formal complaint which number is 15604 and he cancelled the phone conversation that he had agreed to have with Plaintiff.

*Argument*

falsified and/or fabricated is not currently part of OPA's review process." (*See* Exhibit "13" at page 1). As a result, said infractions to the sponsor's rules and the alleged supporting evidence, have remained unknown to Plaintiff making it impossible for Plaintiff to rebut these false allegations. Of the utmost importance, although the regulations specify in 22 C.F.R. 62.10(c) what information "Orientation" *must* include, Plaintiff *never received* from UMass-Amherst: "Sponsor rules that exchange visitors are required to follow while participating in their exchange visitor program," (*cf.* 22 C.F.R. 62.10(c)(5)); "The Office of Designation's address, telephone number, facsimile number, Web site and email address, and a copy of the Exchange Visitor Program brochure or other Department of State materials as appropriate or required," (*cf.* 22 C.F.R. 62.10(c)(7)); and "Wilberforce Pamphlet on the Rights and Protections for Temporary Workers," (*cf.* 22 C.F.R. 62.10(c)(8) and Exhibit "12"). Similarly, as of today, Plaintiff still has not found any of the programs "to protect people who report abuse" mentioned in the second Wilberforce Pamphlet document (Exhibit "12").

iii.   On February 10, 2015, Plaintiff was referred to the Massachusetts Attorney General's Office ("AGO") by a then UMass-Amherst student from Kazakhstan, ████████████████, who had recently been removed from his program after filing a complaint at the MCAD against UMass-Amherst. At that time, both ████ and Plaintiff had found out at their own expenses that, in cases involving non-immigrants, Unions (for graduate students like for postdoctoral researchers) on UMass-Amherst campus collude with the administration, whereas the MCAD, quoting ████, "is in cahoots with UMass." On that day, ████ urged Plaintiff to go to the Civil Rights Department of the AGO, where he had found help. Thus, a complaint filed there by Plaintiff on February 24, 2015 (Exhibit "14")[4]. No result occurred for Plaintiff, as this first AGO complaint was summarily denied less than 24 hours later (Exhibit "15"). Conversely, in ████'s case, a "powerful attorney"

---

[4] This complaint, filed a month before the second DLR pre-complaint filed on March 24, 2015 mentioned earlier, had the purpose of attempting to avert UMass-Amherst's efforts to prevent the *extension* of Plaintiff's program *via an internal transfer* to the Polymer Science and Engineering Department of UMass-Amherst College of Natural Sciences. The original complaint like the supplied copy reads that it was signed on "022414" but this is a mistake as this complaint was actually signed and filed on February 24, 2015.

*Argument*

of the AGO, who Plaintiff believes to be the then Regional Chief of the Western Massachusetts Division, Bart Hollander, intervened (by making a phone call to UMass-Amherst International Programs Office) enabling ████'s reinstatement in his program in 2015 (Exhibit "16"). ████ successfully completed his program and graduated in May 2016 (Exhibit "17"). Nowadays, ████ is a public health coordinator at North Slope Borough in Alaska (Exhibit "17" and Exhibit "18").

iv.   On November 12, 2015, Plaintiff filed a second complaint at the AGO (Exhibit "19")[5]. That time, the welcoming desk employee "Margarita" brought her complaint directly to the unique investigator of the Civil Rights Department of the AGO Western Division, Richard Steward, instead of bringing it to a paralegal assistant like the first complaint filed there by Plaintiff about nine months earlier on February 24, 2015. Mr. Steward offered to meet with Plaintiff and came alone. At this first face-to-face, Mr. Steward acknowledged remembering the name "████████████████" and showed interest in investigating Plaintiff's second complaint. Mr. Steward, in addition, knew what being a postdoctoral researcher entails because he volunteered the information that his daughter was also at that time a postdoctoral researcher in Biology in Boston, MA. From there began what appeared to be a serious unbiased investigation during which Mr. Steward, in an email sent on February 11, 2016 (Exhibit "20"), corroborated that the crux of the avalanche of repercussions assailing Plaintiff emanated from academic misconduct and explained that his investigation was highly confidential. "Anything that you can do to help me make a presentation to people not familiar with biology and not familiar with the general field of scientific research would be helpful. I have spoken to someone whom I would trust with my life about getting a biologist or a

---

[5] This second AGO complaint, similarly to the first AGO complaint filed on February 24, 2015, had the purpose of attempting to avert UMass-Amherst's efforts to prevent the reinstatement of Plaintiff in the U.S. EVP, this time to pursue her goals under the mentorship of Dr. Jeffrey Blanchard, on Faculty at the Biology Department of UMass-Amherst College of Natural Sciences. Following the denial of Plaintiff by Plaintiff on February 13, 2015—to extend her program and *internally transfer* her to the UMass-Amherst Polymer Science and Engineering Department (with Dr. Ribbe as her mentor), Plaintiff was, on February 27, 2015, *externally transferred* to the U.S. EVP of Morgan State University (a Historical Black University in Maryland), at Morgan State University's request. However, this external transfer, which would have extended Plaintiff's program, was not completed. Therefore, in order to pursue her program, Plaintiff had to find another opportunity, which she did on June 1, 2015 with Dr. Blanchard. This time a *reinstatement* into the U.S. EVP, and not simply a program *extension*, was required.

