UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JANE DOE,                                          *
                                                   *
        Plaintiff                                  *
                                                   *
        v.                                         *
                                                   *     Civil Action No. 19-30056-MGM
UMass-Amherst, ET AL.                              *
                                                   *
        Defendants.                                *

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS AND
PLAINTIFF'S MOTION FOR LEAVE TO FILE
A FOURTH AMENDED COMPLAINT
(Dkt. Nos. 176, 178, 333, and 350)

November 1, 2023

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

Jane Doe[1] ("Plaintiff"), proceeding *pro se*, brings this action against various defendants[2]

arising out of her employment in 2014 and 2015 as a postdoctoral researcher in the University of

Massachusetts Microbiology Department as well as events which transpired thereafter. Defendants

have filed motions to dismiss Plaintiff's operative complaint—her Third Amended Complaint

---

[1] The court initially permitted Plaintiff, "at least temporarily," to use the "Jane Doe" pseudonym, but the court subsequently granted a motion to reconsider and ordered that Plaintiff use her real name. (*See* Dkt. Nos. 26, 218, 245.) Nevertheless, Plaintiff appealed the court's order reconsidering the pseudonymity issue, and the court granted Plaintiff's request to stay that order pending her appeal. (Dkt. No. 256.)

[2] In particular, Plaintiff names as Defendants the following entities or individuals associated with the University of Massachusetts: UMass-Amherst, Dr. Derek Lovely, Dr. Toshiyuki Ueki, Dr. John Lopes, Joy Ward, Dr. Kumble Subbaswamy, UMass Police Department Sergeant Jonathan Hall, Karlee Drumgool, Dr. Vynthia Gerstl-Pepin, Sean Regan, and UMass Police Department Chief Tyrone Parham (collectively, "University Defendants"). In addition, Plaintiff also names Assistant Clerk-Magistrate Randall Smith and Amherst Police Department Chief Scott Livingstone.

("TAC")[3]—asserting her claims are untimely and fail on the merits. In addition, Plaintiff has filed a

motion for leave to file a fourth amended complaint. For the following reasons, the court concludes

that Plaintiff has failed to state a claim upon which relief may be granted and that her proposed

fourth amended complaint is futile. Accordingly, the court will grant Defendants' motions to dismiss

and deny Plaintiff's motion for leave to file an amended complaint.

## II. BACKGROUND

The following is a recitation of the facts alleged in Plaintiff's TAC, as well as the exhibits

attached thereto, which the court generally must accept as true at the motion-to-dismiss stage.[4] *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.     Plaintiff's Employment at UMass-Amherst

Plaintiff is a female "dark-skinned French National," who graduated with a Ph.D. in

Biomedical/Life Sciences from Sorbonne University in Paris. (Dkt. No. 171-1, Ex. 4 ¶¶ 1-3.) In

2011, while Plaintiff was working as a postdoctoral research associate at Yale University, she

contacted Dr. Derek Lovely of the UMass-Amherst Microbiology Department "to propose an

original research project dealing with microbial electrosynthesis." (*Id.* ¶ 4.) A few months later,

Plaintiff "formally applied to Dr. Lovely's research group to obtain a postdoc position," and in her

application she provided "a detailed version of the project" she had shared earlier. (*Id.* ¶ 5.) Two

days later, Dr. Lovely stated that he would not be able to offer Plaintiff a position. (*Id.*) In March of

2013, Plaintiff learned that Dr. Lovely and another professor in the UMass-Amherst Microbiology

Department published a review in a scientific journal, the content of which "is summarized via a

---

[3] The sealed, unredacted TAC (which contains Plaintiff's name and other identifying information) is docketed at Dkt. No. 170. The unsealed, redacted TAC which is available on the public docketed is docketed at Dkt. No. 171.

[4] Plaintiff's TAC, which is 157 pages long, is extremely detailed. Moreover, Plaintiff attached to the TAC 149 pages of exhibits, consisting primarily of affidavits which are similarly long and detailed. The court summarizes only the most relevant facts. The court addresses Plaintiff's proposed fourth amended complaint in section V., below.

figure" which "is almost identical to the figure accompanying" Plaintiff's research project proposal she provided in 2011. (*Id.* ¶ 6.)

In April of 2013, Plaintiff met with Dr. Lovely at a conference at Yale University and "reapplied to his group by sharing ideas for a new research project . . . in relation to the pili research." (*Id.* ¶ 7.) Dr. Lovely "said his group had not yet performed these kinds of experiments and expressed a willingness to find out whether he could fund this project." (*Id.* ¶ 8.) On January 29, 2014, Plaintiff "signed a contract for a year with Dr. Lovely, whereby [she] would be paid $38,500 to participate in pili research under his mentorship in his lab in the Microbiology Department of UMass-Amherst." (*Id.* ¶ 9.) Plaintiff would also become "a member of the postdocs' union." (*Id.*) Plaintiff, as a citizen of France, participated in the "work-and-study-based J-1 Exchange Visitor Program primarily administered by the U.S. Department of State." (TAC ¶ 22.) "In carrying out the responsibilities of the Exchange Visitor Program, the Department of State designates public and private entities to act as exchange sponsors," and "UMass-Amherst was the sponsoring agency for Plaintiff." (*Id.*)

1. *Plaintiff's Experiences Working Under Dr. Lovely (February of 2014 to August of 2014)*

On February 3, 2014, Plaintiff began working as a postdoc researcher in the Lovely group lab. (Dkt. No. 171-1, Ex. 4 ¶ 10.) Dr. Lovely assigned Plaintiff two projects which were unrelated to the two research proposals she had shared in 2011 and 2013. (*Id.* ¶ 11.) Dr. Lovely did not provide adequate guidance or assistance to Plaintiff. (*Id.*) Plaintiff also had to share office space with another postdoc researcher, Dr. Nikhil Malvankar, who was verbally abusive to Plaintiff about leaving the door to the office closed. (*Id.* ¶¶ 12, 17.) In addition, Plaintiff encountered hostility from Joy Ward, an administrative manager in the Lovely lab, regarding "frozen stock samples" used in Plaintiff's research. (*Id.* ¶¶ 10, 14; TAC ¶ 27.)

In March of 2014, Dr. Lovely reassigned one of the two projects he originally assigned to Plaintiff and paired Plaintiff with Dr. Toshiyuki Ueki, a Research Assistant Professor, to work on the other project. (Dkt. No. 171-1, Ex. 4 ¶¶ 22-23.) Dr. Ueki "*immediately* began treating [Plaintiff] as if [she] had been assigned to work *under* him whereas according to [Plaintiff's] job description [she] was supposed to work independently." (*Id.* ¶ 24.) Dr. Ueki also criticized Plaintiff's work, often calling it "too slow." (*Id.*) Plaintiff believes she "was being oppressed in an effort to make [her] quit." (*Id.*) At the same time, Ms. Ward began telling Plaintiff: "If you're unhappy, you can leave and Derek will give you a recommendation letter. You're not trapped here." (*Id.* ¶ 26.) On March 19, 2014, Plaintiff learned that Dr. Lovely had given the reassigned project to Ms. Ward, who "was trying to address this project using the idea [Plaintiff] had given only to Dr. Lovely on February 21, 2014." (*Id.* ¶ 27.) In the meantime, Plaintiff began discussing her issues with Susan Chinman, who was an Assistant Dean of the Graduate School but who Plaintiff believed at the time was her union representative. (*Id.* ¶¶ 20, 29.) On March 28, 2014, Plaintiff learned that Ms. Chinman was not her union representative, and on April 3, 2014, Plaintiff spoke with her union representative, Ryan Quinn, who provided Plaintiff a "copy of the postdocs' union contact." (*Id.* ¶¶ 29, 31.)

On April 8, 2014, Dr. Ueki became upset with Plaintiff when she proposed changing an experiment which had negative results. (*Id.* ¶ 34.) Plaintiff walked away to avoid an argument, but Dr. Ueki followed Plaintiff to her office and shouted at her. (*Id.*) The following day, Ms. Ward told Plaintiff that she could either voluntarily resign or get transferred to another project under Dr. Lovely's supervision. (*Id.* ¶ 36.) Shortly thereafter, Plaintiff met with Dr. Lovely, who recommended that Plaintiff "not choose another project with him." (*Id.*) Plaintiff, however, responded that she "had no problem with working on another project with him as [her] supervisor." (*Id.*) "Unhappy with this response," Dr. Lovely "announced that he was placing [Plaintiff] *immediately* on administrative leave." (*Id.*) However, Plaintiff "never received a formal, written notification" that she

had been placed on administrative leave, and Dr. Lovely never gave Plaintiff the reason for the leave nor its duration. (*Id.*) Ms. Ward then confiscated Plaintiff's research samples and work product so Plaintiff could not continue her experiments in the lab. (*Id.*) On April 11, 2014, Mr. Quinn told Plaintiff that Ms. Chinman had announced to him that Plaintiff's pay would not be suspended during the administrative leave, but that her only remaining option was to resign, otherwise she would be fired. (*Id.* ¶ 37.) On April 17, 2014, Mr. Quinn told Plaintiff that Ms. Chinman had relayed that "their intention is to fire you effective Sunday [April 20, 2014] if you don't accept their last offer." (*Id.* ¶ 39.) That same day, "Plaintiff received in writing the threat that . . . she could only resign immediately, otherwise she would be fired." (TAC ¶ 90.)

On April 22, 2014, Plaintiff spoke with Dr. Lovely about returning to the lab, but Dr. Lovely told her "there is no coming back, this had gone too far, the union is involved." (Dkt. No. 171-1, Ex. 4 ¶ 41.) Plaintiff then asked for a severance and "clearly explained that this would be to allow [her] transfer into another lab where [she] would try to implement" the research proposal she shared with Dr. Lovely in 2013. (*Id.*) "According to the regulations of [her] program, [Plaintiff] needed to have personal funding to support [herself] in order to be authorized to continue [her] research program in another lab." (*Id.*) On April 24, 2014, Plaintiff met with the chair of the Microbiology Department, Dr. John Lopes, to ask for help to change labs. (*Id.* ¶ 42.) Dr. Lopes advised Plaintiff to apply to two faculty in his department, one of whom was Dr. Klaus Nüsslein. (*Id.*) On Friday, April 25, 2014, Plaintiff received an email containing an agreement for her to sign separating her relationship with Dr. Lovely's lab. (*Id.* ¶ 43.) Plaintiff was given only the weekend to consider the agreement. (*Id.*)

On April 28, 2014, Plaintiff went the Equal Opportunity and Diversity ("EO&D") Office and the Ombuds Office, where she "asked for help both to change labs and to preserve [Plaintiff's 2013 research proposal] that Dr. Lovely wanted to take as his own." (*Id.* ¶ 44.) Plaintiff also asked

Mr. Quinn to relay to Ms. Chinman that she needed additional time to consider the proposed

severance agreement. (*Id.*) On April 29, 2014, Plaintiff met with Dr. Nüsslein to try obtain another

research position. (*Id.* ¶ 45.) A few hours later, Mr. Quinn informed Plaintiff "that Ms. Chinman had

told him that Dr. Lovely had 'withdrawn the settlement offer, which had initially been a one-day

offer that we got a few extensions on,' that [Plaintiff's] pay would be retroactively suspended for one

month and that [Plaintiff] would begin in another lab rather than returning to Dr. Lovely's lab." (*Id.*

¶ 46.) Plaintiff alleges that "[t]hese actions were taken in retaliation for making a complaint at the

EO&D Office . . . and the Ombuds Office . . . as well as for having consulted with the director of

the [Student Legal Services Office] . . . and with a private attorney." (*Id.*) On April 30, 2014, Plaintiff

received a letter from Dr. Lovely informing her that her pay had been suspended retroactively for

thirty days starting on April 27, 2014. (*Id.* ¶ 47.) Plaintiff alleges that "[t]he reasons presented in the

letter are all misrepresentations defaming [her] character and maligning [her] reputation." (*Id.*)

On May 13, 2014, Plaintiff requested assistance from Catherine Porter, the Ombudsperson,

so that Plaintiff "could save [her] job opportunity with Dr. Nüsslein, who before the suspension of

[her] pay, had shown interest in hiring [her]." (*Id.* ¶ 48.) On May 27, 2014, Plaintiff "met with Ms.

Porter and others at a mediation meeting that [Plaintiff] had asked Ms. Porter to organize." (*Id.*)

Plaintiff asked for, but was denied, union representation at this meeting. (*Id.*) During the meeting,

"Dr. Lovely vehemently tried to force [Plaintiff] to resign voluntarily," but Plaintiff "firmly resisted."

(*Id.*) Dr. Lovely "finally furiously said that [Plaintiff] would have to help the lab manager, Ms. Ward,

with whom he was pairing" Plaintiff. (*Id.*) "At this time, [Plaintiff] observed that [she] had been

replaced by a new postdoc from China, Dr. Yang Tan, who had just graduated from a Chinese

university and who had been hired on April 27, 2014." (*Id.*)[5] After the mediation, Plaintiff "asked

---

[5] Plaintiff also alleges in the TAC that Dr. Tan "received his letter of invitation in January 2014." (TAC ¶ 41.)

Ms. Porter for a summary in writing of the commitments made by Dr. Lovely," but Ms. Porter refused. (*Id.* ¶ 50.)

Thereafter, "Ms. Ward started to behave as if she were [Plaintiff's] supervisor," even though Ms. Ward was not qualified to supervise Plaintiff and the arrangement was for the two to be paired. (*Id.* ¶ 51.) On June 6, 2014, Plaintiff filed her first grievance with the union and signed the Lovely lab work policies and a participating agreement. (*Id.* ¶ 54.) On June 12, 2014, Plaintiff "filed a pre-complaint" at the Massachusetts Commission Against Discrimination ("MCAD") against UMass-Amherst. (*Id.* ¶ 55.) On June 13, 2014, during a lab meeting, Plaintiff presented new research ideas. (*Id.* ¶ 56.) Dr. Lovely approved Plaintiff's new research proposal and told Plaintiff that she could stop working with Ms. Ward. (*Id.*) On June 16, 2014, a first-step hearing was held on Plaintiff's first grievance with the union. (*Id.* ¶ 57.) On June 17, 2014, Ms. Ward told Plaintiff that the samples she had prepared prior to her administrative leave were "being disposed of." (*Id.* ¶ 58.) Plaintiff believes this action was "in retaliation for [her] first-step hearing grievance." (*Id.*)

On June 27, 2014, Dr. Sally Powers, Associate Dean for Faculty and Research, issued her decision on Plaintiff's first-step hearing grievance and found against Plaintiff. (*Id.* ¶ 62.) On June 30, 2014, the union appealed for a second-step hearing. (*Id.*) On July 2, 2014, Ms. Ward sent Plaintiff an email stating that she saw certain pre-made solutions, which came from the RNA manipulation room, at Plaintiff's lab bench and that Plaintiff was not allowed to use them and had to replace them immediately. (*Id.* ¶ 63-64.) Plaintiff replied that she had not used these pre-made solutions but merely borrowed them to copy the information she needed. (*Id.* ¶ 64.) On July 4, 2014, Plaintiff received via email a letter of reprimand "based on the email discussion of the solutions that [Plaintiff] had a few days earlier with Ms. Ward." (*Id.* ¶ 66.) Plaintiff alleges that "[o]ther similarly-situated employees in the past had violated lab protocols but had received no discipline. Likewise,

whites, light-skinned individuals, males and U.S. citizens had routinely violated lab procedures with impunity." (*Id.*)