*Argument*

microbiologist to review what I put together. This person has an advanced degree in science, but works in a different field than microbiology.... **I need to have an outside 'third party' opinion so my superiors here, and other agency personnel to whom I may turn, will understand that this is not just 'your opinion.' That your information 'stands on its own.' I am aware of how dangerous an area in which we are working. I am going to be certain that I do nothing that would compromise your safety.** I am also aware that I have much more experience at working in a dangerous field and as a result am more 'comfortable' with this experience. I know how trying this is for you. **I am going to speak with a Victim/Witness Advocate in our Boston office about your situation. At first I will speak in general terms without giving out your name and location. I will probably not even speak much about the type of matter in which you are involved. I want to first be certain that the Victim Witness unit actually has something to offer. I do not want to spread your information around except to those who absolutely need to know. I do not even leave your file in my office anymore. I carry it around with me. I speak only to one attorney here whom I trust completely. Given the very serious problems your information may cause personnel at UMass, I do not want to engage with police or Court employees whom I do not know and, therefore, cannot trust.** Once the timelines are complete and I have the assurance of my own law enforcement people that something will be done, then we might re-engage with the local police authorities on the assault situation. **I would have our own people take care of that because in general I do not deal with local police departments**." (Exhibit "20"). However, little time afterwards, Mr. Steward would not return anymore Plaintiff's calls and became unwilling to meet again with Plaintiff. On April 22, 2016, more than two months with no-follow up on his February 11, 2016 email (Exhibit "20"), Mr. Steward finally accepted to meet with Plaintiff. But, for the first time, he did not come alone: without warning Plaintiff, he invited Ms. Coles. Plaintiff did not ask to reschedule the meeting; instead, she met alone with both Mr. Steward and Ms. Coles. Mr. Steward radically changed his position, denied answers to Plaintiff's

questions about his prior promises, and did not send Plaintiff a written summary of the content of this meeting.

v.  On May 12, 2016, Plaintiff who had been in contact with the office of the then State Representative of Springfield, MA, Benjamin Swan, filed a third AGO Civil Rights complaint (Exhibit "21")[6]. After filing this complaint, Plaintiff asked Margarita to schedule a meeting with Mr. Steward in which she would be accompanied by Mr. Swan. Margarita answered by threatening to call the Police on Plaintiff while adding "and I know that's not good for you," if she did not leave. In a letter dated May 19, 2016, addressed by Mr. Swan to Mr. Steward, Mr. Swan re-conveyed Plaintiff's request for a meeting with both Plaintiff and himself that stayed unanswered (Exhibit "22"). Consequently, on June 15, 2016, Plaintiff emailed Mr. Steward while Cc'ing Assistant AG Peter Leigh and AG Maura Healey (Exhibit "23"). Nine days later, on June 24, 2016, Ms. Coles emailed Plaintiff a letter written by the then AGO Western Massachusetts Division Regional Chief, Bart Hollander, announcing, with no explanation, the closure of the investigation that had been initiated by Mr. Steward (Exhibit "24").

vi. On October 29, 2015, in a recorded interview with two State Police employees, Detective Gary Hebert and Sergeant Christopher Baran, at the office of the Northwestern District Attorney ("DA") in Northampton, MA, Plaintiff sought assistance as a victim of white-collar human trafficking for "brain potential exploitation." Plaintiff also explained that because of the undocumented situation into which she was constrained, members of the Amherst branch of the NAACP, to whom was referred while searching for legal counsel, had been trying to coerce her into marrying a U.S. citizen. Plaintiff had consistently categorically refused to engage in this illegal practice but the persistence of nine Amherst NAACP

---

[6] This third and last AGO complaint filed six months after the second AGO complaint filed on November 12, 2015, similarly to the second AGO complaint had the purpose of enabling the reinstatement of Plaintiff into the U.S. EVP, that time to work at the Teaching Education & Curriculum Studies Department of UMass-Amherst College of Education under the mentorship of ▌▍▍▍▍▍▍. Contrary to the prior two denied opportunities at UMass-Amherst College of Natural Sciences (with Dr. Ribbe then with Dr. Blanchard), for which Plaintiff was supposed to work on her personal savings until a grant would be obtained to support her, ▌▍▍▍▍▍▍'s work offer was supposed to be compensated via a state grant.

*Argument*

22

members-supporters had caused her to be physically attacked on September 30, 2015 and October 1, 2015 by one of them: a white male, then a UMass-Amherst student, who had been sexually harassing Plaintiff since May 9, 2015. Further, to deter Plaintiff's from reporting him, this predator had pre-emptively made false accusations against Plaintiff that two UMass-Amherst Police Department ("UMPD") officers had credited by altering evidence. Owing to conflicts of interest (ensuing from Plaintiff's complaints against UMass-Amherst and the deducible connections of the assailant with the two UMPD employees who lied to back his accusations), Plaintiff was particularly in need of the assistance of a Law Enforcement office independent of UMass-Amherst. Both Detective Hebert and Sergeant Baran completely dismissed Plaintiff's brain potential exploitation claim and her concerns about conflicts of interest. Detective Hebert, however, on November 2, 2015, informed Plaintiff of the existence, for crime victims, of humanitarian relief if the crimes at issue resulted from perpetrators taking advantage of the victims' undocumented status, and advised her to file a crime report at the UMPD despite the conflicts raised by Plaintiff (Exhibit "25"): "Here are the forms that you will need to look over. **Again you would be applying for a 'U Visa' as a victim of an assault and battery**. You should contact the local police in Amherst. **If the incident occurred at the University, than it would be the campus police that you would report the incident to**." (Emphasis added). As feared by Plaintiff, UMPD showed no interest in helping Plaintiff, which resulted in the director of the Victim Witness Advocate Program of the Northwestern DA's office, Jackie Gaw, advising Plaintiff on November 17, 2015 to go to the Eastern Hampshire District Court ("EHDC") file an application for a criminal complaint on her own in order to obtain a show cause hearing. On November 30, 2015, just after paying the filing fee of said application at the EHDC, the first assistant of the Clerk-Magistrate, Atty. Randall Smith, *instantly* summarily denied Plaintiff's application. When Plaintiff, with tears in her eyes, asked him "why," Atty. Smith loudly yelled at her: "You have a litany of complaints against UMass and there is nothing my office can do for you! This has to be investigated by the Police!" and he did not assign a docket number to Plaintiff's application or even made a written ruling on