On July 18, 2014, another lab meeting was held, at which Plaintiff presented slides about her research. (*Id.* ¶ 71.) On July 22, 2014, Plaintiff received a second letter of reprimand from Dr. Lovely stating that Plaintiff had not presented any slides on July 18th. (*Id.* ¶ 72.) In this letter of reprimand, Dr. Lovely told Plaintiff for the first time "that there was a specific format he required for slides." (*Id.*) On July 23, 2014, a coworker told Plaintiff that Dr. Lovely was looking for her. (*Id.* ¶ 73.) Plaintiff found Dr. Lovely in the conference room talking to Dr. Ueki. (*Id.*) Dr. Lovely appeared "extremely angry" at Plaintiff, as he asked her "in a raised tone of voice to send him the slides he had asked for." (*Id.*) Plaintiff responded that she had presented slides on July 18, 2014 "and asked him if these were the slides he was referring to. He then said that these were not what he had asked for." (*Id.*) Plaintiff then requested union representation, and Dr. Lovely said that Plaintiff did not need to involve the union, but Plaintiff insisted, and he allowed her to go look for a representative. (*Id.*) On July 24, 2014, Plaintiff sent Dr. Lovely a revised version of the slides she had presented on July 18, 2014, but Dr. Lovely rejected her revised slides. (*Id.* ¶ 74.) On July 25, 2014, Plaintiff responded that she "disagreed with Dr. Lovely's mischaracterization of the facts in the email" from the previous day and asked to meet with him in the presence of a union represented because she "was having difficulty understanding why he considered [her] slides non-compliant." (*Id.* ¶ 76.) Dr. Lovely responded that the "directions are very simple and should not require a meeting with a 'representative' to understand." (*Id.*)

On July 28, 2014, Plaintiff emailed Dr. Lovely explaining that she believed she "had found new conditions to implement a reliable pili purification method," and Dr. Lovely responded that he did not understand what she meant. (*Id.* ¶ 77.) Plaintiff answered that she would present "something new" at the lab meeting scheduled for August 1, 2014. (*Id.*) Dr. Lovely then asked Plaintiff to send

him new slides, and Plaintiff "asked to meet with him again to understand what he expected in the slides." (*Id.*) On July 30, 2014, Plaintiff received a letter stating that she was being suspended effective immediately, and she was ordered to turn in her lab and office keys, lab notebook, and lab-owned computer. (*Id.* ¶ 78.) "The stated reason was failure to comply with Dr. Lovely's 'simple request to produce . . . a simple set of slides." (*Id.*) The letter also stated that an investigatory meeting with Dr. Lopes had been scheduled for August 4, 2014. (*Id.*) During the August 4, 2014 meeting, Plaintiff showed Dr. Lopes that she "had complied with Dr. Lovely's requirements regarding slides," but Dr. Lopes issued a decision on August 13, 2014, concluding that Plaintiff's suspension was valid. (*Id.* ¶ 81.) Plaintiff asked Dr. Lopes "several times to correct his investigation letter but he refused to do so." (*Id.* ¶ 83.)

   2. *Plaintiff's Post-Dr. Lovely Experiences at UMass (August of 2014 to March of 2015)*

       On August 8, 2014, Plaintiff "filed a complaint requesting a hearing at the 'anti-bullying at the workplace initiative' office that had just recently been created by the UMass-Amherst Chancellor Dr. Kumble Subbaswamy." (*Id.* ¶ 82.) On August 20, 2014, the hearing officer at the step-two hearing on Plaintiff's first union grievance, Ms. Susan Pearson, an Assistant Chancellor, affirmed Dr. Powers' decision at the first-step hearing. (*Id.* ¶ 84.) However, Ms. Pearson "mischaracterized the evidence" by claiming Plaintiff did not dispute certain facts asserted by Dr. Lovely. (*Id.*) On August 21, 2014, the director of the anti-bullying at the workplace initiative office summarily denied Plaintiff's complaint. (*Id.* ¶ 85.) On September 4, 2014, Plaintiff resubmitted her slides after discussing the matter with two union representatives. (*Id.* ¶ 86.) She then filed a second grievance with the union. (*Id.*) On September 11, 2014, Dr. Lopes emailed Plaintiff a memo stating that she would be fired unless she "resubmitted slides compliant with Dr. Lovely's requirements by September 25, 2014." (*Id.* ¶ 87.) On September 17, 2014, Plaintiff resubmitted slides; this time the slides "contained the same information as the initial version but with a different look." (*Id.* ¶ 90.)

On September 18, 2014, Plaintiff asked her union to advance her first grievance to arbitration. (*Id.* ¶ 91.) The following day, Mr. Quinn informed Plaintiff "that the union had decided to use the threat of arbitration to negotiate a settlement." (*Id.* ¶ 92.) Plaintiff repeated to him that the only settlement she would take "would be one enabling [her] relocation and/or assignment to other duties like teaching as allowed by the union contract." (*Id.*) Mr. Quinn "answered that he doubted that the university would ever agree with this type of settlement," so Plaintiff told him that she "was refusing union representation and was going to ask again for help to the Chancellor," who Plaintiff had already contacted on September 15, 2014. (*Id.*) Still, Mr. Quinn emailed Plaintiff later that day with a proposed settlement, which Plaintiff "adamantly rejected" as she "had never asked him to perform such negotiations." (*Id.*)

On September 22, 2014, Plaintiff received an email from an assistant to the Chancellor stating: "Please be advised that Chancellor Subbaswamy is not prepared to intervene in your case." (*Id.* ¶ 93.) Mr. Quinn then emailed Plaintiff again, "insisting that [she] reconsider the offer he had sent [her] on September 19, 2014." (*Id.*) Mr. Quinn also stated that he expected Plaintiff would be fired if she did not accept the offer and "that he had gotten Ms. Chinman to agree to hold off on . . . Dr. Lopes' September 25, 2014 deadline for slides." (*Id.*)

On September 23, 2014, Plaintiff emailed Dr. Lopes to ask for feedback on the slides she sent him on September 17, and he responded: "I received your slides and I will get back to you as soon as possible." (*Id.* ¶ 94.) On September 27, 2014, Dr. Lovely emailed Plaintiff "a letter announcing the non-renewal of [her] appointment contract and no reason was stated in this letter to justify the decision." (*Id.* ¶ 95.) That same day, Plaintiff stopped receiving notification of events at UMass-Amherst, likely because her email address was removed from an email list. (*Id.* ¶ 96.) On September 30, 2014, Plaintiff "received a letter from an attorney hired by the union, Atty. James

Shaw, announcing without justification the refusal of the union to arbitrate [Plaintiff's] first grievance as well as to pursue the proceeding of [her] second grievance." (*Id.* ¶ 98.)

On October 2, 2014, Dr. Lopes responded to Plaintiff's requests for feedback on her slides: "[Due] to negotiations with you and your union rep regarding settlement discussions, we are holding off on final review of your slides until these negotiations are finished." (*Id.* ¶ 100.) Plaintiff answered: "I do not know about which 'negotiations with [me]' you are referring to since I have asked you or the Union to make such." (*Id.*) The following day, Dr. Lopes responded: "I understand. Susan Chinman needs to be involved and she will be in touch with Ryan Quinn. I will wait until I hear back from Susan." (*Id.* ¶ 101.)

On October 9, 2014, Dr. Lopes informed Plaintiff that her slides had been accepted and that she would be permitted to return to work on October 27, 2014, if she submitted a new research plan by October 17, 2014. (*Id.* ¶ 102.) The following day, Plaintiff "engaged in voluntary mediation regarding [her] pre-complaint pending with MCAD," during which she "asked to be relocated to a different lab." (*Id.* ¶ 103.) On October 17, 2014, Plaintiff emailed Dr. Lopes and explained she was awaiting a decision on her request to be relocated to a different lab. (*Id.* ¶ 104.) On October 20, 2014, Dr. Lopes responded by telling Plaintiff that she "was being ordered to submit a research plan no later than October 24, 2014." (*Id.* ¶ 106.) On October 23, 2014, Plaintiff sent Dr. Lopes her research plan, but he did not respond. (*Id.* ¶ 109.)

On October 27, 2014, Plaintiff reported to work, but Dr. Lopes told Plaintiff she could not return to Dr. Lovely's lab and promised she would get a separate lab space. (*Id.* ¶ 110.) Plaintiff explained that she needed to access the equipment she had used in Dr. Lovely's lab as well as the solutions she had already prepared. (*Id.*) "Because [her] contract was expiring on February 1, 2015 and Dr. Lovely had informed me on September 27, 2014 that it would not be renewed, [Plaintiff] had very little time to attempt to make meaningful progress and save [her] career." (*Id.*) However,

Dr. Lopes "kept trying to end the conversation and started to raise his voice"; he also told her to seek union representation. (*Id.*)

On October 28, 2014, Dr. Lopes denied Plaintiff's request to return to the Lovely lab and for reimbursement for travel expenses for a visiting stay in another lab and a training in another university. (*Id.* ¶112.) Plaintiff alleges these "restrictions constituted a violation of the postdocs' union contract." (*Id.*) On November 5, 2014, Plaintiff filed a second pre-complaint at MCAD against UMass-Amherst. (*Id.* ¶ 113.) Shortly thereafter, Plaintiff had a consultation with Attorney Patrick Daniel Morrissey, an immigration attorney, "in the hope of finding a way to rescue her program and stay in the U.S. workforce as a postdoctoral researcher." (TAC ¶ 96.) However, Attorney Morrissey had a conflict of interest and could not help Plaintiff. (*Id.* ¶ 97.)

On November 19, 2014, Dr. Lopes sent Plaintiff a Return to Work Letter which committed to allow Plaintiff to return on November 24, 2014. (Dkt. No. 171-1, Ex. 4 ¶ 114.) The letter also denied Plaintiff's request for an undergraduate student assistant, which Plaintiff alleges "proved disparate treatment vis a vis the white female employees in the lab," all of whom had undergraduate assistants. (*Id.*) On November 24, 2014, Plaintiff reported to work, but "Dr. Lopes pretended not to have the work policies of the lab space he had assigned to [her], and he told [her] to come back the day after." (*Id.* ¶ 115.) The following day, Dr. Lopes allowed Plaintiff to return to work but relocated her to "a worn-out combined lab and office space where [she] was alone and had no access to the major part of the materials and equipment that [she] needed to perform meaningful research." (*Id.* ¶ 116.) Plaintiff alleges this working space violated two provisions of the postdocs' union contract and presented "serious health and safety issues." (*Id.*) Dr. Lopes acted ruder toward Plaintiff after she filed her second MCAD pre-complaint which named him. (*Id.* ¶ 117.) Plaintiff also learned about the hiring of her replacement in the Lovely lab, Dr. David Walker, a white male. (*Id.*)

On December 1, 2014, Dr. Lopes replied to Plaintiff's request for training on equipment that was new to her by stating that her emails were unproductive and accusing her of insubordination and harassment. (*Id.* ¶ 118.) On December 8 and 15, 2014, Dr. Lopes held meetings with Plaintiff, during which he "mischaracterized facts, which made [Plaintiff] very uncomfortable." (*Id.* ¶ 120.) On December 10, 2014, Dr. Lopes denied Plaintiff's request to attend a training and "continued his rude behavior towards [her] while ignoring professional ethics." (*Id.* ¶ 121.) Plaintiff believes this denial was in retaliation for her second MCAD pre-complaint. (*Id.*)

On December 12, 2014, Plaintiff's then-attorney, Raymond Dinsmore, "sent a second letter to the General Counsel Office of UMass this time to request that [Plaintiff] be immediately granted authorization to use the materials and equipment whose access had been denied to me by Dr. Lopes." (*Id.* ¶ 122.) Attorney Dinsmore also recommended that Plaintiff contact Attorney Sandra Torres, the Associate General Counsel of UMass regarding immigration issues. (*Id.* ¶ 135.) At that time, Plaintiff "was looking for information about the way to fill a gap between two paid positions and maintain a J-1 visa during this gap," as "the Exchange Visitor Program is continuous: in case of interruption, the J-1 visa is invalidated and a two-consecutive-year waiting period is indispensable before submitting a new application for another J-1 visa." (*Id.*) However, when Plaintiff called Attorney Torres, "[s]he was very hostile and did not answer [Plaintiff's] questions regarding a gap between two paid positions under a J-1 visa"; instead, she redirected Plaintiff to the Director of International Programs Office ("IPO"), Ken Reade. (*Id.* ¶ 136.)

On December 17, 2014, "a significant fluid leak occurred in the remote research space where [Plaintiff] had been compelled to relocate" and she almost slipped. (*Id.* ¶ 123.) On December 18, 2014, attorney Lisa Lippiello sent a letter to the General Counsel Office at UMass to request a mediation on behalf of Plaintiff. (*Id.* ¶ 124.) On December 22, 2014, Plaintiff "filed a complaint of misconduct in research for plagiarism and abuse of confidentiality via the Director of the Office of

Research Compliance." (*Id.* ¶ 126.) That same day, Plaintiff met with Ken Reade, the Director of IPO. (*Id.* ¶ 137.) Mr. Reade was "hostile" and began the meeting by stating: "[W]e know about the performance issues; we spoke with the General Counsel Office," and he refused to answer Plaintiff's questions regarding a gap between two paid positions. (*Id.*) Plaintiff alleges: "This was again in retaliation for my MCAD pre-complaints and it was clear that the University did not want to accommodate me in any way, shape, or form because I had the courage to assert my rights." (*Id.*)

On January 5, 2015, Plaintiff appeared for a rescheduled meeting with Dr. Lopes; however, the meeting did not take place because a union representative was not available and Plaintiff felt uncomfortable. (*Id.* ¶ 127.) On January 6, 2015, Plaintiff had a preliminary review meeting regarding her December 22, 2014 complaint of misconduct in research. (*Id.* ¶ 128.) Three days later, the Vice Chancellor for Research and Engagement, Dr. Michael Malone, denied Plaintiff "a hearing in front of a committee of experts under the University's misconduct in research policy . . . asserting that there was insufficient substance to the allegation." (*Id.* ¶ 129.) Plaintiff notified Dr. Malone that she intended to appeal this decision to the Provost, Dr. Katherine Newman, once she knew the proper procedure. (*Id.*)

On January 11, 2015, Plaintiff sent a request to meet the following day with Dr. Newman regarding her appeal. (*Id.* ¶ 130.) Later that day, Plaintiff asked Dr. Lopes to reschedule a meeting set for that same day, explaining that she had a meeting planned with Dr. Newman. (*Id.*) On January 12, 2015, after not receiving a response from Dr. Newman, Plaintiff went to the Provost's Office and requested an urgent meeting with Dr. Newman to obtain the policy for filing an appeal, but the Provost's assistant did not schedule a meeting. (*Id.* ¶ 131.) Later that day, Dr. Lopes answered Plaintiff's request for rescheduling by moving the meeting to January 20, 2015, and he asked Plaintiff to bring proof that she met with the Provost that day. (*Id.*) On January 13, 2015, Plaintiff filed an appeal to the Provost. (*Id.* ¶ 132.)