it in spite of having orally summarily denied it. About three years later, similar offenses against justice occurring at the Massachusetts District Courts were reported in an article "Inside the secret Courts" written by the Boston Globe's Spotlight Team and published on September 30, 2018 (Exhibit "26"): "It is the darkest corner of the Massachusetts justice system, **where thousands of criminal charges vanish without a trace**. There are few rules and fewer records **in these closed sessions where who you are—or who you know—can matter more than right and wrong. Clerk-Magistrates and their assistants hold private sessions in which they can make criminal cases disappear, even when there is plenty of evidence against the accused.**" (Emphasis added). The unjust not recorded November 30, 2015 summary denial elicited a supplemental struggle for Plaintiff, this time to obtain a show cause hearing. Mr. Swan brought again support to Plaintiff by enabling her to obtain a meeting with Northwestern Assistant District Attorney ("ADA") Jennifer Suhl in his presence on May 4, 2016. During this meeting (into which, without warning Plaintiff, Detective Hebert, Sergeant Baran, and Ms. Gaw were also invited), ADA Suhl agreed to send to Plaintiff a response after reviewing the facts presented by Plaintiff. Nine months later, on February 3, 2017, ADA Suhl finally emailed a letter to Plaintiff that was exonerating the misconduct of the UMass-Amherst Police (in this regard, on April 18, 2017 and April 19, 2017, Plaintiff filed a rebuttal to the inaccurate statements in ADA Suhl's February 3, 2017 letter; *see* Exhibit "27" at page 1) and advising Plaintiff to either file a complaint at the Massachusetts Trial Court against Atty. Randall Smith or re-file an application for a criminal complaint at the EHDC. On April 15, 2017, Plaintiff who intended to follow the second option, asked ADA Suhl whether she could change venues to file her second application for a criminal complaint (*See* Exhibit "27" at page 3): "Based on the aforementioned conflicts of interest, I would like to know please whether there is a rule that allows me to file my second application in a District Court where the towns of Amherst and South Hadley have no jurisdiction please. **This could change everything for me.**" Atty. Suhl answered three days later on April 18, 2019 (*See* Exhibit "27" at page 2): "I am not aware of any rule that would allow you to file your private application for criminal

complaint in any other District Court given the law regarding jurisdiction." Thence, Plaintiff resigned herself to file her second application for a criminal complaint at the contentious EHDC and informed ADA Suhl on April 18, 2017 that she was planning to accomplish this that same week (*See* Exhibit "27" at page 2): "Following your recommendation, I intend to have filed during this week a second application for a criminal complaint as a private entity (the first one was filed on November 30, 2015)." However, in an attempt to avoid being subjected again to Atty. Smith's verbal aggressiveness, Plaintiff asked a then Christian fellow from College Church in Northampton, MA to accompany her at the EHDC Clerk-Magistrate's office on April 22, 2017, which was the day chosen by Plaintiff to file this second application for a criminal complaint. On April 22, 2017, as dreaded by Plaintiff, the personnel of the EHDC Clerk-Magistrate's office displayed a serious lack of cooperation. Regardless the hostility against her, Plaintiff persevered to have her second application *apparently* filed[7], which led to her being physically attacked about 30 minutes after leaving this office. In rapid sequence, Plaintiff sustained physical injuries and had to return the day after, April 23, 2017, to this same hostile office, to petition for a 10-day Harassment Prevention Order ("HPO") against the perpetrator of the April 22, 2017 physical attack. On May 5, 2017, at the hearing for extension of the 10-day HPO granted on April 23, 2017[8], another manifestation of the EHDC personnel's recurrent bias against Plaintiff occurred. The then First Justice, Thomas Estes, did not believe Plaintiff needed a HPO. Plaintiff was flabbergasted at both the judge's reaction and the inaction of the Amherst Police Department ("APD") liaison, Detective Tina Knightley[9], in the face

---

[7] In fact, this second application, like the first application Plaintiff tried to file on November 30, 2015, was never formally filed. In addition, contrary to the November 30, 2015 application *instantly summarily denied*, the April 22, 2017 application did not receive a docket number. Then, on June 30, 2017, following multiple inquiries by Plaintiff, Atty. Smith finally *summarily denied* Plaintiff's second application *five weeks after it was supposedly filed*.

[8] On April 23, 2017, Judge Patricia Poehler, from her chambers at the Palmer District Court, allowed via a phone hearing Plaintiff's 10-day HPO petition.