At the January 20, 2015 meeting with Dr. Lopes, he asked for proof that Plaintiff met with the Provost on January 12, 2015, and Plaintiff requested a union representative. (*Id.* ¶ 133.) Dr. Lopes responded that he had told Plaintiff she could bring a union representative if she wanted, and then he suspended Plaintiff without pay until the end date of her appointment scheduled on February 1, 2015. (*Id.*) He then tried to hand Plaintiff a letter, but she told him to email it to her. (*Id.*) Later that afternoon, Dr. Lopes emailed Plaintiff a letter of suspension "in which the suspension without pay that he had announced about eight hours earlier had turned into a suspension with pay" until February 1, 2015. (*Id.* ¶ 134.) Plaintiff believes "[t]his was the result of the phone call made by Mr. Quinn" when, "most likely, Mr. Quinn informed Ms. Chinman that if they suspended [Plaintiff's] pay, pursuant to the union contract, [she] could request an expedited grievance whose filing the union would have been unable to deny and that would have obliged the University to extend [Plaintiff's] contract." (*Id.*) However, because Plaintiff's pay was not suspended, Mr. Quinn refused to file a grievance. (*Id.*) Later that day, Plaintiff went to check her mail at the Microbiology Department business office and saw that her tag on the mailbox had been removed. (*Id.* ¶ 145.)[6]

On January 21, 2015, Plaintiff scheduled a meeting with the Student and Exchange Visitor Information System Coordinator, Naoko Ishida, to try to obtain information about changing her J-1 visa category from "Research Scholars" to "Students," but the meeting was canceled the following day and Plaintiff was redirected to Mr. Reade. (*Id.* ¶ 138.) Plaintiff alleges: "This was yet another retaliation for my MCAD pre-complaints." (*Id.*) When plaintiff requested an appointment with Mr.

---

[6] On January 23, 2015, Dr. Lopes sent Plaintiff an email asking for a forwarding address, and Plaintiff responded that she could pick up her mail and had no forwarding address. (*Id.* ¶ 148.) He replied: "I am afraid this is not possible because starting [February 1, 2015] UMass will stop accepting your mail and will send it to your last known address." (*Id.* ¶ 148.) He did not explain what he meant by "last known address," because in the UMass Human Resources system her last known address was her "professional address in the Department of Microbiology." (*Id.*) Dr. Lopes added in his email: "You will need to secure an off-campus P.O. Box by next Friday and provide this information to me in writing." (*Id.*)

Reade, he replied that he was not available before January 26, 2015 and he tried to address her questions via email. (*Id.*)

On January 22, 2015, Plaintiff filed a third pre-complaint at the MCAD. (*Id.* ¶ 139.) She also asked to meet with the Advisor for International Faculty and Researchers at IPO, Nancy Condon. (*Id.*) An IPO clerk responded that Plaintiff could not meet with Ms. Condon because Mr. Reade had asked the clerks to redirect Plaintiff to him for any questions. (*Id.*) Plaintiff alleges that "[t]his was yet another act of retribution for my MCAD pre-complaints." (*Id.*) The following day, Plaintiff returned to IPO and met with Ms. Condon, who explained that Plaintiff "could fill a gap between two paid positions by working on [her] own funding; this way [Plaintiff] would not lose [her] J-1 visa while waiting for a grant under which [she] would be compensated." (*Id.*) Ms. Condon also explained "that she would extend [Plaintiff's] program if [she] obtained from any lab director at UMass . . . an offer to work on [her] own personal funding." (*Id.*) "Furthermore, she said that she would be able to extend [Plaintiff's] program even during the 30-day grace period after the end date of [her] appointment scheduled on February 1, 2015." (*Id.*)

On February 2, 2015, Plaintiff went to the Microbiology Department business office to request the mail that had arrived for her during the last week of her employment. (*Id.* ¶ 149.) Two clerks told Plaintiff that Dr. Lopes had directed them to give him Plaintiff's mail. (*Id.*) Plaintiff alleges that "[t]his action was yet another retaliatory action taken against me." (*Id.*) Plaintiff was told she "could knock on [Dr. Lopes'] door and ask him for [her] mail," as he was in his office. (*Id.*) On February 6, 2015, Plaintiff went to the EO&D Office "to ask advice about how to obtain my mail sequestered by Dr. Lopes." (*Id.* ¶ 150.) Attorney Ryan Morse told Plaintiff to simply go to the Microbiology Department business office and demand it and also to demand it via email. (*Id.*) Later that day, Plaintiff went to the Microbiology Department business office to demand her mail, but the clerk in charge of the mail said Dr. Lopes was not present and that she could not find her mail in his

office. (*Id.* ¶ 151.) Plaintiff then emailed Dr. Lopes to demand her mail. (*Id.*) She also entered a

forwarding address in the UMass-Amherst Human Resources system. (*Id.* ¶ 152.) Also on February

6, 2015, Attorney Nathan LaVallee from the UMass-Amherst General Counsel Office responded to

Plaintiff's email to Dr. Lopes by stating she had sent an unauthorized communication. (*Id.* ¶ 153.)

On February 10, 2015, Plaintiff accepted a non-compensatory position offered by Dr.

Alexander Ribbe in the Department of Polymer Science and Engineering at UMass-Amherst until he

could obtain a grant to compensate Plaintiff. (*Id.* ¶ 141.) "At that time, [Plaintiff's] appointment in

the Lovely lab had ended on February 1, 2015 and so [she] was on the 9th day of [her] 30-day grace

period." (*Id.*) Plaintiff "then informed Ms. Condon of this new sponsor who was willing to hire

[Plaintiff] under [her] own resources for six months, until he got funding via the grant application(s)

[they] were to write together." (*Id.*) However, Ms. Condon redirected Plaintiff to Mr. Reade. (*Id.*)

Plaintiff "believe[s] that this was another act of retaliation against [her] for having filed the MCAD

pre-complaints." (*Id.*) On February 13, 2015, Dr. Ribbe told Plaintiff that Mr. Reade had informed

him: "It is too late; upon federal regulations I cannot extend her visa." (*Id.* ¶ 142.) Plaintiff alleges

"[t]his was yet another act of reprisal against [her] for [her] MCAD pre-complaints" and

contradicted the information provided by Ms. Condon and federal regulations. (*Id.*)

On February 26, 2015, Ms. Condon was contacted by Dr. Victor McCrary, the Vice

President of Research and Economic Development at Morgan State University in Maryland, to have

Plaintiff's immigration records transferred in connection with an employment opportunity. (*Id.* ¶

143.) On February 27, 2015, Mr. Reade transferred Plaintiff's immigration records. (*Id.* ¶ 144.)

Plaintiff alleges: "The fact that Mr. Reade was able to transfer my immigration records to [Morgan

State University] proves that he could have equally well extended my program at UMass-Amherst so

that I could work with Dr. Ribbe." (*Id.*) Instead, UMass-Amherst "was denying [her] opportunities

at its own institution because of the three MCAD pre-complaints [she] had filed." (*Id.*)

Also on February 26, 2015, Plaintiff returned to the Microbiology Department business office and asked where her mail had been sent, as she had not received any at the new address entered in the HR system. (*Id.* ¶ 154.) The clerks "refused to answer." (*Id.*) Plaintiff noticed a journal on the counter with its mailing tag removed and "strongly suspect[s]" it was her periodical, as she was the only subscriber to it in the Microbiology Department. (*Id.*) Plaintiff alleges that "[t]his was yet another retaliatory action." (*Id.*) On February 27, 2015, after Plaintiff asked Attorney LaVallee where her mail had been sent, he hand delivered an envelope containing the mail received for the week of February 23, 2015. (*Id.* ¶ 156.) This included a copy of her "last paycheck showing that the hard copy paycheck had been mailed to [her] new forwarding address in the UMass-Amherst Human Resources database on February 27, 2015." (*Id.*) Plaintiff then asked Attorney LaVallee for her periodicals and the address for the mail that she "was given copies of [and] had been delivered during [her] last week of employment and the time period prior to February 23, 2015." (*Id.*) On March 2, 2015, Attorney LaValle told Plaintiff "at last where [her] mail had been sent." (*Id.* ¶ 157.) Plaintiff "believe[s] that Dr. Lopes sequestered [her] mail then sent it to an address that no longer existed in the UMass-Amherst Human Resources database in retaliation for [her] three MCAD pre-complaints." (*Id.*)

B.   Events between March of 2015 and May of 2016

On March 3, 2015, Plaintiff filed a pre-charge of prohibited practice against her union at the Massachusetts Department of Labor Relations ("DLR"), and on March 25, 2015, she filed another pre-charge for retaliation based on Mr. Reade's refusal to extend Plaintiff's program at UMass-Amherst so that she could work with Dr. Ribbe. (*Id.* ¶¶ 158, 160.) On May 7, 2015, following an investigative conference at the DLR, Plaintiff received an email from Dr. McCrary rescinding "his offer and cancel[ling] [her] transfer to Morgan State University." (*Id.* ¶ 164.) The email stated: "We can no longer be in a position to offer you an opportunity at Morgan State University per [Dr.]

Niba's email. We ask you [to] contact the proper authorities and [make] arrangements for your immigration status consistent with the current laws." (*Id.*)

On June 1, 2015, Dr. Jeffrey Blanchard, from the UMass-Amherst Microbiology Department, offered Plaintiff "a self-funded position of about six months at least until he could compensate [her] via a grant." (*Id.* ¶ 167.) On June 5, 2015, Dr. Blanchard sent Plaintiff an email stating: "I just sent a letter of support to Nancy [Condon] and Ken Reade. Best wishes in this process." (*Id.* ¶ 168.) On June 18, 2015, Dr. Blanchard sent Plaintiff another email stating: "I talked with Nancy Condon and Nate LaVallee yesterday. They are working on it and will contact me when we can move forward with the application. It sounds like . . . maybe . . . a week or two." (*Id.*) On June 19, 2015, during a hearing at the Department of Unemployment Assistance ("DUA"), a letter written by Attorney LaValle, which demanded that "DUA not allow [her] to receive benefits until [she] could provide an updated work authorization," was entered as an exhibit. (*Id.* ¶ 169.) However, Attorney LaVallee knew at the time that Dr. Blanchard had offered Plaintiff a non-compensatory position for six months. (*Id.*) Therefore, Plaintiff alleges, Attorney LaVallee's "letter was retribution for [Plaintiff's] past engagement in protected activities." (*Id.*)

On June 30, 2015, Plaintiff "reluctantly accepted" to move into an apartment on the UMass-Amherst campus rented by Michael Mongeau, a student at UMass-Amherst. (TAC ¶ 101.) Plaintiff met Mr. Mongeau at a public meeting of the Amherst NAACP a couple months earlier. (*Id.* ¶ 99.) Thereafter, "Plaintiff would be flooded daily with emails from Mr. Mongeau" offering to help her. (*Id.* ¶ 101.) In addition, Mr. Mongeau and other acquaintances often tried to convince Plaintiff to marry Mr. Mongeau to solve her immigration problems, but Plaintiff made it clear she was not interested. (*Id.*) On July 3, 2015, Mr. Mongeau, who was attending a conference in another state, sent Plaintiff three emails stating that he loved her. (*Id.* ¶ 102.)

On August 5, 2015, the U.S. Department of State ("DOS"), which Plaintiff had contacted on June 2, 2015 to complain about retaliation by the sponsor of her program, rendered a determination that it found no evidence of retaliation. (Dkt. No. 171-1, Ex. 4 ¶ 168, 170.) Plaintiff hired a lawyer in Boston "to transmit to UMass-Amherst that she only wanted to be reinstated to a valid program status," as "Plaintiff had until the end of the year 2015 to have a reinstatement application filed on her behalf." (TAC ¶ 102.) However, on September 29, 2015, Dr. Blanchard informed Plaintiff: "my understanding is that you do not have the necessary approval to work at UMass." (Dkt. No. 171-1, Ex. 4 ¶ 171.) Plaintiff alleges that she "was denied yet another position at the University in retaliation for my three MCAD pre-complaints." (*Id.*)

"On September 29, 2015, Mr. Mongeau's sexual advances evolved" to the point where he was "stalking Plaintiff." (TAC ¶ 103.) The two had a verbal confrontation, during which "Plaintiff tried to make it clear once and for all that she would never fall in love with him, . . . let alone marry him." (*Id.*) The following day, after Mr. Mongeau organized a meeting for Plaintiff with another individual without asking her permission, the two had another confrontation. (*Id.*) Mr. Mongeau demanded that Plaintiff leave his apartment and then he "started to shove Plaintiff and he raised his fist to punch Plaintiff, which made [her] run and lock herself in the 'back room' where she had her phone" so she could call a friend for help. (*Id*) Mr. Mongeau was unable to force the door open and called the UMass-Amherst Police Department ("UMPD"). (*Id.*) While Plaintiff was on the phone with her friend, Sergeant Jonathan Hall of the UMPD forced the door open. (*Id.*) Because Plaintiff feared deportation and an attorney had advised her not to interact with the police, "Plaintiff chose not to volunteer information." (*Id.* ¶ 106.) While Plaintiff was leaving the apartment, Sergeant Hall asked for her identity and whether she had a key to the apartment; he also threatened that if she did have a key and did not give it back, she could be charged with larceny. (*Id.*) Plaintiff alleges that the UMPD report of this incident contained falsehoods, including its listing of Plaintiff as "Black, 5'10,

150 lbs.," because "Plaintiff is not Black, nor 5'10, nor 150 lbs." (*Id.*) Later that night, Plaintiff

returned to Mr. Mongeau's apartment to pack up her belongings, but Mr. Mongeau engaged in

further verbal and physical abuse during the early morning hours of September 30, 2015. (*Id.* ¶¶ 107-

08.)

On October 15, 2015, Plaintiff learned about a "U-Visa" available for certain non-citizen

crime victims. (*Id.* ¶ 110.)[7] On October 19, 2015, Plaintiff requested a copy of the UMPD report

from September 29, 2015, and she received the report on October 21, 2015. (*Id.* ¶ 111.) Plaintiff

then spoke with Sergeant David Black of the UMPD, who suggested Plaintiff file an offense report.

(*Id.*) After consulting with a detective and a sergeant at the District Attorney's Office in

Northampton, Plaintiff filed a report at the UMPD on November 5, 2015. (*Id.*) While Plaintiff was

waiting for her report to be printed so she could sign it, Sergeant Hall shouted at Plaintiff from the

corridor: "I heard you were here. You're giving your name now? You're providing your name now?"

(*Id.*) On November 10, 2015, Plaintiff wrote a rebuttal to the initial UMPD report which was based

on the information provided by Mr. Mongeau, and this rebuttal was included in the UMPD records.

(*Id.* ¶ 112.)

On November 19, 2015, after speaking with the Director of the victim/witness advocate

unit, Plaintiff went to the Eastern Hampshire District Court ("EHDC") to file an application for a

criminal complaint on her own and requested a copy of the paperwork to be filed to obtain a show

cause hearing. (*Id.*) On November 30, 2015, Plaintiff came back to the EHDC to file an application

for a criminal compliant with two counts of assault and battery against Mr. Mongeau. (*Id.* ¶ 113.)

---

[7] "The Victims of Violence Protection Act created the 'U' non-immigrant visa classification, and in order to be eligible to a 'U' visa, [a non-citizen] must establish that [s]he 'suffered substantial physical or mental abuse' as a result of having been the victim of specified criminal activity." *Bejarno v. Chertoff*, 2008 WL 2439746, at *1 (S.D. Fla. June 13, 2008) (quoting 8 U.S.C. § 1101(a)(15)(U)(i)). Moreover, "[i]n order to obtain a U-Visa, an alien who was the victim of an enumerated crime must obtain a 'certification' from law enforcement officials confirming that he was helpful to the investigation or prosecution of the crime." *Ordonez Orosco v. Napolitano*, 598 F.3d 222, 224 (5th Cir. 2010) (quoting 8 U.S.C. § 1184(p)(1)).