[9] Unlike the September 30, 2015 and October 1, 2015 misdemeanor, the April 22, 2017 felony occurred in Amherst, MA but outside UMass-Amherst campus, and therefore fell under the APD's jurisdiction. Several times in advance of the May 5, 2017 HPO extension hearing, Plaintiff requested the APD report of the April 22, 2017 crime. Plaintiff was referred by the APD record clerk, who refused to give her even a partial copy of this report, to Detective Knightley. Plaintiff left voicemails to Detective Knightley that were never returned. On the day of the HPO extension hearing, Plaintiff perchance encountered Detective Knightley at the EHDC Clerk-Magistrate's office. Plaintiff politely approached her. Detective Knightly instantly put Plaintiff off stating that she was busy and could not talk.

of the Defendant's lies. On July 3, 2017, Plaintiff who did not know where else to report the conflicts of interest prejudicing her at the EHDC, went to the office of the Federal Bureau of Investigation ("FBI") located in Springfield, MA. There, Plaintiff recounted to Agent McCormick the instance of bias exhibited by the then EHDC First Justice on May 5, 2017. It was to no avail. Agent McCormick simply retorted that "nothing that can be done against a judge" and the FBI has no jurisdiction. Nevertheless, about three weeks later, the then EHDC First Justice was placed on administrative leave owing to a complaint filed at the MCAD in August 2017 by a then drug court clinician, Tammy Cagle. This MCAD complaint, removed to the U.S. District Court on January 22, 2018, states from paragraphs 161 to 166: "161. On or about July 3, 2017, Judge Estes again invited Plaintiff into his chambers. 162. On July 3, 2017, the Plaintiff went to the Judge's chambers in Belchertown. 163. Judge Estes closed and locked the door. 164. Judge Estes took off his judicial robe. 165. This time there was no conversation: Judge Estes closed the blinds, and immediately came over to where the Plaintiff was sitting, pulled his pants down and made the Plaintiff to perform oral sex on him. 166. The Plaintiff did perform fellatio on Judge Estes." *See Cagle v. Thomas Estes & Behavioral Health Network, Inc.*, No. 3:18-cv-10123-KAR. July 3, 2017 is the day when Plaintiff met with Agent McCormick for assistance regarding the misconduct she had already endured at the EHDC from several employees including the then First Justice. On May 25, 2018, Judge Estes resigned from the Massachusetts Trial Court. Yet, the FBI never followed up with Plaintiff. To date, nearly four years after having being physically attacked by a now former UMass-Amherst student on the UMass-Amherst campus, and about two and a half years after having been physically attacked by another white male, like-the-first-assailant born in Western Massachusetts and well-connected, Plaintiff has still not obtained the Law Enforcement certification that would enable her to apply for humanitarian relief. The most recent update from Plaintiff's immigration counsel is dated July 29, 2019 (Exhibit "28") and reads: "... I'm waiting to hear back from Captain Ronald Young who is in charge of the Administrative Department at the Amherst PD. I didn't receive **the information about the department's U-visa guidelines** as anticipated

because Captain Young is away until tomorrow. I'll call him when he returns and then **we should know what they need**." (Emphasis added).

27. On the basis of the foregoing, the materials in the filings of the case 3:19-cv-30056-MGM will essentially gravitate around three privileged areas:

    i.    <u>The research performed by Plaintiff before, during, and after her participation in the U.S. EVP with UMass-Amherst as her direct sponsor and Dr. Lovley as her mentor.</u> The primary goal of the case 3:19-cv-30056-MGM is to demonstrate what Plaintiff was doing in the Lovley lab and how she contributed (directly and indirectly) to two reviews, three articles, one collaboration, and one patent application, without receiving the slightest credit. This is a strategy to respond to the unproven allegations of Dr. Lovley and other UMass-Amherst employees that Plaintiff is "[a]rguably the worst employee ... ever" manufactured after Plaintiff expressed concerns and began lodging complaints in order to pursue her program's objectives with another mentor in another lab. The New York Times' investigation of allegations against a former Harvard high-profile professor, Dr. Roland Fryer, disclosed in the article "Star Economist at Harvard Faces Sexual Harassment Complaints" written by Jim Tankersley and Ben Casselman and published on December 14, 2018 (Exhibit "29"), corroborates that accusers' competence and ability to continue their program are directly targeted in those types of academic controversies: "... he **directed another employee to compile examples of poor performance by the accuser**. He refused to write recommendations for economics graduate programs she was applying to, according to her complaint, and all rejected her." (Emphasis added). To attain the aforementioned goal, substantial confidential research information will have to be exposed. Furthermore, documentary evidence primordial to prove that Plaintiff was "set up" has remained inaccessible to her because the offices who possess it would invoke that it contains trade secrets or simply because it is *per law* protected (e.g., the personnel records of "comparator" postdoctoral employees). This evidence is indispensable to demonstrate Plaintiff's competence and prove that an unlawful discriminatory reason predominantly motivated the disparate and adverse treatment applied to Plaintiff.