Plaintiff spent three hours hand-writing the affidavit section of the application. (*Id.*) When Plaintiff turned in her application, Attorney Randall Smith, the First Assistant Clerk-Magistrate of the EHDC, told Plaintiff that he did not know if he could read her handwriting; he also asked "whether she was still an employee of UMass." (*Id.*) Plaintiff "responded that she had lost valid program status because she had filed complaints." (*Id.*) After Clerk-Magistrate Smith told Plaintiff there was a $15 filing fee, which Plaintiff paid, "Smith abruptly told Plaintiff that he had the right to deny a complaint *summarily* and he gave her a copy of the Standard 3:00[8] while stating that a private entity had no right to the issuance of a criminal complaint." (*Id.*) Plaintiff "in tears asked 'why?' and . . . Smith loudly answered: 'You have a litany of complaints against UMass and there is nothing my office can do for you! This had to be investigated by the police!'" (*Id.*) Plaintiff replied that she had already gone to the police and that they had "lied in Mr. Mongeau's report." (*Id.*)

On December 11, 2015, Plaintiff went to the EHDC and requested a copy of the decision on her application. (*Id.* ¶ 114.) Plaintiff was given a copy of the first page of her application showing a docket number and signature by Clerk-Magistrate Smith dated December 7, 2015, with the following statement: "Filed and Denied. No Further Process." (*Id.*) On December 14, 2015, Plaintiff emailed the UMPD officer who had filed her November 5th report and told him "that she would like the November 5, 2015 report and her November 10, 2015 rebuttal to be investigated," but the officer never responded. (*Id.*)

On December 21, 2015, Plaintiff sent an email to Clerk-Magistrate Smith and CCed his supervisor, Clerk-Magistrate William Nagle, "asking for a statement of his reasons for denying Plaintiff's application." (*Id.* ¶ 115.) Plaintiff also emailed the UMPD then-Interim Chief, Patrick

---

[8] "Standard 3:00" appears to be a reference to the District Court Standards of Judicial Practice: the Complaint Procedure, which "are administrative regulations promulgated by the Chief Justice of the District Court that [are] treated as statements of desirable practice to be followed in the District Courts." *Eagle-Trib. Pub. Co. v. Clerk-Magistrate of Lawrence Div. of Dist. Ct. Dep't*, 863 N.E.2d 517, 521 (Mass. 2007) (internal quotation marks omitted).

Archbald, to ask that her report and rebuttal be investigated. (*Id.*) The following day, Plaintiff received a voicemail from a UMPD officer stating: "Uh, apparently uh, it came down it's back in our hands again to uh issue A&B charges. I need you to confirm that you want to do that and then come in and sign the A&B complaint. Uh, it's just on your behalf." (*Id.*) On December 23, 2015, Plaintiff emailed the UMPD officer: "I confirm that I would like to press A & B charges. There is something that I could not understand in your voicemail: do you mean that I will have to file the complaint as a private entity because if so I have already done this and the Belchertown court assistant clerk denied it and sent me back to UMass-Amherst Police." (*Id.*) Plaintiff then spoke with Sergeant Hall on the phone, who stated: "And so on your behalf, based on your statement, we have a criminal complaint that would go back to the courthouse once you signed it." (*Id.*) The following day, Plaintiff went to UMPD and "was surprised at realizing that it was not a 'complaint' that she was being asked to sign" but, instead, "an application for a criminal complaint, identical to that she had filed at the EHDC on November 30, 2015." (*Id.*) In addition, Plaintiff "was asked to sign this application as if she were the complainant but the address of the UMPD was in the complainant box." (*Id.*) After signing this document, "Plaintiff had questions about what she had just signed" and she was told to contact UMPD Officer Roberts and was denied a copy of the document. (*Id.*)

On January 4, 2016, Plaintiff emailed Officer Roberts and requested a meeting regarding the document she signed on December 24, 2015. (*Id.*) Officer Roberts responded: "Yes we should meet to discuss the [court's] decision." (*Id.*) Plaintiff then called Officers Roberts, who "very angrily" stated that she "had not told him that she had already filed this at the EHDC and that it was denied." (*Id.*) On January 5, 2016, Plaintiff emailed Clerk-Magistrate Nagle:

> I would like to discuss the application for a criminal complaint that was recently filed on my behalf by UMass-Amherst Police office please. For weeks I have been terribly misled and, as a result, UMass-Amherst Police office did not file this complaint earlier as it should have after I reported at this office on November 5, 2015 my allegations of A&B.

(*Id.* ¶ 116.) Clerk-Magistrate Nagle did not respond to Plaintiff's email. (*Id.*)

On January 8, 2016, Plaintiff went to the Amherst Police Department ("APD") to ask whether the APD could investigate the crimes she had been a victim of on the UMass campus. (*Id.* ¶ 117.) Sergeant Janet Lopez explained that APD could not investigate because the crimes were under UMPD's jurisdiction. (*Id.*) Plaintiff then went to the EHDC Clerk-Magistrate's office to request a copy of the application filed by UMPD on her behalf, and an assistant answered that she could not find any such application. (*Id.*) Clerk-Magistrate Smith then came out of the Clerk-Magistrate's office and told Plaintiff that Clerk-Magistrate Nagle had asked him to respond to Plaintiff's January 5, 2016 email and his response would be: "The police is an executive branch of the government and we are not allowed to answer to the matter. . . . You can come as many times as you want; that's what the answer is. This is private!" (*Id.*) A few minutes later, while Plaintiff was talking with an assistant district attorney, Smith again exited the Clerk-Magistrate's office and told Plaintiff "he had seen 'what [Plaintiff] had signed on December 24, 2015' and it was the same she had filed as a private complainant, so he denied it." (*Id.*) Smith also stated that he could not discuss whether the police filed the application or not and that Plaintiff was trying his patience. (*Id.*) He later stated: "The police didn't file; if they told you that they filed, they are lying. Who told you to come here to obtain a copy of this application?" (*Id.*) Plaintiff told him it was Sergeant Kershaw, and Smith replied: "I will talk to Sergeant Kershaw!" (*Id.*) Plaintiff then stated that she would "ask a regional judge for a transfer to another division," to which Smith responded: "You have no rights, no standing, no legal authority because you are not a party." (*Id.*)

On January 14, 2016, Plaintiff received an email from Clerk-Magistrate Smith stating that Clerk-Magistrate Nagle directed him to respond to her January 5, 2016 email and that

> [n]either Clerk Nagle or myself may speak with you about the decision of the UMass Police . . . department to file or not to file an application for a criminal complaint. That decision lies [solely] in their discretion. Further, pending applications for criminal complaints are unavailable to the public, and no information concerning a pending

application may [be] given out by the Clerk's office except to the Complainant and the Defendant.

(*Id.* ¶ 119.) According to Plaintiff, "[t]his message confirmed that the UMPD was the complainant, which raises the question of why Plaintiff had been asked . . . to sign this application." (*Id.*)

On January 19, 2016, in response to an inquiry from Plaintiff, UMPD Interim Chief Archbald stated:

> I confirmed with our Detective Lt. that the court paperwork with the charge of Assault and Battery was delivered to the Belchertown Court by our Court Officer. An in-person conversation was had between our Court Officer and the Clerk Magistrate Smith about the application. When our Court Officer was informed by the Clerk that the complaint application and facts had already been heard – and . . . he rendered a previous decision – the complaint application was not filed with the Court. . . . At this point a Clerk Magistrate has made a decision on the Assault and Battery charge, I do not intend to have our office refile the matter with the Court.

(*Id.* ¶ 120.)

On February 8, 2016, Plaintiff met with the new UMPD Chief, Tyrone Parham, who gave Plaintiff a copy of the application she had signed "on which Plaintiff instantly noted that someone had imitated her handwriting and written her name in the complaint box just above the UMPD's address." (*Id.*) In addition, this copy was "truncated, so it was not possible to determine whether or not it had received a docket number and there was no decision on it." (*Id.*) Despite requesting to see the original, Plaintiff was never given permission to do so. (*Id.*) Moreover, Plaintiff's "case was never investigated: her evidence was never reviewed and her witnesses never interviewed." (*Id.*)

On January 14, 2016, two employees of the UMass-Amherst Du Bois Library filed a false report against Plaintiff with the UMPD, which accused Plaintiff of living in the library and using the Faculty Writing Room without authorization, after Plaintiff stayed late in the library. (Dkt. No. 171-1, Ex. 4 ¶ 173.) On March 23, 2016, a building monitor working at the Du Bois Library discovered Plaintiff at 4:15 a.m. in the bathroom and filed an internal report regarding this encounter. (*Id.* ¶ 174.) The building monitor stated he needed to verify the validity of the "UCard" Plaintiff was using

to access the building, but he could not find Plaintiff's name in a database. (*Id.*) Plaintiff doubts that the building monitor "would have subjected to such a level of scrutiny or would have mistrusted a white person placed in a similar situation." (*Id.*) "Since April 1, 2016," Plaintiff asked UMPD Chief Parham "several times" to investigate the false allegations of the Du Bois Library employees, but he refused. (*Id.* ¶ 176.)

On April 26, 2016, an application to allow an extension of Plaintiff's "courtesy account at UMass-Amherst . . . was rejected without justification" and the applicant, Dr. Ernest Washington, was referred to Mr. Reade. (*Id.* ¶ 177.) On May 16, 2016, Chancellor Subbaswamy responded to a May 6, 2016 email from Plaintiff requesting a meeting: "I have consulted my staff and am informed that you have taken advantage of the many offices and routes of appeal available to you at the University. It seems to me that your concerns have been fully addressed and that a meeting with me would not be fruitful." (*Id.* ¶ 266.)

C.     Events Between June of 2016 and June of 2021

On June 23, 2016, Dr. Washington, who wanted to hire Plaintiff in a funded position, "contacted DOS to inquire for help to have [her] immigration paperwork processed," but he was referred to the UMass-Amherst IPO. (*Id.* ¶ 178.) On August 18, 2016, Dr. Washington informed the Chair of his Department, Teacher Education & Curriculum Studies, that he wished to appoint Plaintiff with funding from the Center for Racial Justice and Urban Affairs. (*Id.* ¶ 179.) On September 12, 2016, Dr. Washington emailed Ms. Condon to schedule a meeting regarding obtaining a work authorization for Plaintiff, but Ms. Condon answered that she forwarded the request to Mr. Reade. (*Id.* ¶ 181.) Plaintiff alleges: "This was again in retaliation for my three MCAD pre-complaints." (*Id.*) On September 16, 2016, Mr. Reade answered: "The situation was carefully discussed within the Provost's Office and Human Resources and I have been informed that the university will not authorize any further consideration of employment of [Plaintiff]." (*Id.* ¶ 182.)

On April 5, 2017, the UMass-Amherst EO&D Office denied Plaintiff's requests to file a formal complaint against two UMPD employees (Sergeant Hall and Officer Jessica Norton) regarding the false UMPD report from September 30, 2015. (*Id.* ¶ 185.) Attorney Morse stated: "I have been informed that you are engaged in active litigation against the University, and you are currently represented by counsel. At this time, the EO&D Office will not be responding to your queries, and must insist that any communication be directed to the University's counsel by your counsel of record." (*Id.*) Plaintiff alleges that "[t]his was in retaliation for filing pre-complaints with the MCAD." (*Id.*)

On April 20, 2017, Plaintiff went back to the EHDC to file a new application for a criminal complaint against Mr. Mongeau. (TAC ¶ 123.) This time, Plaintiff filed an affidavit of indigency to waive the filing fee, which was granted by Judge Jacklyn Connly. (TAC ¶ 4.m.) "The granting of the waiver should have marked the application for official filing," but the application never received a docket number and was never officially filed. (*Id.* ¶¶ 4.m., 123.) Shortly after Judge Connly granted Plaintiff's fee waiver application, Plaintiff was physically attacked by an unrelated individual. (*Id.*)[9] On June 30, 2017, Plaintiff returned to the EHDC to ask for a copy of the decision on her April 20, 2017 application. (*Id.*) Clerk-Magistrate Smith then denied Plaintiff's application while signing it and retroactively dating it to April 21, 2017, with the notation: "No probable cause found." (*Id.* ¶ 4.m.) "When Plaintiff attempted to ask why there was no docket number on it so she could appeal for a redetermination by a judge, . . . Smith yelled at Plaintiff extremely loudly: 'I don't want to hear it! I don't want to hear it!.'" (*Id.*)

On February 1, 2018, Plaintiff went back to EHDC to file another application for a criminal complaint against the individual who attacked Plaintiff on April 20, 2017. (*Id.* ¶ 123.) Clerk-

---

[9] On April 21, 2017, Plaintiff applied at the EHDC for a Harassment Prevention Order ("HPO") against the perpetrator of the physical attack which occurred on the previous day. (*Id.* ¶ 4.n.) A 10-day HPO was granted by Judge Patricia Poehler, but on May 5, 2017, Judge Thomas Estes denied Plaintiff's request for an extension of the HPO. (*Id.*)

Magistrate Smith "tried to summarily deny this application again, although it was an application for two felonies and one misdemeanor." (*Id.*) The application was not summarily denied, but Clerk-Magistrate Nagle and Clerk-Magistrate Smith requested that it be heard by another Clerk-Magistrate on February 22, 2018, citing "conflicts" with Plaintiff. (*Id.*) However, Clerk-Magistrate Nagle had already held a show cause hearing on August 29, 2017 on a complaint filed by the APD regarding the April 20, 2017 incident, "during which Plaintiff, who was the main witness, was not summoned." (*Id.*)[10] At the August 29, 2017 hearing, Clerk-Magistrate Nagle found probable cause but "decided to hold the matter at the 'show cause level' for a period of six months and further ordered that the Defendant pay $200.00 and $40.00," to which the APD did not object. (*Id.* ¶ 164.) On August 30, 2017, APD Chief Scott Livingstone called Plaintiff "to tell her that a show cause hearing had taken place and Clerk-Magistrate Nagle had dismissed the case." (*Id.* ¶ 165.) "During this phone conversation, Chief Livingstone advised Plaintiff to bring the case on her own and he agreed to give Plaintiff the contacts of her witnesses." (*Id.*) The following day, Plaintiff met with Chief Livingston, who stated that "[t]here was no reason" for the dismissal. (*Id.*) "Plaintiff, who believed that by 'dismissed the case,' Chief Livingstone meant that no probable cause was found, then asked him to file a petition for a redetermination by a judge," but he "instantly refused and gave no explanation for his refusal." (*Id.*) Chief Livingston also denied "without justification" Plaintiff's request for the witnesses' contact information. (*Id.*)

On July 10, 2018, Plaintiff obtained a copy of her UMass-Amherst personnel records, which were 161 pages. (Dkt. No. 171-1, Ex. 4 ¶ 273.) On September 19, 2018, MCAD affirmed its September 29, 2017 determinations that Plaintiff's three pre-complaints lacked probable cause.

---

[10] Moreover, Clerk-Magistrate Smith later issued rulings "in the criminal case to which Plaintiff's February 1, 2018 application had finally led." (*Id.*)

(TAC ¶ 14.) On September 24, 2018, "Plaintiff officially received a complete set of notices about these three final decisions." (*Id.*)

On October 24, 2018, "Plaintiff found out that [Clerk-Magistrate] Smith deceived Plaintiff on September 30, 2015 by making her believe that a two-count A&B is a misdemeanor whereas it is a felony." (*Id.* ¶ 124.) According to Plaintiff, "the summary denial of a private application seeking felonious charges is much less permissible," especially if there may be a continuing danger to the complainant or the public, as was true with regard to Mr. Mongeau. (*Id.*) Also on December 24, 2018, Plaintiff learned that a UMPD Sergeant, after being informed that Clerk-Magistrate Smith denied Plaintiff's November 30, 2015 application for a criminal complaint, called Mr. Mongeau and advised him that the complaint had been denied "and no further action was pending in regards to this investigation." (Dkt. No. 171-1, Ex. 4 ¶ 281; *see also* TAC ¶ 157.)