ii.   The physical repercussions on Plaintiff of the abuses by UMass-Amherst and others
documented in medical records. The day when Plaintiff first met with the
representative of the UMass-Amherst Postdoctoral Researchers' Union, April 3,
2014, Plaintiff had the injuries she was sustaining in the Lovley lab medically
documented (Exhibit "30"): "**History of Present Illness:** ... In her current position
she does very repetitive work with her hands. She brought in a tube [sic] in to show
me how she must remove the tops of tubes and replace them to keep anaerobic
conditions.... She apparently is working for a boss that insists she work 7 days a
week and is demanding that she work even more now.... She is forced to use heavy
wipes on her hands which apparently should only be used for surfaces. She's also
restricted as to the number of gloves that she can wear and so sometimes her current
set of gloves get somewhat damp inside.... The patient is very disappointed in the
situation as she was really looking forward to this job.... **Physical Exam** ... There
is some spam of the right paravertebral muscles in the cervical area. Her posture is
not particularly good.... Positive test for carpal tunnel syndrome. Her skin is
extremely dry throughout arms, legs, and especially her hands where the xerosis is
severe. There are abrasions over her knuckles. There is some diffuse loss of
muscles in the hands bilaterally." On June 26, 2016, *two days after the closure of
Mr. Steward's investigation was announced to Plaintiff via email* (Exhibit "24"),
Plaintiff "under a great deal of stress having to do with her immigration status
and her doctoral thesis work," *see* Exhibit "31", began suffering from a bowel
volvulus, which required that she undergo emergency surgery on July 1, 2016
(Exhibit "31"). Currently, albeit eligible "for compensation for injuries resulting
from a violent crime ... under the Victims of Violent Crimes Compensation Act"
(Exhibit "32"), Plaintiff cannot afford to have stitched the radial tear that the April
22, 2017 felonious physical attack has caused to her right knee lateral meniscus
(Exhibit "33"). Since April 22, 2017, Plaintiff has been enduring Chronic Pain
Syndrome ("CPS"), a condition originating from this untreated injury.

    iii.    <u>The internal records of the state and federal agencies solicited by Plaintiff.</u> The large-scale obstructive acts afore-exposed[10] show that many U.S. officials (MCAD, DLR, DOS, AGO, Northwestern DA's office, local Police, State Police, EHDC, FBI) have *secretly* participated in covering up all responsibilities by curtailing Plaintiff's active efforts to end the unfair situation imposed on her.

*The extent of community interest*

28. The following extensive but abbreviated exploration implies that the public's interest in Plaintiff's case is atypically weak. First, several U.S. (state and federal) administrative agencies where officials had or still have the power to aid Plaintiff have manifested an interest solely in keeping her case from being adjudicated effectively resulting in shoving it under the rug. Even when certain state officials displayed an intent to assist Plaintiff (*cf.* State Police Detective Hebert from October 29, 2015 until November 2, 2015 and AGO Civil Rights Department Senior Investigator Steward from November 12, 2015 until February 11, 2016), the facts that ensued strongly suggest that those were ordered by higher supervisors to halt their efforts on Plaintiff's behalf as if the law did not apply to her.

29. Except Mr. Swan (who asked Plaintiff on March 18, 2016 how she could still be alive after all she had already been through), members of the community who were made aware of Plaintiff's case (e.g., NAACP but also several churches) have tried either to verbally (and even forcefully; *cf.* the physical attack on UMass-Amherst campus alluded to previously) coerce Plaintiff into committing a crime (fake marriage to a U.S. citizen), or to discourage Plaintiff from bringing an action in a U.S. court while adding that she would "better return to France even if it's to work at a McDo!" The latter quoted statement, railed against Plaintiff on August 6, 2015 by Dr. Gary Tartakoff—who at that time claimed to be a supporter of the Amherst NAACP—resonates with the July 14, 2019 Twitter message of the President of United States about four new Democratic members of the U.S. congress.

30. Academic peers who Plaintiff discovered had known for very long about the "open secret" of Dr. Lovley's unethical conduct, have exhibited no interest in coming forward even after having promised help (Exhibit "34"): **"Derek has a long history of treating people that**

---

[10] Actually, in the present memorandum, Plaintiff referenced only a subset of these acts.

have worked with him very badly. **Some when they worked for him, others after.** You are in very good company. I cannot make any promises that we can find a solution. I am not looking to hire a postdoc at this time (I don't have the funding), but others are. **One thing you need to consider is the following: you have been placed into a situation that is not your fault. If you do nothing, you may very well be fired. If you feel that there is scientific misconduct occurring in the lab by others, you (with my help) may have to discuss it with program manager (the sponsor from the Office of Naval Research) to avoid being fired and possibly, with the sponsors help, obtain a new position elsewhere."**

31. Globally, independently of the type of occupation, the press has remained completely silent on the responses of authorities when accusers against white male public figures are females of a minority class who are also not self-funded non-immigrants.

32. The January 12, 2018 CNN Politics online article "Trump decries immigrants from 'shithole countries' coming to US," written by Eli Watkins and Abby Phillip, states (Exhibit "35"): "... White House spokesperson Raj Shah did not deny the 'shithole' remark, but instead said in a statement that Trump 'is fighting for permanent solutions that make our country stronger by welcoming those who can contribute to our society, grow our economy and assimilate into our great nation.'" In compliance with 22 C.F.R. 62.20(b) "Purpose," Plaintiff, an educated non-immigrant foreigner, came to the U.S. "to engage in research, teaching and lecturing with [her] American colleagues, to participate actively in cross-cultural activities with Americans, and ultimately to share with [her] countrymen [her] experiences and increased knowledge of the United States and their substantive fields," and not to get married and/or have children and/or become a victim of crimes. Plaintiff, a chaste Christian, has never been married and has never been sexually involved with anyone. Plaintiff has been dedicating her whole life to studying while fighting homelessness and unemployment. Besides the biomedical sciences, Plaintiff has a passion for ballet—an art that requires high discipline, pure diligence, technical precision, and hard sacrifices. These latter skills were nurtured by Plaintiff to become a scientist who could "contribute to" the U.S. society, and "assimilate into" this nation. Yet, Plaintiff has hardly

ever felt welcomed at UMass-Amherst and has consistently been sidelined at U.S. administrative agencies.