From November 26, 2018 to December 4, 2018, Plaintiff corresponded via email "with several employees of the Springfield MCAD office because [she] was worried for not having received her right-to-sue letters" from EEOC. (Dkt. No. 171-1, Ex. 4 ¶ 284.) On December 4, 2018, Attorney Jennifer Laverty explained: "There is not a procedure at the MCAD to obtain EEOC letters; I suggest you contact the EEOC directly and I am sure they can help you." (*Id.*) On January 22, 2019, Plaintiff received three EEOC dismissal notices, which explained that EEOC had adopted MCAD's findings and which contained right-to-sue notices. (TAC ¶ 15; Dkt. No. 171-2.) The letters arrived in Dr. Washington's office, which Plaintiff had began using in 2016. (Dkt. No. 171-1, Ex. 1.) The letters were dated October 2, 2018, addressed to a location Plaintiff no longer used, and were already opened. (*Id.*) On January 31, 2019, Plaintiff spoke with an EEOC representative and "asked him why these letters had been sent to a wrong address." (Dkt. No. 171-1, Ex. 4 ¶ 285.) The representative explained "that his office could not know that [Plaintiff's] address in the EEOC system was incorrect because it was entered by the MCAD." (*Id.*) Plaintiff explained that she "had

updated several times [her] address at the MCAD and received their last mail dated September 19,

2018 . . . at the last address that [she] had provided to the MCAD via email on September 29, 2016."

(*Id.*)

Plaintiff filed her original complaint in this court on April 22, 2019. (Dkt. No. 1.) In

December of 2019, Plaintiff's former immigration counsel, Attorney Scott Clark, "told her that the

APD had finally agreed to certify her criminal case for a U Non-immigrant Status petition." (TAC ¶

167 n.35.) "However, the form that the APD representative . . . did sign on December 13, 2019 had

been inaccurately pre-filled by Atty. Clark," who, for example, falsely marked "False Imprisonment"

as one of the qualifying crimes. (*Id.*) Plaintiff still has not received an accurate U-Visa certification,

which would enable her to apply for a U-Visa. (*Id.*)

On June 1, 2021, Plaintiff was working in what she believed was still Dr. Washington's

office[11] at the UMass-Amherst College of Education when Human Resources Manager Karlee

Drumgool and a UMPD officer opened the office door with a key. (Dkt. No. 171-1, Ex. 13 ¶ 9.) Ms.

Drumgool and the UMPD officer "accuse[d] [Plaintiff] of having been living in this office and kept

asking for [her] name and an ID." (*Id.*) Plaintiff then asked Ms. Drumgool: "Why do you escalate

things? You could have just spoken to me. Why didn't you call Dr. Washington?" (*Id.* ¶ 10.) Ms.

Drumgool answered that Plaintiff "could have been violent." (*Id.* ¶ 11.) The following day, Ms.

Drumgool called Plaintiff's cell phone and told Plaintiff that she had until 12:00 p.m. on June 4,

2021 to remove her documents from the office and threatened that Plaintiff would be "trespassed"

if she were to be seen in the office after that time. (*Id.*) A few hours later, Dr. Cynthia Gerstl-Pepin,

the Dean of the College of Education, called Plaintiff's cell phone "and threatened that the lock of

---

[11] By August of 2020, Dr. Washington was no longer employed by UMass and no longer controlled this office, but he never informed Plaintiff. (Dkt. No. 171-1, Ex. 13 ¶ 13.) Moreover, between March 24, 2020 and August 29, 2021, the College of Education building was locked and closed to the public due to the COVID-19 pandemic, and Plaintiff did not have "special authorization" to enter the building at that time. (*Id.* ¶¶ 13, 17; TAC ¶ 245.)

this office would be 're-cored' and [Plaintiff's] documentary materials 'removed' after 12:00 pm on June 4, 2021." (*Id.*) Plaintiff believes both Ms. Drumgool and Dr. Gerstl-Pepin knew who she was, including that she had filed complaints against UMass. (*Id.* ¶¶ 10, 12.)

On June 23, 2021, Sean Regan, the Director of University Relations and Public Records in the UMass President's Office, and UMPD Chief Parham denied Plaintiff's June 8, 2021 requests for public records related to the incident in the College of Education building. (TAC ¶ 261.) Both explained that the public records requested could not be provided because they "are the subjects of ongoing litigation." (*Id.*)

In her TAC, Plaintiff asserts the following claims: Violation of 42 U.S.C. § 1983 against Dr. Lovely, Dr. Lopes, Chancellor Subbaswamy, Sergeant Hall, Clerk-Magistrate Smith, and Chief Livingstone (Count I); Violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws. Ch. 12, § 11I against Karlee Drumgool (Count II); Violation of Title VII, 42 U.S.C. §§ 2000e-2(a), (d) against UMass-Amherst, Dr. Lovely, and Ms. Ward (Count III); Violation of Title VII, 42 U.S.C. §§ 2000e-2(a), (d) against UMass-Amherst and Dr. Ueki (Count IV); Violation of Title VII, 42 U.S.C. §§ 2000e-3(a) against UMass-Amherst, Dr. Lovely, Dr. Lopes, Ms. Ward, Ms. Drumgool, Dr. Gerstl-Pepin, Mr. Regan, and UMPD Chief Parham (Count V); Violation of Mass. Gen. Laws ch. 151B, § 4.1 against UMass-Amherst, Dr. Lovely and Ms. Ward (Count VII); Violation of Mass. Gen. Laws ch. 151B §§ 4.4 and 4.4A against UMass-Amherst, Dr. Lovely, Dr. Lopes, Ms. Ward, Mr. Regan, Ms. Drumgool, Dr. Gerstl-Pepin, and UMPD Chief Parham (Count VIII); Violation of Mass. Gen. Laws ch. 151B § 4.5 against UMass-Amherst and Dr. Ueki (Count IX); Breach of Contract against UMass-Amherst, Dr. Lovely, and Dr. Lopes (Count XIII); Defamation against Dr. Lovely, Dr. Lopes, Ms. Ward, and Ms. Drumgool (Count XIV); Fraud against Dr. Lovely, Dr. Lopes, Ms. Ward, UMPD Sergeant Hall, Clerk-Magistrate Smith, and APD Chief Livingston (Count XV); Abuse of Process against UMPD Sergeant Hall, Magistrate-Clerk Smith, and APD Scott

Livingston (Count XVI); Conspiracy against UMPD Sergeant Hall, Magistrate-Clerk Smith, APD Chief Scott Livingston, Ms. Drumgool, and Dr. Gerstl-Pepin (Count XVIII); Breach of Implied Professional Responsibility against UMass-Amherst, Dr. Lovely, Dr. Ueki, Dr. Lopes, Ms. Ward, Chancellor Subbaswamy, and UMPD Sergeant Hall (Count XXIII); and Violation of Public Records Law, Mass. Gen. Laws ch. 66 § 10(a) against Mr. Regan and UMPD Chief Parham (Count XXV).[12]

### III. JURISDICTION

Plaintiff invokes both federal question subject-matter jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332. As to federal question jurisdiction, Counts I, III, IV, and V assert claims arising under federal law. The University Defendants and Clerk-Magistrate Smith argue that Plaintiff has not established diversity jurisdiction and, therefore, the court should decline to exercise supplemental jurisdiction over her state-law claims if the federal claims are dismissed. The court, however, finds that it has diversity jurisdiction, as well as federal question jurisdiction.

Under 28 U.S.C. § 1332(a):

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1)  citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State.

---

[12] In her TAC, Plaintiff withdrew Counts VI, X, XI, XII, XIX, XX, XXI, and XXIV, but she retained the numbering for the remaining counts. Moreover, in her opposition to APD Chief Livingston's motion to dismiss, Plaintiff withdrew Counts XVII and XXII against all defendants. (Dkt. No. 343-1 at 30, 32.)

28 U.S.C.A. § 1332(a). "In order to be a citizen of a State within the meaning of the diversity statute, a natural person must be both a citizen of the United States and be domiciled within the State." *Hearts With Haiti, Inc. v. Kendrick*, 856 F.3d 1, 2–3 (1st Cir. 2017).

Here, all Defendants were citizens of Massachusetts when Plaintiff commenced this action and filed the operative complaint. Although Plaintiff has resided in Massachusetts since 2014, she alleges (and Defendants do not dispute) that she is not a United States citizen but, instead, is a citizen of France. Moreover, there has been no suggestion that Plaintiff has been "lawfully admitted for permanent residence in the United States." 28 U.S.C. § 1332(a)(2). To the contrary, Plaintiff alleges that she had a temporary J-1 work exchange visa which lapsed in 2015 and that this lapse has prevented her from obtaining work. *See Teleanu v. Koumans*, 2020 WL 4896858 (S.D.N.Y. Aug. 20, 2020) ("J-1 visas provide temporary status to foreign professionals who have 'no intention of abandoning' their home countries but come to the United States to work or study."). Moreover, "[c]ourts have found that the language of § 1332(a)(2) refers only to an alien litigant's official immigration status and that the permanent resident alien provision of § 1332(a) applies only to aliens who have received permission from the INS to remain permanently in this country and not to those whose applications for green cards are pending." *Angeles v. Uson*, 2020 WL 9747770, at *3 (D. Mass. Dec. 1, 2020) (internal quotation omitted).

Accordingly, Plaintiff is considered an alien for purposes of diversity and this court has jurisdiction under 28 U.S.C. § 1332(a)(2). *See Polanco-Garcia v. Santa Rosa Mall, LLC*, 2014 WL 545969, at *1 (D.P.R. Feb. 10, 2014) ("[U]nlawful long-term residents are diverse for the purpose of federal jurisdiction."); *Terdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 637–38 (E.D.N.Y. 2000) (explaining that because the decedent "had been a Japanese citizen residing in the United States on a 'temporary' E–2 visa that does not confer 'permanent residency status' for the purposes of 28 U.S.C. § 1332(a)[,] [i]t followed that the plaintiff should be treated as an alien"); *Kato v. Cnty. of*

*Westchester*, 927 F. Supp. 714, 714–16 (S.D.N.Y. 1996) ("As a Japanese citizen present in the United States on an E–2 visa, Isao Kato is not admitted for permanent residence in the United States. Therefore, he is treated as an alien for diversity purposes."); *Miller v. Thermarite Pty. Ltd.*, 793 F. Supp. 306, 308 (S.D. Ala. 1992) ("Mr. Barrett has not been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws: it is undisputed that Mr. Barrett's status under the immigration laws is nonimmigrant temporary worker.").

## IV.   MOTIONS TO DISMISS

Defendants have filed motions to dismiss Plaintiff's TAC. The University Defendants argue Plaintiff's claims are untimely and fail to state a claim upon which relief may be granted. Clerk-Magistrate Smith and APD Chief Livingston also argue Plaintiff's claims fail on the merits. The court will address in separate sections the claims based on Plaintiff's employment, her experiences with law enforcement and state court personnel in relation to the 2015 and 2017 assaults, and the incident at the UMass-Amherst College of Education in 2021.

### A.   Standard of Review

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A facially plausible claim contains pleaded facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, when the well-pleaded facts only "permit the court to infer . . . the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating the sufficiency of the factual allegations contained in the complaint, the court must be careful to credit the factual assertions made by the plaintiff while disregarding "legal conclusions," such as "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678.

Ultimately, determining whether a complaint states a plausible claim for relief is a context-specific

inquiry, requiring the reviewing court to draw on its judicial experience and common sense. *Id.* at

679. In addition, because Plaintiff is proceeding *pro se*, the court construes her complaint more

liberally than "pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

      B.    <u>Employment-related Claims</u>

      The University Defendants argue that the claims arising out of Plaintiff's employment at

UMass-Amherst in 2014 and 2015 are untimely and fail to state a claim upon which relief may be

granted. The court agrees.

      Plaintiff originally filed this action on April 22, 2019. (Dkt. No. 1.) As the University

Defendants argue, claims under 42 U.S.C. § 1983 (Count I) borrow the state's limitation period

governing personal injury causes of action, which is three years in Massachusetts. *See Nieves v.*

*McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001). Plaintiff's claims for violations of Mass. Gen. Laws ch.

151B (Counts VII, VIII, and IX), breach of contract against UMass-Amherst (Count XIII), and her

intentional tort claims (defamation, Count XIV; and fraud, Count XV) also have three-year

limitations periods. *See* Mass. Gen. Laws ch. 151B, § 9; Mass. Gen. Laws ch. 260, §§ 2A, 3A, and 4.

In addition, Plaintiff's claim for breach of implied professional responsibility (Count XXIII), to the

extent it is a type of malpractice claim, is also governed by a three-year limitations period. Mass.

Gen. Laws ch. 260, § 4. Accordingly, these claims must have accrued after April 22, 2016, in order

to be timely, unless a tolling doctrine applies.

      *1.  Section 1983 Claim against Dr. Lovely, Dr. Lopes, and Chancellor Subbaswamy (Count I)*

      As to Count I, "[a]lthough section 1983 borrows its limitations period from state law, the

accrual date for a section 1983 claim is measured by federal law." *Alamo-Hornedo v. Puig*, 745 F.3d

578, 581 (1st Cir. 2014). Under federal law, these claims accrue "when the plaintiff knows, or has reason to know of the injury on which the action is based." *Id.* (internal quotation marks omitted). Moreover, "a plaintiff is deemed to know or have reason to know at the time of the act itself and not at the point that the harmful consequences are felt." *Moran Vega v. Cruz v. Burgos*, 537 F.3d 14, 20 (1st Cir. 2008) (internal quotation marks omitted). The allegations against Dr. Lovely and Dr. Lopes relate to Plaintiff's employment in 2014 and 2015, and the TAC makes clear that Plaintiff knew about her alleged injuries and their causes when they occurred. Therefore, Plaintiff's § 1983 claim against Dr. Lovely and Dr. Lopes accrued prior to April 22, 2016 and is untimely.

The § 1983 claim against Chancellor Subbaswamy is based on supervisory liability for failure to intervene. (TAC ¶ 197.) As the University Defendants argue, "any conceivable claim against him accrued no later than September 22, 2014 . . . , when his assistant made clear that the Chancellor would not be intervening." (Dkt. No. 177 at 3.) Plaintiff argues that her claim against Chancellor Subbaswamy "can be anchored on Plaintiff's second request for intervention," which was a request for a meeting that was denied on May 16, 2016. (Dkt. No. 189-2 at 12; *see* Dkt. No. 171-1, Ex. 4 ¶ 266.) The court does not agree. *See Moran Vega*, 537 F.3d at 20 (rejecting the plaintiff's continuing violation theory that the limitations period "clock" was "reset" when the defendants handled his administrative claim in a discriminatory fashion). Moreover, even assuming Chancellor Subbaswamy's May 16, 2016 denial of a request for a meeting constituted a "discrete discriminatory act[] sufficient to" start a new "limitations period," *Moran Vega*, 537 F.3d at 20, the allegations of inaction against him are insufficient to state a plausible supervisory liability claim under § 1983, as the University Defendants argue. *See Maldonado v. Fontanes*, 568 F.3d 263, 275 (1st Cir. 2009) ("[S]upervisory liability lies only where an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation." (internal quotation marks omitted)).