*The reason for the request*

33. Plaintiff seeks to prevent potential negative effects that this case could have on the issuance of a patent for which an application, issued on December 27, 2018, is currently ready for examination (Exhibit "36"). In the positive outcome that this patent issues soon, Plaintiff would be able to amend the complaint 3:19-cv-30056-MGM with a claim of correction of inventorship. The materialization of this element would make out an irrefutable *prima facie* showing of white-collar labor exploitation human trafficking.

34. Confidential research information, necessary to validate various misconduct aspects, is inextricably intertwined with the claims at issue. Conducting the entire proceedings under seal would preempt the Defendants' potential defense that, to safeguard privileged information, the claims should not be permitted to go forward.

35. Dr. Lovley (with the connivance of Dr. Kelly Nevin[11], one of his former graduate students who he hired in his lab as a postdoc then as a Research Assistant Professor; and Dr. Nikhil Malvankar, another of his former graduate students who he helped become an independent Assistant Professor) has only partially converted some of Plaintiff's research ideas. Therefore, disclosing Plaintiff's research statements to the public should be prevented. Additionally, when on June 1, 2015, Plaintiff applied to the lab directed by Dr. Blanchard at the UMass-Amherst Biology Department, Plaintiff submitted in support the draft of a new research project that should remain shielded from the public's view.

36. Since June 2014, Plaintiff has been fighting for a fair opportunity to clean her name. Plaintiff was smeared for trying to save her career and life. A neutral fact-finder/decision-maker is integral to prove the unlawfulness of the after-the-fact attacks of Plaintiff's performance, the assassination of her credentials, the denial of accreditation for her work, which have fueled Plaintiff's blackballing and inflicted on her emotional distress. This means that the retaliatory demeaning allegations with which the defendants have papered

---

[11] Dr. Nevin is renowned on UMass-Amherst campus for having had an affair with Dr. Lovley while he was both married and her mentor. Dr. Nevin's favorable treatment in exchange for sexual favors is another marker of the large-spectrum misconduct perpetrated with impunity by Dr. Lovley in UMass-Amherst campus.

Plaintiff's both employment and immigration records have to be submitted to the court for examination. In order to "contain" the smear already caused to Plaintiff's reputation, impoundment appears to be the most secure alternative. The dissemination of disinformation that has already unjustly maligned Plaintiff's character would "let the cat out of the bag without any effective way of recapturing it," *see F.T.C.*, 830 F.2d at 407, if it bore out that the Defendant's allegations are false.

37. In parallel, since November 2, 2015 (Exhibit "25"), Plaintiff has been fighting to obtain the certification required to become eligible for humanitarian relief and thence retrieve the valid non-immigrant status of which she was purposefully deprived. The disclosure to public of the records in this case will very likely adversely affect this struggle too.

38. Plaintiff has already sought aid at various places without maintaining the names of the accused confidential, which permits the uncovering of her identity. A pseudonym, therefore, appears inadequate to avert connections from being made with Plaintiff.

39. The substantial likelihood of clerical bevues, exemplified by the mistake made on June 17, 2019 in the case ▮▮▮▮▮▮ ▮▮▮▮▮▮▮[12] (Exhibit "37"), confirms that a pseudonym cannot warrant that Plaintiff's identity will not be disclosed to the public.

40. A Nature World View online article "Universities show their true colours in court" written by Dr. Steven Piantadosi and published online on July 1, 2019 (Exhibit "38"), has brought to Plaintiff's attention that recently "... lawyers for Dartmouth College in Hanover, New Hampshire, argued that two women must be named publicly if they are to join a class-action lawsuit describing rape, abuse and harassment in its Department of Psychological and Brain Sciences. The suit has been filed by seven others, six whom are identified. **The college's arguments for outing the complainants' identities include that pseudonyms are 'confusing' and that unnamed plaintiffs will make a fair defence impossible — even though Dartmouth itself does know these women's identities.**" (Emphasis added).

41. Plaintiff's true identity is crucial to warrant fairness in a trial. In the past, almost systematically, Plaintiff was mistrusted and concurrently records were corrupted. Plaintiff,

---

[12] On July 4, 2019, Plaintiff found this error perchance. She reported it to the Clerk's office the day after, July 5, 2019. Albeit by now this mistake is supposed to have been fixed, the page displayed in Exhibit "37" is still visible and associated with Plaintiff's name on the web.