Plaintiff also argues that the "discovery rule" tolls the statute of limitations because Plaintiff, a foreigner, "had never heard of constitutional rights nor of the due process rights afforded to anyone in the U.S." until April 6, 2018 (when the due process rights of the perpetrator of the April 20, 2017 attack were raised in court proceedings). (Dkt. No. 189-2 at 16-17.) "[P]ursuant to the federal discovery rule, accrual is delayed until the plaintiff knows, or should know, of" the acts comprising the constitutional violation. *Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020); *see also Jardin De Las Catalinas Ltd. P'ship v. Joyner*, 766 F.3d 127, 133 (1st Cir. 2014) ("[T]o the extent that the facts necessary to bring a claim are unknown, the discovery rule may delay accrual until such facts are or should be apparent to a reasonably prudent person similarly situated." (internal quotation marks omitted)). "Typically, the discovery rule comes into play either when the injury has lain dormant without manifestation or when the facts about causation [are] in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Jardin De Las Catalinas*, 766 F.3d at 133 (internal quotation marks omitted). Importantly, "the knowledge which triggers accrual (and hence the running of the statute of limitations) is the discovery of sufficient *facts* about the injury and its cause to prompt a reasonable person to inquire and seek advice," *Skwira v. United States*, 344 F.3d 64, 78 (1st Cir. 2003) (emphasis added), not the plaintiff's knowledge or discovery of the law, as Plaintiff argues. *See Ouellette*, 977 F.3d at 136 ("[T]he federal discovery rule delays accrual until a reasonably prudent person similarly situated to the plaintiff would discover these two key pieces of *factual* information -- namely, the existence of the injury and its probable cause." (emphasis added; internal quotation marks omitted)). Accordingly, that Plaintiff may not have been aware of her constitutional rights until April 6, 2018 does not toll the limitations period based on the discovery rule. Therefore, Count I will be dismissed as to Defendants Dr. Lovely, Dr. Lopes, and Chancellor Subbaswamy.

2. *Chapter 151B Claims (Counts VII, VIII, and XI)*

The University Defendants argue Plaintiff's employment discrimination, hostile work environment, and retaliation claims under Chapter 151B accrued, at the latest, by the time Plaintiff left the university's employment in 2015 and are therefore untimely. Plaintiff argues the "continuing violation" doctrine applies because incidents of retaliation occurred after April 22, 2016 and "were part of an on-going pattern of discrimination performed by employees of UMass-Amherst who continued the pattern of discrimination started by Dr. Lovely, Dr. Ueki, Dr. Lopes, and Ms. Ward." (Dkt. No. 189-2 at 29.) But the continuing violation doctrine, under both federal and Massachusetts law, "does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,'" *Ayala v. Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015), and does not serve to revive untimely employment-related claims based on events which occurred after a plaintiff's employment has ended. *See Everett v. 357 Corp.*, 904 N.E.2d 733, 751 (Mass. 2009) ("Ordinarily, the decision to terminate or the failure to rehire an employee is considered a discrete, separate act that does not draw other allegedly discriminatory acts into its scope, either prospectively or retrospectively."). Rather, for the continuing violation doctrine to apply, "the claim must be one that arises from 'a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact,'" such as a hostile work environment claim. *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 34-35 (1st Cir. 2015) (quoting *Cuddyer v. Stop & Shop Supermkt. Co.*, 750 N.E.2d 928, 936 (Mass. 2001)); *see Cuddyer*, 750 N.E.2d at 937 ("Incidents of sexual harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and many incidents in isolation may not be serious enough for complaint. . . . However, when linked together, the seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable, sexually offensive, conditions." (internal citation omitted)); *Ayala*, 780 F.3d at 57 (explaining that the continuing violation doctrine "applies only to

claims that cannot be said to occur on a particular day and that by their very nature require repeated conduct to establish an actionable claim," and "simply allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." (internal quotation marks omitted)).

In addition, under the continuing violation doctrine, "the plaintiff must show that a reasonable person in her circumstances would have refrained from filing a complaint within the limitations period." *Shervin*, 804 F.3d at 35. Here, even assuming the continuing violation doctrine could apply to these kinds of claims, Plaintiff alleges "that she knew of the alleged incidents of retaliation and discrimination and regarded them as pervasive." *Id.* Accordingly, as the TAC makes clear, "[a] reasonable person in [Plaintiff's] shoes . . . . could not plausibly have thought that her discriminatory treatment was likely to abate," rendering the continuing violation doctrine inapplicable. *Id.*; *see Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 808 N.E.2d 257, 267 n.16 (Mass. 2004) ("[A] complainant may not assert previous violations outside the limitations period if, at the time of the earlier violations, the complainant knew or could have formed a reasonable belief that the earlier violations were discriminatory.").

As to the alleged incidents of retaliation which occurred after April 22, 2016, although they are within the limitations period, they are not sufficient on their own to state a claim. These include the UMPD's failure to investigate allegations made against Plaintiff by Du Bois Library employees, despite her "several" requests after April 1, 2016; the university's non-authorization of Plaintiff's employment on September 16, 2016; and the EO&D Office's denial of Plaintiff's request to file a complaint, because Plaintiff was engaged in pending litigation against the university and represented by counsel, on April 5, 2017. (Dkt. No. 171-1, Ex. 4 ¶¶ 176, 182, and 185.)[13]

---

[13] The court addresses the 2021 incident at the UMass-Amherst College of Education in section IV.D., below.

The UMPD's failure to investigate was not related to Plaintiff's employment in any way but, rather, a post-employment dispute about printing privileges in the library. The EO&D Office's denial also was not related to Plaintiff's employment but to the post-employment events which transpired on September 30, 2015 between Plaintiff and Mr. Mongeau. Granted, the September 16, 2016 non-authorization of Plaintiff for hire is itself a "discrete act" of alleged employment discrimination, and generally "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Ayala*, 780 F.3d at 57 ("[T]ermination, failure to promote, denial of transfer, or refusal to hire are easily identifiable discrete acts instantaneously actionable." (internal quotation marks omitted)). However, "an employee may not extend or circumvent the limitations period by requesting modification or reversal of an employer's prior action." *Id.* at 131 (quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 131 (1st Cir. 2009)). Thus, an "employer's refusal to rehire the plaintiff after [her] termination [is] not a separate act of discrimination, but rather a consequence of [her] initial demotion." *Tobin*, 553 F.3d at 132 (collecting cases). In this case, Plaintiff had already sought and been denied authorization to work at UMass-Amherst on multiple occasions after her employment ended and before September of 2016. (Dkt. No. 171-1, Ex. 4 ¶¶ 142, 171.) Moreover, by this time, Plaintiff's J-1 Visa had already expired, which prevented her from obtaining work authorization. As the University Defendants argue, Plaintiff cannot indefinitely extend the limitations period "by her continued pursuit of positions as to which she knew her immigration status would inevitably prove to be an impediment." (Dkt. No. 177 at 5.) *Cf. Ocean Spray Cranberries,* 808 N.E.2d at 267-68. Accordingly, Plaintiff's September of 2016 request for work authorization was a request for modification or reversal of UMass-Amherst's prior denials and, as such, did not trigger a new limitations period. *See Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 n.15 (1980).

Plaintiff also argues that she "was induced to believe that her" Chapter 151B claims "were all timely . . . because the 'last' act of discrimination timely formally reported to the MCAD had

occurred on April 5, 2017." (Dkt. No. 182-2 at 28.) Under Mass. Gen. Laws ch. 151B, § 9, "a

plaintiff has three years 'after the alleged unlawful practice occurred' to sue in court." *Cuddyer*, 750

N.E.2d at 936 n. 11 (quoting Mass. Gen. Laws ch. 151B, § 9). Accordingly, because the continuing

violation doctrine does not apply, Plaintiff may only assert claims for alleged unlawful discriminatory

practices which occurred after April 22, 2016, and the April 5, 2017 EO&D letter does not

somehow restart the limitations period for all the untimely acts which occurred prior to April 22,

2016. *See Everett*, 904 N.E.2d at 751.

Moreover, to the extent Plaintiff seeks to invoke equitable tolling principles based on her

correspondence with MCAD, the court concludes Plaintiff has not met the high burden of doing so.

"Equitable tolling is to be used sparingly, and the circumstances where tolling is available are

exceedingly limited." *Halstrom v. Dube*, 116 N.E.3d 626, 632 (Mass. 2019) (internal quotation marks

omitted). Here, Plaintiff has alleged that she was represented by counsel in the months following the

receipt of the MCAD letters which purportedly induced her to believe her claims would be timely as

filed. In particular, on November 8, 2016, Christopher Browne, an attorney at the law firm

Stobierski and Connor, "amended, clarified, supplemented, and consolidated [Plaintiff's] three

MCAD/EEOC pre-complaints" on her behalf "and committed to removing these pre-complaints

from the MCAD to bring them to Superior Court with a preliminary injunction relief petition."

(Dkt. No. 171-1, Ex. 4 ¶ 268.)[14] Moreover, from January of 2017 through at least May 15, 2017, after

Attorney Browne had left the law firm for other employment, Attorney John Connor, from the

same firm, represented Plaintiff in connection with her MCAD proceedings. (*Id.* ¶¶ 268, 271.)[15]

---

[14] For claims under Chapter 151B, plaintiffs do not have "to await a determination by the MCAD prior to filing a civil
suit" but, rather, can "remove the case to the Superior Court on 'the expiration of ninety days after the filing of a
complaint with the [MCAD], or sooner if a commissioner assents in writing.'" *Everett v. 357 Corp.*, 904 N.E.2d 733, 747
(Mass. 2009) (quoting Mass. Gen. Laws ch. 151B, § 9).

[15] In addition, on February 1, 2018, "plaintiff had an attorney come with her to file an application for a criminal
complaint regarding the second physical attack of which she was a victim on April 20, 2017," and after Clerk-Magistrate

Accordingly, as Plaintiff was represented by counsel during this time period, she had "[c]onstructive knowledge of all procedural requirements" with regard to the timeliness of her claims under Chapter 151B. *Andrews v. Arkwright Mut. Ins. Co.*, 673 N.E.2d 40, 41 (Mass. 1996); *see also Everett*, 904 N.E.2d at 755. Plaintiff also has not alleged "any misconduct that may have dissuaded" her from filing a timely complaint or any "affirmative misleading by the MCAD." *Andrews*, 673 N.E.2d at 41-42. Accordingly, equitable tolling is not available to salvage Plaintiff's Chapter 151B claims.

The court will therefore dismiss the Chapter 151B claims as untimely, with the exception of Count VIII against UMass-Amherst, Mr. Regan, Ms. Drumgool, Dr. Gerstl-Pepin, and UMPD Chief Parham, to the extent it is based on the 2021 events surrounding the incident at the College of Education, which will be addressed in section IV.D. below.

### 3. *Breach of Contract (Count XIII)*

In Count XIII, Plaintiff asserts a breach of contract claim against UMass-Amherst, Dr. Lovely, and Dr. Lopes based on alleged violations of the postdoc union's collective bargaining contract. As mentioned, for the breach of contract claim against UMass-Amherst, the limitations period is three years. *See* Mass. Gen. Laws ch. 260, § 3A; *Wong v. Univ. Of Massachusetts*, 777 N.E.2d 161, 167 (Mass. 2002). "The general rule is that a contract action accrues at the time the contract is breached." *Berkshire Mut. Ins. Co. v. Burbank*, 664 N.E.2d 1188, 1188 (Mass. 1996). Here, as the University Defendants argue, Plaintiff alleged violations of the union contract from the very start of her employment. Moreover, Plaintiff alleged that she was aware of these violations as they occurred, that she had a copy of the union contract as early as April 3, 2014, and that she filed numerous

---

Smith "tried to refuse to file the application," the attorney accompanying Plaintiff threatened to "go to the SJC" if Plaintiff's complaint was not filed. (TAC ¶ 4.q.)

unsuccessful grievances and appeals in connection with these alleged breaches. The breach of contract claim against UMass-Amherst is clearly time-barred.[16]

In addition, the breach of contract claim fails on the merits against Dr. Lovely and Dr. Lopes. Even assuming Plaintiff is a proper party to seek redress for collective bargaining agreement violations and assuming this claim is not preempted by Chapter 151B, the claim still fails against these individual defendants because there is no allegation or suggestion that they were parties to that contract. *See, e.g., Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 1997 WL 263732, at *1 (D. Mass. May 8, 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998). Accordingly, Count XIII will be dismissed.

### 4. *Defamation (Count XIV)*

In Count XIV, Plaintiff asserts a claim for defamation against Dr. Lovely, Dr. Lopes, and Ms. Ward based on letters "introduced" into her "personnel/employment records." (TAC ¶ 235.)[17] These documents all originated from the 2014 and 2015 time period and relate to Plaintiff's employment. (Dkt. No. 171-1, Ex. 4 ¶¶ 273-76.) The one document which post-dated Plaintiff's employment was a letter from Attorney LaVallee introduced at a hearing at the DUA on June 19, 2015, but Plaintiff became aware of this letter no later than the date of the hearing. (*Id.* ¶ 169.) Under Massachusetts law, "[t]he general rule in libel and defamation cases is that the cause of action accrues, and the statutory period begins to run, on the date of publication." *Collins v. Nuzzo*, 244 F.3d 246, 253 (1st Cir. 2001). Therefore, Plaintiff's claim of defamation based on the DUA letter is clearly untimely. *See id.*; Mass. Gen. Laws ch. 260, § 4.

As for the other allegedly defamatory statements, Plaintiff argues she did not discover them until she got access to her personnel file on July 18, 2018. (Dkt. No. 189-2 at 31.) But even assuming

---

[16] Plaintiff's contention that her breach of contract claim has been "reactivated" by the issuance of a patent (related to her 2013 pili research ideas) on July 20, 2021, is without merit.

[17] Again, the court addresses the defamation claim against Ms. Drumgool, based on the 2021 incident in the College of Education, in section IV.D. below.

that this discovery could operate to toll the limitations period, her claim still fails on the merits. To establish a defamation claim under Massachusetts law, "a plaintiff must show that: (1) the defendant made a false statement about him to a third party; (2) the statement was defamatory in that it could damage the plaintiff's reputation in the community; (3) the defendant was at fault in making the statement; and (4) the statement either caused economic loss or is actionable without economic loss." *Landino v. Massachussetts Tchrs. Ass'n*, 621 F. Supp. 3d 185, 191 (D. Mass. 2022) (internal quotation marks omitted). As to the first element, "[t]he mere act of placing false information about an employee in his personnel file does not give rise to a claim for defamation," because "[t]here must be an oral or written 'publication' of the defamatory information by the defendant to a person other than the plaintiff." *Toussaint v. Chatam Bars Inn*, 2019 WL 8407460, at *4 (D. Mass. Jan. 18, 2019); *see White v. Blue Cross & Blue Shield of Massachusetts, Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004) ("The publication element of defamation requires that the defendant communicate the defamatory statement to a third party."). Plaintiff's allegations do not satisfy the first element because she has not alleged publication of the allegedly defamatory statements to another party. She merely speculates that officials from Morgan State University may have reviewed her personnel file, leading to the cancellation of her transfer. (*See* TAC ¶ 235 ("Since it is intuitively sound to infer that Plaintiff was vetted by Morgan State University, as UMass-Amherst had done before hiring Plaintiff, an interesting question remains as to whether Morgan State University cancelled Plaintiff's external transfer to its campus because of these letters disparaging Plaintiff's competence.").) But such speculation, which is not based on any concrete or objective facts, is insufficient even at this stage. *See Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (explaining that "threadbare" and speculative allegations are not sufficient to overcome a motion to dismiss).

   Plaintiff also has not alleged sufficient non-conclusory factual allegations from which the court can plausibly infer the content of the statements was false or defamatory, rather than protected

expressions of opinion. *See Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015 ("Because defamation requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible of being proved true or false."); *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st Cir. 2000) ("[O]nly statements that are provable as false are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected. (internal quotation marks omitted)). Moreover, in light of the conditional privileges for employers and former employers to disclose defamatory information about employees under Massachusetts law, *see White*, 809 N.E.2d at 1038, Plaintiff must allege Defendants recklessly made "'unnecessary, unreasonable or excessive' publications," *id.* (quoting *Bratt v. Int'l Bus. Machs. Corp.*, 467 N.E.2d 126 (Mass. 1984), which she has not done. Accordingly, the court will dismiss Count XIV.