*Argument*

even at her death bed, was not believed when, on July 1, 2016, at the Emergency Room Department of Cooley Dickinson Hospital in Northampton, MA, she answered to the question concerning her profession that she was a doctor in the biomedical sciences. The emergency doctor like the surgeon who operated on Plaintiff referred to Plaintiff as a graduate student in the medical records (Exhibit "31"): "under a great deal of stress having to do with her immigration status and her doctoral thesis work.... She is pursuing her doctoral degree in biomedical science at UMass."[13] Likewise, a surgeon consulted on January 24, 2018 wrote in his notes "a █████████ graduate student" (Exhibit "33")[14]. When Plaintiff consulted for a second surgical opinion on March 14, 2018 (Exhibit "33"), Plaintiff was accompanied by a white male attorney[15]. Strikingly, the medical records of this latter visit came out accurate (Exhibit "33"). These facts altogether support that even individuals, who like Plaintiff possess a doctorate degree, do not presume that Plaintiff could be saying the truth when she presents, herself, her occupation. Accordingly, addressing Plaintiff as a "Jane Doe," would unfairly place the Defendants on a pedestal, whereas, in the first place, if the Defendants were intellectual "geniuses," they would not have needed to plagiarize/convert Plaintiff's ideas[16]. In such a context, the impact of addressing one with their correct name and/or title is outlined in Ms. McNeill's January 8, 2019 opinion when she refers to Dr. Rosalind Franklin (Exhibit "05"): "Feynman is not the only powerful man who has been able to control the story of science to the disadvantage of the women in his professional orbit. For a long time, the world believed that Rosalind Franklin had nothing to do with James Watson's and Francis Crick's discovery of DNA's structure. **In no small part, that's because Watson said she didn't, and we believed him**. His 1968 autobiography *Double Helix* was the first full-length account of the discovery story. **He refers to Franklin as 'Rosy' throughout the book** ... He also omits the part of the story in which he and Crick used Franklin's Photograph 51 without her

---

[13] Because of the repetition, this cannot be construed as the result of a mistake. Also, the accurate sentence "She is celibate, lifelong, having for many years strongly considered dedicating herself to religious order" in these medical records (Exhibit "31") validates that Plaintiff expressed herself without ambiguity during the medical examination.

[14] This surgical opinion contains other inaccuracies: the visit took place on *January 24, 2018*, not January 25, 2018, and the date of onset is *April 22, 2017*, not April 20, 2017.

[15] Plaintiff was accompanied by the counsel who represented her at the March 23, 2018 show cause hearing, which he had requested by filing on February 1, 2018 at the EHDC, on Plaintiff's behalf, an application for a criminal complaint against the perpetrator of the April 22, 2017 felonious physical attack.

[16] In fact, if such were the case, Plaintiff would have never had these ideas because the Defendants' brains would have already produced them.

*Argument*

permission or knowledge; Photograph 51 was the key evidence to unlocking the structure of DNA. **He couldn't completely erase Franklin, since too many people knew who she was, but he diminished her enough with a whimsical nickname ....**" Trying this case anonymously will compound Plaintiff's disadvantage by amplifying her burden of disturbing the jury's unconscious bias or susceptibility to stereotypes associating being a successful scientist with certain features (e.g., male, white or light-skinned). In this latter regard, on August 9, 2019, Melissa McCartney in her article "What's in a name?" published by the second worldwide leading scientific journal, Science (Exhibit "39"), reported a recent study that "provides additional experimental support to **the double-blind challenges faced by women of color in science and helps to expose faculty biases that may impede minority members from advancing in STEM.**"[17] (Emphasis added).

*Constitutional rights, investigative secrecy, and safety*

42. Plaintiff has due process interests derived from the Sixth Amendment that should be included within the good cause analysis. Attempts to interfere with her witnesses are plausible and therefore the identities of the latter should be protected too.

43. Plaintiff has a legitimate interest in the non-disclosure of the internal to-date-handled-in-secrecy records of the state and federal agencies solicited in the past. Arguably, many of these records "[fall] within the ambit of the attorney-client privileged" invoked in *Siedle*, 147 F.3d at 11.

44. Plaintiff's safety[18] is already in jeopardy because of a precarious situation (CPS and financial hardship). Disclosure of Plaintiff's two-dimensional whistle-blower claims can further imperil her. The social media platforms and blogging sites available in this Digital Era have oversimplified not just the vilification but the annihilation of whomever is perceived as a villain. The death threats endured by Dr. Christine Blasey Ford, despite

---

[17] Indirectly, this article shows that the *triple bias*, to which minority females who are also non-immigrants not self-supporting are subject in the STEM, keep being sidestepped in the U.S. press.

[18] Plaintiff's **February 8, 2016 email entitled "I am terribly afraid for my safety"** to AGO Senior Investigator Richard Steward (Exhibit "20"), was followed by Plaintiff enduring a life-threatening medical condition **from June 26, 2016 to July 1, 2016** because of "a great deal of stress" provoked by the closure of Mr. Steward's investigation announced two days earlier, **on June 24, 2016**. Afterward, Plaintiff **on April 22, 2017** was victim of a felonious physical attack that has left Plaintiff injured and, since then, in chronical pain. **Would Plaintiff's life have followed a trajectory significantly less fraught with harm, trauma, and danger, had Mr. Steward followed up on his February 11, 2016 commitments (Exhibit "20") and completed his investigation?**

being both white and a U.S. citizen, as well as the rise of hate crimes in the U.S. for the third consecutive year (reported by the FBI on November 13, 2018), speak volumes.

*Immediate and irreparable harm is very probable*

45. A concrete form of immediate irreparable harm is a false charge of accruing willfully unlawful presence in the U.S., which would nullify any tedious progress made at this juncture by Plaintiff, via immigration counsel, on the path to regaining a valid non-immigrant status (Exhibit "28").