   5.   *Fraud against Dr. Lovely, Dr. Lopes, and Ms. Ward (Count XV)*

   In Count XV, Plaintiff asserts a claim of fraud against Dr. Lovely, Dr. Lopes, and Ms. Ward. In particular, she asserts "Dr. Lovely's employment offer to Plaintiff was a fraud to seize her ideas"; "Dr. Lopes . . . assigned himself a function that he was not allowed to take on (mentorship of Plaintiff on a project unknown to him and for which he had no qualifications)"; and "Ms. Ward behaved toward Plaintiff as if she had been her supervisor and then she proclaimed herself as Dr. Lovely's representative." (TAC ¶ 238.) As the University Defendants argue, these allegations concern Plaintiff's employment in 2014 and 2015. Therefore, Plaintiff's fraud claim against these defendants is time-barred. *See Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 17 (1st Cir. 2004) (explaining that fraud claims under Massachusetts law begin to accrue when "a plaintiff learns or reasonably should have learned of the misrepresentation." (internal quotation marks omitted)).

   Plaintiff's argument that the limitations period should be tolled based on the discovery of certain records in 2018 is without merit. Plaintiff's TAC and the affidavits attached thereto make clear that Plaintiff knew about the alleged misrepresentations and their harm at or around the time

when they occurred. Importantly, "[t]he plaintiff need not know the extent of the injury . . . for the cause of action to accrue." *Williams v. Ely*, 668 N.E.2d 799, 804 (Mass. 1996). Rather, once a plaintiff "knows or reasonably should know that . . . she has sustained appreciable harm as a result of [the defendants'] conduct, the statute of limitations starts to run." *Id.* That occurred well before April 22, 2016, for all the alleged fraudulent misrepresentations. Accordingly, Plaintiff's fraud claim against Dr. Lovely, Dr. Lopes, and Ms. Ward is untimely and will be dismissed.

6. *Breach of Implied Professional Responsibility (Count XXIII)*

Similarly, Plaintiff's claim for breach of implied professional responsibility against UMass-Amherst, Dr. Lovely, Dr. Ueki, Dr. Lopes, Mr. Ward, Chancellor Subbaswamy, and UMPD Sergeant Hall[18] is untimely. Plaintiff asserts these defendants breached the UMass Code of Professional Ethics for the Faculty and/or the UMass Board of Trustees Principles of Employee Conduct. (TAC ¶¶ 255-56.) Plaintiff also asserts Chancellor Subbaswamy "did not live up to the expectations of his role of governance" as described in the UMass Board of Trustees Statement of Governance. (*Id.* ¶ 257.) Assuming this is a kind of malpractice claim, it is barred by the three-year limitations period because the alleged conduct occurred well before April 22, 2016. *See* Mass. Gen. Laws. ch. 260, § 4.

More fundamentally, this claim fails as a matter of law because there is no such private right of action based on violations of these policies which is recognized under Massachusetts law. In addition, Plaintiff has not alleged facts from which it can be inferred that Defendants owed Plaintiff a duty based on these policies. Accordingly, Count XXIII will be dismissed.

7. *Title VII Claims (Counts III, IV, and V)*

In Counts III, IV, and V, Plaintiff asserts claims for violations of Title VII, 42 U.S.C. §§

---

[18] The remaining claims against Sergeant Hall are addressed in section IV.C., below.

2000e-2, 2000e-3 against UMass-Amherst, Dr. Lovely, Dr. Lopes, Ms. Ward, and Dr. Ueki.[19] The

University Defendants first argue individuals cannot be liable under Title VII. They are correct. *See*

*Fantini v. Salem State College*, 557 F.3d 22, 28-31 (1st Cir. 2009) (concluding individual liability is not

available under Title VII). Accordingly, the Title VII claims against the individual defendants will be

dismissed.

As for the Title VII claims against UMass-Amherst based on the events which occurred

during her employment, the University Defendants argue they are untimely because Plaintiff failed

to file her complaint within 90 days of the "giving" of the right-to-sue letters by the EEOC. *See* 42

U.S.C. § 2000e-5(f)(1). Plaintiff argues the court should equitably toll this 90-day limitations period

because she filed her complaint within 90 days of her actual receipt of the right-to-sue letters, after

they were originally sent to the wrong address. Plaintiff's argument is undermined by binding

precedent.

In *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 119 (1st Cir. 2009), the court

addressed a similar argument. The plaintiff argued he was entitled to equitable tolling because his

failure to file his complaint within 90 days after the EEOC sent his right-to-sue letter was due to

him not receiving the letter "because it was sent to the wrong address." *Id.* at 120. The plaintiff also

argued "that while acting as a *pro se* litigant he was diligent in communicating with MCAD" but that

"he lacked any knowledge of the EEOC's filing requirements." *Id.* The First Circuit upheld the

district court's refusal to apply equitable tolling, explaining that the plaintiff did not receive the

notice because he had moved "and never filed a change of address with the EEOC," which

demonstrated a lack of diligence in violation of an EEOC regulation which requires claimants to

notify EEOC of changes of address. *Id.* (citing 29 C.F.R. § 1601.7(b)). Moreover, the First Circuit

---

[19] Plaintiff also asserts a Title VII claim against UMass-Amherst, Ms. Drumgool, Dr. Gerstl-Pepin, Mr. Regan, and UMPD Chief Parham related to the 2021 incident at the College of Educate, which is separately addressed in section IV.D. below.

explained that "the fact that Dr. Abraham originally filed his complaint with the MCAD and had no

initial communication with the EEOC does not excuse his failure to provide a change of address to

the EEOC," and that "the MCAD's actions in not forwarding [the plaintiff's new address] to the

EEOC cannot serve as an excuse for Dr. Abraham's failure to provide the [new] address to EEOC."

*Id.* (collecting cases); *see also Taal v. Hannaford Bros. Co.*, 211 Fed. Appx. 4, 5 (1st Cir. 2006)

(unpublished) (rejecting equitable tolling argument under similar circumstances because "[e]nsuring

that the EEOC had her current address was not a circumstance beyond Taal's control"); *Nelmida v.*

*Shelly Eurocars, Inc.*, 112 F.3d 380, 384-86 (9th Cir. 1997) (collecting cases); *St. Louis v. Alverno College*,

744 F.2d 1314, 1316-17 (7th Cir. 1984) (explaining that "[t]he burden of providing the EEOC with

changes of address is minimal. It is unreasonable to expect EEOC to pore over its files, and those of

state administrative agencies, in an effort to ascertain which of the addresses contained therein is

correct. . . . The claimant is obviously in a far better position to ensure that the Commission has

current, accurate information and to provide that information in much less time that it would take

an EEOC employee to go through the claimant's file.").

Here, Plaintiff acknowledges she did not update her address with EEOC, which is why she

did not initially receive the right-to-sue letters, but she explains that she assumed her updates of

address at MCAD would "automatically" update her address at EEOC as well. (Dkt. No. 189-2 at

22; Dkt. No. 171-1, Ex. 4 ¶ 185.) This argument is foreclosed by *Abraham*, 553 F.3d 120, and is

contrary to the EEOC's regulation, 20 C.F.R. § 1601.7(b), which states that the claimant "has the

responsibility to provide the Commission with notice of any change in contact information so that

the Commission may communicate with him or her during the Commissioner's consideration of the

charge." *Id.*; *see also Williams v. Chertoff*, 2008 WL 2001897, at *6 (E.D.N.Y. May 8, 2008) ("The law is

clear that, in a Title VII case, the complainant bears the burden of notifying the EEOC of any

change in address. In fact, that has been the rule since 1977."). The First Circuit has made clear that

"equitable tolling is sparsely applied and cannot be used to rescue a plaintiff from his or her lack of diligence." *Abraham*, 553 F.3d at 119.[20]

Accordingly, the court concludes that Plaintiff's Title VII claims based on her employment are untimely and she is not entitled to equitable tolling.

      C.      <u>Claims against Law Enforcement and Court Personnel</u>

Plaintiff asserts claims against UMPD Sergeant Hall, Clerk-Magistrate Smith, and APD Chief Livingstone in relation to the assaults in 2015 by Mr. Mongeau and in 2017 by another individual and Plaintiff's attempts to press criminal charges and obtain a U-Visa certification thereafter. In particular, Plaintiff asserts claims for violation of § 1983 (Count I), fraud (Count XV), abuse of process (XVI), and conspiracy (Count XVIII) against these Defendants.

      *1.*   *Section 1983 Claim against Sergeant Hall, Clerk-Magistrate Smith, and Chief Livingston (Count I)*

As an initial matter, the § 1983 claim against Sergeant Hall is untimely, as the University Defendants argue. This claim is based on Sergeant Hall's conduct in responding to the initial assault incident with Mr. Mongeau and in creating confusion regarding an application for a criminal complaint signed by Plaintiff, both of which occurred in 2015. (TAC ¶ 196.) As to Sergeant Hall, therefore, this claim accrued at or around the time of these events, which was well before April 22, 2016. *See Moran Vega*, 537 F.3d at 20.

Plaintiff's § 1983 claim also fails on the merits against these Defendants. As Defendants argue, Plaintiff has no constitutionally protected interest in the criminal investigation, arrest, or application or issuance of a criminal complaint in relation to the alleged assaults perpetrated against her. The Supreme Court has made clear "that, in American jurisprudence at least, a private [party] lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v.*

---

[20] The court also notes that Plaintiff "lagged" in contacting EEOC to ask about the right-to-sue letters after being directed there by MCAD officials on December 4, 2018. (Dkt. No. 189-2 at 25; *see* Dkt. No. 171-1, Ex. 4 ¶¶ 284-85.) This demonstrates a lack of diligence for purposes of equitable tolling. *See Nelmida*, 112 F.3d at 385.

*Richard D.*, 410 U.S. 614, 619 (1973); *see also United States v. Texas*, 143 S. Ct. 1964, 1970-71 (2023) (explaining that a party "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution," and "when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual or property, and thus does not infringe upon interests that courts often are called upon to protect" (internal quotation marks omitted)); *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 768 (2005); *Clapp v. Cohen*, 2019 WL 1207861, at *7 (D. Mass. Mar. 14, 2019).[21]

Moreover, Plaintiff lacks a protected property interest in both the U-Visa certification and issuance of the U-Visa. The Supreme Court has explained that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than an unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock*, 545 U.S. at 756 (internal quotation marks omitted). Thus, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* Courts have held, based on the language of 8 U.S.C. § 1184(p), "that the decision to issue a law enforcement [U-Visa] certification is a discretionary one." *Ordonez Orosco v. Napolitano*, 598 F.3d 222, 226 (5th Cir. 2010). Among other things, the U-Visa certification "must state that the petitioner 'has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of criminal activity,'" and "[w]hether or not

---

[21] In addition, Plaintiff's official capacity damages claim against Sergeant Hall and Clerk-Magistrate Smith is barred by Eleventh Amendment state sovereign immunity and because these Defendants are not "persons" in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself."); *see id.* at 64-66 (holding that a state or a state official sued in his official capacity is not a "person" under § 1983); *Johnson v. Rodriguez*, 943 F.2d 104, 108 (1st Cir. 1991) ("It is settled beyond peradventure . . . that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action."). The individual capacity claim against Clerk-Magistrate Smith is also barred by absolute quasi-judicial immunity, since he was performing a discretionary adjudicatory function. *See Zonon v. Guzman*, 924 F.3d 611, 616-17 (1st Cir. 2019); *Nystedt v. Nigo*, 700 F.3d 25, 30-31 (1st Cir. 2012); *Clapp*, 2019 WL 5864752, at *2-3; *Roberts v. Town of Scituate*, 2012 WL 2914444, at *4 (D. Mass. July 16, 2012). Moreover, although Plaintiff seeks prospective injunctive relief in addition to monetary damages, the *Ex Parte Young* exception to Eleventh Amendment state sovereign immunity, which permits a plaintiff to sue a state official in his official capacity "to remedy a state officer's ongoing violation of federal law," *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73 n.16 (1996), is not available because there is no ongoing violation of federal law.

an alien has been 'helpful' is not an objective determination that can be made ministerially." *Id.*

(quoting 8 U.S.C. § 1184(p)(1)). The ultimate issuance of a U-Visa is also discretionary. *See Torres-*

*Tristan v. Holder*, 656 F.3d 653, 656 n.3 (7th Cir. 2011) ("A person who meets the statutory criteria

[for a U-Visa] is only eligible for such a visa, not entitled to one as a matter of right. The relevant

statutes and regulations leave the final decision to the discretion of DHS."); *see also Maldonado-*

*Guzman v. Sessions*, 715 Fed. App'x 277, 284-85 (4th Cir. 2017) ("U visas are a discretionary form of

relief. . . . Thus, [the plaintiff's] U visa application does not create a liberty or property interest

protected by the Due Process Clause." (citations omitted); *Shukhrat v. Sec'y of U.S. Dep't of Homeland*

*Sec.*, 634 Fed. App'x 880, 884 (3d Cir. 2015) ("Similarly, [the plaintiffs'] due process claim fails

because they are not entitled to a visa as a matter of right . . . and therefore have no claim of

entitlement to a liberty or property interest . . . ." (citations omitted)). Accordingly, Plaintiff is not

entitled to the U-Visa certification[22] or the U-Visa and, thus, lacks a constitutionally protected

interest in either.

In addition, to the extent Plaintiff asserts a substantive due process claim against these

Defendants, the actions set forth in Plaintiff's pleadings are not "so extreme and egregious as to

shock the contemporary conscience." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59-60 (1st Cir. 2020)

(internal quotation marks omitted); *Freeman v. Town of Hudson*, 714 F.3d 29, 40 (1st Cir. 2013)

(explaining that substantive due process "claims are limited to government action that, by its very

nature, shock[s] the conscience" and are "reserve[d] . . . for truly horrendous situations." (internal

quotation marks omitted)).

Accordingly, Plaintiff's § 1983 claims (Count I) will be dismissed against all Defendants.

*2.   Fraud against Sergeant Hall, Clerk-Magistrate Smith, and Chief Livingstone (Count XV)*

As to her fraud claim, Plaintiff alleges "Sergeant Hall lied to try to portray as legitimate the

---

[22] In fact, Plaintiff admits that the U-Visa "certification is not an entitlement." (Dkt. No. 343-1 at 17.)

filing of a malicious report with the UMPD by Mr. Mongeau. Sergeant Hall then misrepresented the process of having charges issued by the police on behalf of a victim by directing Plaintiff to sign a complaint application." (TAC ¶ 238.) She also alleges Clerk-Magistrate Smith "deceived Plaintiff in regard to the charges she sought in her two complaint applications against Mr. Mongeau." (*Id.*) In addition, she alleges "Chief Livingstone lied to Plaintiff on August 30, 2017 then on September 1, 2017, which misled her into believing that the reason why Clerk-Magistrate Nagle had refused to issue a complaint against the perpetrator of the April 20, 2017 felonious physical attack was because Clerk-Magistrate Nagle had found no probable cause." (*Id.*)

Under Massachusetts law, "[t]he elements of fraud consist of [1] a false representation [2] of a matter of material fact [3] with knowledge of its falsity [4] for the purpose of inducing [action] thereon, and [5] that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage." *Balles v. Babcock Power Inc.*, 70 N.E. 3d 905, 913 (Mass. 2017) (internal quotation marks omitted). Plaintiff's allegations fail to state a claim upon which relief may be granted.