46. Plaintiff's principal purpose with the action at issue is to secure a name-clearing litigation ("reserving to her [for the first time] the right to confront and cross-examine all witnesses against her, and to summon witnesses in her defense," *See Smith v. Commissioner of Mental retardation*, 409 Mass. 545, 547 (1991), to restore her ability to gain employment in her domain of expertise. Whilst mischaracterizations of Plaintiff's competence in all likelihood will be expanded by the Defendants, propagating the former in the public—of which potential employers are also members—will thwart Plaintiff's name-clearing endeavor. In fine, Plaintiff might irretrievably lose the possibility of ever being employable in Academia again because these demeaning accusations will dog her indefinitely.

47. Plaintiff's main asset to clear up her name is the patent application currently under review by the U.S. Trademark and Patent Office (Exhibit "36"). Plaintiff's contribution to the work that led to this patent application was not acknowledged. Divulging the current action to the public has a high risk of averting the issuance of this patent, which would inescapably lessen Plaintiff's *prima facie* case of white-collar labor exploitation human trafficking.

48. Plaintiff uses the UMass-Amherst campus resources (public computers to write her pleadings and an address to receive mail thanks to ▉▉▉▉▉▉▉▉▉▉ on faculty at UMass-Amherst College of Education). In the past, UMPD's proclivity for racial profiling was utilized by personnel of the UMass-Amherst Du Bois library to harm Plaintiff for attempting to report harassment she was enduring at this library. In 2015, 2018, and even recently in 2019, Plaintiff had several of her personal correspondences sequestrated if not delivered conspicuously opened. Public access to the records of this case is extremely likely to exacerbate these adverse actions. By way of example, an unlawfully-gained

trespass order would deprive Plaintiff of resources that she critically needs to ensure her representation (especially since the Hampshire Law Library opening days have been reduced to two days a week starting July 9, 2019), severely prejudicing her.

49. Plaintiff's attempts to obtain a show cause hearing at the EHDC regarding the two counts of Assault and Battery that took place on UMass-Amherst campus on September 30, 2015 and October 1, 2015, caused her to be libeled, slandered, and stalked on UMass-Amherst campus by the perpetrator of this crime. UMPD, EHDC, Northwestern DA's office, UMass-Amherst Title IX office, and APD—all denied assistance to Plaintiff in spite of this perpetrator's long list of criminal records while UMass-Amherst allowed him to stay freely on its campus. On September 21, 2017, five months after the April 22, 2017 felony, the perpetrator of the September 30, 2015 and October 1, 2015 misdemeanor began stalking Plaintiff again on UMass-Amherst campus. After this latter incident, an APD Officer, Sergeant Janet Lopez, who Plaintiff had recently re-contacted[19] in relation to the April 22, 2017 felonious attack, finally accepted to assist Plaintiff. Sergeant Lopez's intervention was successful. However, because this predator has never been held accountable despite Plaintiff's hard efforts[20], his harassing behaviors might also be reactivated if these proceedings are not conducted under seal.

**Narrow tailoring**

50. The usage of a pseudonym will not prevent disclosure of Plaintiff's identity because the field of expertise in question is very specific and a large network of individuals from various state and federal agencies are aware of the controversy at issue.

51. The most part of the documents that Plaintiff anticipates will have to be filed in this case are legally privileged because they represent sensitive materials that need to be protected, and, as such, they have been handled to date in secrecy. Once the latter is withheld, there

---

[19] Plaintiff had contacted Sergeant Lopez for the first time on January 8, 2016, in an attempt to have APD investigate the September 30, 2015 and October 1, 2015 misdemeanor in which UMPD had denied interest.

[20] These efforts actually resulted in the April 22, 2017 felonious physical attack of Plaintiff by the then spiritual fellow from College Church in Northampton, MA who had accepted to accompany Plaintiff on April 22, 2017 at the EHDC Clerk-Magistrate's office where Plaintiff did not want to be alone when filing her second application for a criminal complaint against the perpetrator of the September 30, 2015 and October 1, 2015 two counts of Assault and Battery.

*Argument*

will remain no substantive information to disclose, which justifies the request for shielding the entire case record and not just portions of the parties' legal filings.

52. Plaintiff is amenable to a seal modifiable by this Honorable Court as the proceedings progress. The First Circuit has previously ruled "[w]e do not hold that the materials which Putnam claims are privileged necessarily must remain under permanent seal. As the record develops and additional facts are adduced, the district court may find that Putnam's claims of privilege are unsupported ...." *See Siedle*, 147 F.3d at 12.

*Memorandum in Support of Second Motion for Impoundment ▮▮▮▮▮▮ v. UMass-Amherst and three other Defendants_081219*

## <u>Conclusion</u>

Wherefore, Plaintiff deduces that she has met her burden of showing good cause for continuing the impoundment of the records of the case 3:19-cv-30056-MGM. If privacy rights are not attached to these judicial records, Plaintiff will very likely suffer from additional, severe, irreparable damages; a special circumstance adequate to overcome the presumption of public accessibility. Consequently, Plaintiff prays that the proceedings of this case will commence under the auspices of the high-level confidentiality required inasmuch as the factors discussed hereinabove allow.

*Memorandum in Support of Second Motion for Impoundment_███████ v. UMass-Amherst and three other Defendants_081219*

## Service

The Plaintiff respectfully requests that the present memorandum be filed under seal and reviewed ex-parte by this Honorable Court.

Respectfully submitted,
/s/ █████████, Pro Se