First, as to Sergeant Hall, Plaintiff's claim is untimely because it is based on events which occurred in 2015. Second, in any event, the fraud claim also fails on the merits as to all these Defendants. As Defendants argue, Plaintiff has not adequately alleged false representations of material fact or detrimental reliance. In her briefing, Plaintiff argues "Sergeant Hall tricked Plaintiff via intentional misstatements to make her believe that the two-count A&B that she had reported was only a misdemeanor" (Dkt. No. 189-2 at 44), but she does not identify the specific misstatements which led her to that belief. Plaintiff also argues Sergeant Hall misled her to make her believe "that UMPD was acting on her behalf to hold accountable [Mr. Mongeau] by requesting the issuance of a criminal complaint of which he made her believe the UMPD was the complainant but which he asked Plaintiff to sign." (*Id.*) Again, however, Plaintiff does not identify the specific misrepresentations she is relying upon. Plaintiff's allegations also make clear that a UMPD officer

sought to file assault and battery charges against Mr. Mongeau, after Plaintiff's initial application was

denied for lack of probable cause, but declined to do so after being informed by Clerk-Magistrate

Smith that Plaintiff's prior application (based on the same facts) had been denied. (*See* TAC ¶ 120.)

Thus, Plaintiff's contention that Sergeant Hall, on December 22, 2015, led her to believe UMPD

was trying to hold Mr. Mongeau accountable was not materially false, at least at that time.

Plaintiff's assertions as to Clerk-Magistrate Smith and Chief Livingstone are similarly

insufficient. She argues Clerk-Magistrate Smith "fraudulently implied that the application for a

criminal complaint that Plaintiff had been asked to sign by Sergeant Hall had been filed by the

UMPD and that the UMPD was the complainant." (Dkt. No. 190 at 14.) But there is no basis to

infer such a fraudulent implication, nor has Plaintiff alleged how she relied upon any

misrepresentation or was damaged by it. To the contrary, Plaintiff subsequently filed yet another

application for a criminal complaint against Mr. Mongeau on April 20, 2017 on her own behalf.

(TAC ¶ 4.m.)

> As to Chief Livingstone, Plaintiff argues he
>
> lied to Plaintiff telling her that the case [against the second perpetrator] had been
> dismissed (and not that the complaint had not issued because it had been deferred),
> inducing her into believing that no probable cause had been found (when in fact
> probable cause had been found), lying to her by telling her that there was no reason to
> explain why the case had been dismissed, and inducing her into believing that he would
> give her the contact information of her witnesses only to renege on that promise,
> which was made to encourage Plaintiff to bring her criminal complaint application on
> her own.

(Dkt. No. 190 at 14.) But Plaintiff's allegations do not plausibly suggest intentional

misrepresentations, meant to induce reliance, and Plaintiff's actual reliance and damages resulting

therefrom. *See Balles*, 70 N.E. 3d at 913; *see also Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has

not 'show[n]' . . . 'that the pleader is entitled to relief.'" (quoting Fed. Rule Civ. Proc. 8(a)(2)). For

example, there is no basis to infer that Plaintiff detrimentally relied upon Chief Livingstone's alleged

promise to give her witness contact information between August 30, 2017 and September 1, 2017, when he purportedly reneged on this promise. There is also no basis to infer that Chief Livingstone knew and refused to provide Plaintiff with the actual reason the case against the second perpetrator was dismissed or that such information would be helpful to Plaintiff in any way.

In short, Plaintiff's allegations do not support a plausible claim of fraud against any of these Defendants. Accordingly, Count XV will be dismissed.

3. *Abuse of Process (Count XVI)*

In Count XVI, Plaintiff asserts a claim of abuse of process against Sergeant Hall, Chief Livingstone, and Clerk-Magistrate Smith. In particular, Plaintiff alleges "Sergeant Hall and Chief Livingstone abused the police procedure of bringing charges on behalf of a victim by respectively averting the issuance [of] a criminal complaint and making a misdemeanor charge disappear." (TAC ¶ 240.) Plaintiff also alleges Clerk-Magistrate Smith "abused the procedure of seeking charges as a private party, twice preventing Plaintiff from being heard on a complaint for a felony." (*Id.*) Plaintiff's allegations do not state a plausible claim for abuse of process.

"Under Massachusetts law, an abuse of process claim requires a plaintiff to show that 'process' was used for an ulterior or illegitimate purpose and resulted in damages." *Yacubian v. United States*, 750 F.3d 100, 110 (1st Cir. 2014) (quoting *Vittands v. Sudduth,* 730 N.E.2d 325, 332 (Mass. App. Ct. 2000)). The term "process" means "causing papers to be issued by a court to bring a party or property within its jurisdiction." *Id.* (quoting *Vittands*, 730 N.E.2d at 332 n.9). Accordingly, "[a]n abuse of process claim requires that the defendants participate in judicial proceedings against the plaintiff." *Jenkins v. City of Taunton*, 2017 WL 4364177, at *19 (D. Mass. Sept. 29, 2017) (internal quotation marks omitted). Here, however, no "process" was used against Plaintiff; rather, she complains about the lack of criminal process used against a third-party. Plaintiff's abuse of process claim therefore fails as a matter of law.

4.   *Conspiracy against Sergeant Hall, Clerk-Magistrate Smith, and Chief Livingstone (Count XVIII)*

In Count XVIII, Plaintiff asserts a conspiracy claim against Sergeant Hall, Clerk-Magistrate Smith, and Chief Scott Livingstone based on the contention that they "conspired to prevent Plaintiff receiving protection for her safety under the form of a U Non-immigrant Status Certification." (TAC ¶ 244.) Defendants argue this claim fails because there is no underlying tortious conduct. The court agrees.

Plaintiff has made clear that she is asserting a vicarious liability-type of conspiracy for aiding "the tortious conduct of others." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009). "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort. . . . The conspiracy consists in agreeing to, or assisting in, this underlying tort." *Id.* (citation omitted). Plaintiff identifies the underlying tort as fraud. (Dkt. No. 343-1 at 31. However, as explained above the court concludes Plaintiff fails to state a plausible claim for fraud. Accordingly, absent an underlying tort, Plaintiff's conspiracy claim fails as a matter of law. *See Snyder v. Collura*, 812 F.3d 46, 52-53 (1st Cir. 2016).

D.   Claims related to 2021 College of Education Incident

The last set of claims are those related to the 2021 incident at the College of Education. Specifically, Plaintiff asserts claims for violation of the MCRA, Mass. Gen. Laws ch. 12, § 11I, against Ms. Drumgool (Count II); violation of Title VII, 42 U.S.C. § 2000e-3(a), against UMass-Amherst, Ms. Drumgool, Dr. Gerstl-Pepin, Mr. Regan, and UMPD Chief Parham (Count V); violation of Mass. Gen. Laws ch. 151B, § 4.4 against UMass-Amherst, Ms. Drumgool, Dr. Gerstl-Pepin, Mr. Regan, and Chief Parham (Count VIII); defamation against Ms. Drumgool (Count XIV); conspiracy against Ms. Drumgool and Dr. Gerstl-Pepin (Count XVIII); and violation of Mass. Gen. Laws ch. 66, § 10(a) against Mr. Regan and Chief Parham (Count XXV). The University Defendants argue these claims fail on the merits as well, and the court agrees.

55

1. *MCRA Claim (Count II)*

As to Count II, "the MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitutions or laws has been interfered with by 'threats, intimidation or coercion.'" *Thomas v. Harrington*, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Mass. Gen. Laws ch. 12, §§ 11H, 11I). "A 'threat' means 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm'; 'intimidation' means 'putting in fear for the purpose of compelling or deterring conduct'; and 'coercion' means 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" *Id.* (quoting *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994)). "[T]he MCRA contemplates a two-part sequence: [liability may be found where] (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that [she] has the constitutional right to do." *Id.* (internal quotation marks omitted).

Here, as the University Defendants argue, "Plaintiff's pleading makes clear that she had no right to access the [College of Education] building at all, let alone the office." (Dkt. No. 177 at 17.) Plaintiff admits Dr. Washington had retired well before this incident (although she did not know), so he no longer had any right to use the office and could not authorize Plaintiff to use that office either. (Dkt. No. 171-1, Ex. 13 ¶ 13.) Moreover, the College of Education building was closed to the public during this time due to the COVID-19 pandemic, and Plaintiff did not have special authorization to access the building. (*Id.* ¶¶ 13, 17; TAC ¶ 245.) Accordingly, Plaintiff had no right to be in Dr. Washington's former office when she was allegedly threatened, intimidated, or coerced by Ms. Drumgool. In addition, given the context, Plaintiff's allegations do not plausibly rise to the level of threats, intimidation, or coercion for purposes of the MCRA. *See Meuser v. Fed. Express Corp.*, 564 F.3d 507, 520 (1st Cir. 2009). In fact, Ms. Drumgool allowed Plaintiff to leave her items in the office

for more than two additional days after the initial encounter on June 1, 2021. The court will therefore dismiss Count II.

2. *Title VII and Chapter 151B Claims based on 2021 Events (Counts V and VIII)*

Plaintiff's employment discrimination/retaliation claims based on the 2021 College of Education incident also fail. First, because there is no individual liability under Title VII, Count V will be dismissed against the individual defendants. *See Fantini*, 557 F.3d at 28-31. Second, and more fundamentally, these Title VII and Chapter 151B claims based on 2021 events are insufficiently connected to Plaintiff's employment six years earlier. In other words, Plaintiff has not plausibly alleged a causal connection between the protected conduct and the adverse action. *See Mole v. Univ. of Mass.*, 814 N.E.2d 329, 341 (Mass. 2004). Instead, Plaintiff's allegations suggest Ms. Drumgool and Dr. Gerstl-Pepin merely intended to prevent Plaintiff's continued unauthorized access to a university office. The court will therefore dismiss Counts V and VIII.

3. *Defamation against Ms. Drumgool (Count XIV)*

Plaintiff's defamation claim against Ms. Drumgool is based on the allegation that Ms. Drumgool accused Plaintiff of living in Dr. Washington's former office and stated that she requested a UMPD officer accompany her because Plaintiff "could have been violent." (Dkt. No. 171-1, Ex. 13 ¶¶ 10, 11; TAC ¶ 236.) The University Defendants argue these statements were not defamatory but, instead, were protected opinions. The court agrees.

"Because defamation requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible of being proved true or false." *Piccone*, 785 F.3d at 771. "Thus, a statement cannot be defamatory if 'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts.'" *Id.* (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir.2000)). Here, Plaintiff's allegations make clear that Ms. Drumgool was merely expressing a

subjective view, rather than claiming to be in possession of objectively verifiable facts, regarding

Plaintiff's unauthorized presence in the office and Ms. Drumgool's safety concerns. Accordingly, her

statements were not defamatory, and Count XIV will be dismissed.

    4.  *Conspiracy against Dr. Gerstl-Pepin and Ms. Drumgool (Count XVIII)*

      In Count XVIII, Plaintiff asserts a conspiracy claim against Dr. Gerstl-Pepin and Ms.

Drumgool. However, as was true with the conspiracy claim against Sergeant Hall, Clerk-Magistrate

Smith, and Chief Livingstone, this claim fails in the absence of an underlying tort. *See Snyder*, 812

F.3d at 52. Accordingly, Count XVIII will be dismissed.

    5.  *Public Records Claim (Count XXV)*

      Lastly, in Count XXV, Plaintiff asserts a claim for violation of Mass. Gen. Laws ch. 66,

§ 10(a), the Massachusetts Public Records statute, against Mr. Regan and UMPD Chief Parham,

based on their denial of her June 8, 2021 public records request as "subjects of ongoing litigation."

(TAC ¶ 261.) The University Defendants argue that "while requestors who are denied records by a

state agency can, in accord with § 10A of the statute, petition the Supervisor of Records (§ 10A(a))

and/or file a complaint in Suffolk Superior Court (§ 10A(c)), § 10A does not provide for recourse in

federal court, nor does it contemplate actions against individual defendants but rather agencies."

(Dkt. No. 177 at 20.) Plaintiff did not respond to this argument. (Dkt. No. 189-2 at 46.) The court

agrees with the University Defendants.

      Under Mass. Gen. Laws ch. 66, § 10A(a), an individual "may petition the supervisor of

records for a determination as to whether a violation [of the Public Records statute] has occurred."

*Id.* In addition, under § 10A(c), an individual "may initiate a civil action to enforce the requirements

of this chapter." Mass. Gen. Laws ch. 66, § 10A(c). However, "[a]ny action under this subsection

shall be filed in Suffolk superior court with respect to agencies and, with respect to municipalities, in

the superior court in the county in which the municipality is located." *Id.* Accordingly, as the statute

limits the private right of action for violations of the Massachusetts Public Records law to state court, Count XXV will be dismissed.[23]

V.   MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

Plaintiff has also filed a motion for leave to file a fourth amended complaint. (Dkt. No. 350.) Plaintiff explains that she is seeking another amendment to the complaint primarily because she recently learned "that it is apparently impossible to seek injunctive/equitable relief when a violation of section 1983 is asserted against a state actor <u>solely</u> in his or her personal capacity." (*Id.* at 1.) Plaintiff therefore seeks to add the employers of the individual Defendants in Count I: UMass-Amherst, the Executive Office of the Trial Court, and the Town of Amherst.

However, Plaintiff's TAC already asserts claims against the individual Defendants in their official capacities, which is the appropriate way to seek prospective injunctive relief under *Ex Parte Young. See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009) ("[T]he *Ex Parte Young* doctrine permits suits to proceed against state officers in their official capacities to compel them to comply with federal law."). Moreover, for the reasons explained above, all the underlying claims in the TAC fail on the merits.[24] Accordingly, Plaintiff's proposed amendment to add the individual defendants' employers is futile. *See Abraham*, 553 F.3d at 117 ("[I]f the proposed amendment would be futile because, as thus amended, the complaint still fails to state a claim, the district court acts within its discretion in denying the motion to amend.").

---

[23] Moreover, a Massachusetts regulation permits the Supervisor of Records to "deny an appeal, for, among other reasons if, in the opinion of the Supervisor . . . the public records in question are the subjects of disputes in active litigation, administrative hearings or mediation." 950 C.M.R. § 32.08(2)(b)(1). Here, although Plaintiff did not amend her complaint to formally include allegations and claims based on the 2021 College of Education incident and against these defendants until September of 2021, she filed a motion for a temporary restraining order on June 3, 2021 based on this incident and requested the court allow her to access Dr. Washington's former office. (*See* Dkt. No. 132.) Accordingly, this incident was clearly the subject of a dispute in active litigation by the time Plaintiff made her records request on June 8, 2021.

[24] In addition, the *Ex Parte Young* exception is not available here because there is no ongoing violation of federal law to enjoin. *See supra* note 21.

Plaintiff also seeks to add a claim for violation of 42 U.S.C. § 1985(3) for conspiracy to interfere with civil rights. (Dkt. No. 350 at 2.) However, Plaintiff provides no explanation for seeking to add this claim at this time, rather than earlier. Accordingly, given this court's earlier admonition that no further amendments to the complaint should be expected, the court denies the motion for leave to amend to the extent it seeks to add this claim. (*See* Dkt. No. 161.) *See ACA Fin. Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 56 (1st Cir. 2008) (explaining that courts may deny motions to amend based on "undue delay," among other reasons). The proposed fourth amended complaint also fails to allege how Defendants violated § 1985(3), and Plaintiff's briefing in support of the motion to amend fails to make the connection as well. Therefore, the court also concludes that the proposed amendment to add this claim is futile.

## VI. Conclusion

For these reasons, the court ALLOWS Defendants' motions to dismiss (Dkt. Nos. 176, 178, and 333) and DENIES Plaintiff's motion for leave to file a fourth amended complaint (Dkt. No. 350). This case may now be closed.

It is So Ordered.


  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge